# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| **INSTITUTE FOR PUBLIC REPRESENTATION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) | **Civil Action No. 07-2092 (JR)** |
| | ) | |
| **FEDERAL COMMUNICATIONS COMMISSION,** | ) ) | |
| **Defendant.** | ) ) | |
| _____ | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, the Federal Communications Commission, through its undersigned counsel, hereby respectfully moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on the grounds that no genuine issue of material fact exists and that Defendant is entitled to judgment as a matter of law.  In support of this motion for summary judgment, the Court is respectfully referred to the accompanying Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment, Statement of Material Facts To Which There Is No Genuine Issue, and the Declaration of Michael Perko attached hereto.

Respectfully submitted,

_/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

_/s/_ _____

JUDITH A. KIDWELL
Assistant United States Attorney
555 Fourth Street, N.W.- Civil Division
Room E4905
Washington, D.C. 20530
(202) 514-7250


Of counsel:

Michael A. Krasnow, Esq.
Office of General Counsel
Federal Communications Commission

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INSTITUTE FOR PUBLIC REPRESENTATION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 07-2092 (JR) |
| FEDERAL COMMUNICATIONS COMMISSION, | ) ) ) | |
| Defendant. | ) ) | |

### STATEMENT OF MATERIAL FACTS FOR WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Rule 7(h), defendant submits the following statement of material facts as to which there is no genuine issue:

1.    The records at issue in this case pertain to the FCC's Localism in Broadcasting Initiative and its 2006 Quadrennial Review of its broadcast ownership rules -- the newspaper/broadcast cross-ownership rule, the radio/television cross-ownership rule, the local television ownership rule, the local radio ownership rule, and the dual network rule. *See In the Matter of 2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, MB Docket No. 06-121 et al., Report and Order and Order on Reconsideration ("Media Ownership Order"), 2008 WL 294635 (released February 4, 2008).

2.    The media ownership rules are designed to foster the Commission's longstanding policies of competition, diversity, and localism. *See* Media Ownership

Order at ¶ 9; *2002 Biennial Review Order*, 18 FCC Rcd at 13627-45, ¶¶ 17-79.

3.      The FCC reviewed the broadcast ownership rules under Section 202(h) of the Telecommunications Act of 1996 ("1996 Act"), which requires the Commission to review its ownership rules (except the national television ownership limit) every four years and "determine whether any of such rules are necessary in the public interest as the result of competition." *See* Media Ownership Order at ¶ 1.

4.      Under Section 202(h), the Commission "shall repeal or modify any regulation it determines to be no longer in the public interest." *Id.*; 1996 Act, 110 Stat. at 111-12.

5.      In September 2002, the Commission commenced the statutorily mandated review of its media ownership rules (the 2002 Biennial Regulatory Review). *See* Perko Decl. at ¶ 3.

6.      In June 2003, the Commission adopted a *Report and Order and Notice of Proposed Rulemaking* which modified five of the six broadcast ownership rules reviewed in the 2002 Biennial proceeding. *Id.*

7.      The rule changes were subsequently challenged in the courts and, on September 3, 2003, in *Prometheus Radio Project v. FCC*, the U.S. Court of Appeals for the Third Circuit stayed, and subsequently remanded, some of the new media ownership rules adopted in the 2002 Biennial Review. *Id.*; 2003 WL 22052896 (3rd. Cir. 2003); 373 F.3d 372 (3rd Cir. 2004).

8.      In June 2006, in response to the *Prometheus* remand and to comply with statutory requirements, the Commission adopted a *Further Notice of Proposed Rulemaking* opening its quadrennial review of the media ownership rules. *See* Perko

Decl. at ¶ 3; 2006 WL 1699354.

9.      In August 2003, the "Localism in Broadcasting Initiative" was announced
to: (1) establish the Localism Task Force ("LTF") to conduct hearings and research and
ultimately submit a report to the Commission with recommendations, including
regulatory and legislative changes, that could promote broadcast localism; (2) encourage
low-power FM ("LPFM") station development; and (3) issue a Localism Notice of
Inquiry ("NOI").  *See* Perko Decl. at ¶ 4; 2003 WL 21976279.

10.      The Commission conducted public hearings on localism and media
ownership in 2006 and 2007.  *Id.* at ¶ 5.

11.      On December 18, 2007, the Commission adopted a *Report and Order and
Order on Reconsideration* in its Media Ownership proceeding*,* as well as a *Report on
Broadcast Localism and NPRM*.  *Id.*; Media Ownership Order at ¶¶ 1, 9.

12.      The Commission modified the newspaper/broadcast cross-ownership rule,
and generally retained the other broadcast ownership rules currently in effect.  *See* Media
Ownership Order at ¶ 1.

13.      MB was the lead bureau in all phases of the Commission's localism and
media ownership hearings and proceedings.  *See* Perko Decl. at ¶ 5.

14.      On August 10, 2006, plaintiff filed a FOIA request with the FCC seeking:

> all studies and/or proposals for studies, reports, analytical assessments,
> and factual data gathered or compiled after July 1, 2003, by the FCC or by
> outsiders under contract with the FCC, which relate in any way to the
> localism initiatives announced in August 2003 . . . or to the Commission's
> media ownership rules, including the TV ownership rule, local radio
> ownership rule, newspaper broadcast cross-ownership rule, radio cross-
> ownership rule, dual network rule, and UHF discount ("media ownership
> rules"). We request any contracts the FCC entered into with outsiders to
> conduct studies, analysis, or to provide the FCC with factual data on
> localism and/or media ownership rules. . . . We would expect that this

3

request includes any studies, data, or contracts relating to . . . [the] June 16, 2004 issuance of a "Presolicitation Notice" regarding a solicitation for monitoring "the localism content of a sampling of radio stations nationwide" . . . including but not limited to contracts with Edison Media Research, Mediaguide, and National Aircheck; and . . . any updates and/or critiques of the twelve studies released on October 1, 2002 by the FCC's Media Ownership Working Group.

*See* Perko Decl. at ¶ 6; Attachment B thereto, at 1-2 (August 10, 2006 letter from Marvin Ammori, Staff Attorney, IPR, to Shoko Hair, FOIA Officer, FCC).

15.     By letter dated August 23, 2006, plaintiff clarified its FOIA request to specify that it sought "not only completed studies but also any drafts, working papers, or similar documents (whether partial or complete)." *See* Perko Decl. at ¶ 7; Attachment C thereto (August 23, 2006 letter from Marvin Ammori to Shoko Hair).

16.     The request was assigned to the FCC's MB for processing and response. *See* Perko Decl. at ¶ 6.

17.     Plaintiff requested a fee waiver for processing its request, which was initially denied, but then granted by the FCC's Office of General Counsel after plaintiff made a supplemental filing.  *See* Perko Decl. at ¶ 10; Attachment E thereto.

18.     The Commission posted on its Internet website a broad array of records related to those proceedings. *See* Perko Decl. at ¶ 12.

19.     To process plaintiff's FOIA request, in August 2006, relevant Commission staff were contacted by email and asked to produce any and all documents and records within the scope of the IPR FOIA request within two weeks. *Id*. at ¶ 11.  Following the collection of materials, MB staff held several meetings and spent many hours reviewing documents, including not only the contracts and related materials released to plaintiff, but more than 150 additional documents that it withheld from plaintiff pursuant to various

FOIA exemptions. *Id.*

20.    MB notified four contractors of plaintiff's FOIA request as required under the Commission's rules, because the contracts that plaintiff sought contain confidential commercial information.  *See* Perko Decl. at ¶ 9; 47 C.F.R. § 0.461(d)(3).  Each contractor responded: Edison and Tribune opposed release of portions of their contracts; and Nielsen BDS and Anderson consented to the release of their contracts in full.  *Id.*

21.    On January 4, 2007, MB issued its FOIA decision, which granted in part and denied in part plaintiff's FOIA request.  *See* Perko Decl. at ¶ 13; Attachment F thereto (January 4, 2007 letter from Michael S. Perko, Chief, Office of Communications and Industry Information, Media Bureau to Marvin Ammori).

22.    MB provided plaintiff with copies of various contracts and contractual materials, redacting from the Edison and TMS contracts "commercial information includ[ing] unit pricing data, a detailed description of a proprietary 'fingerprinting' technology licensed to Edison, and an independent financial and credit evaluation of Edison." *Id.*; Attachment F at 1-4.

23.    MB referred plaintiff to numerous reports, draft reports, documents and work papers that the Commission had recently posted on the agency's Internet website, and provided plaintiff with paper copies of these records.  *See* Perko Decl. at ¶ 14; Attachment F at 2-3, *citing* www.fcc.gov/ownership/additional.html; *see also FCC Media Bureau Posts Staff Reports and Studies on Media Ownership Webpage* (Dec. 29, 2006), *available at* <http://hraunfoss.fcc.gov/ edocs_public/attachmatch/DOC-269271A1.pdf>.

24.    MB also provided to plaintiff eight DVDs containing approximately one-half of the audio recordings made by Edison under its contract with the Commission, and

indicated that the remaining audio files would be provided after they had been reviewed for sound quality and accuracy of labeling. *See* Perko Decl. at ¶ 15; Attachment F at 3. MB cautioned plaintiff that "any further copying, transmission or other distribution to any other party may be a violation of the Copyright Act." *Id.*; 17 U.S.C. §§ 101, *et seq.*

25.    MB indicated that it was withholding "approximately 1400 pages of internal Commission records that appear[ed] to be responsive to the IPR Request… includ[ing] data and data analyses; proposals and deliberations on proposals; and internal communications, including emails, memoranda and briefing papers." *See* Perko Decl. at ¶ 16; Attachment F at 4.

26.    MB explained that the factual data and data analyses withheld included "approximately 700 pages of material consisting of factual data and data analyses consisting of spreadsheets and memoranda which apply and analyze factual data from several proprietary sources…used by Commission staff to examine issues in the Localism in Broadcasting Initiative and/or the Media Ownership proceeding." *See* Perko Decl. at ¶ 17; Attachment F at 5. These materials were "obtained pursuant to agreements that generally limit the agency's ability to distribute or disclose the information to outside sources." *Id.* MB withheld these records under FOIA Exemption 4 because release "could cause financial or competitive harm to the copyright holders." *Id., citing Weisberg v. Dep't of Justice*, 631 F.2d 824, 827-28 (D.C. Cir. 1980).

27.    MB withheld under FOIA Exemption 5 "analyses of factual data created by Commission staff or outside parties under contract with the Commission" because these records "reflect the deliberative process of agency personnel and contractors." *See* Perko Decl. at ¶ 18; Attachment F at 6.

28.    Furthermore, MB withheld under Exemption 5 "approximately 700 pages of internal communications, including e-mails, memoranda and briefing papers that present and/or discuss proposals for studies or reports in connection with the Localism in Broadcasting Initiative and/or the Media Ownership proceeding." *Id.* These records included "two draft staff reports which provide an overview of the record developed in the Localism proceeding." *Id.*

29.    MB noted that no segregation and release of non-exempt material was possible. *See* Perko Decl. at ¶ 20; Attachment F at 6.

30.    On February 5, 2007, plaintiff filed an application for review (administrative appeal) of MB's FOIA decision. *See* Perko Decl. at ¶ 21; Attachment G thereto.

31.    In late February 2007, MB provided plaintiff with the full set of audio files that Edison had provided to the FCC at that time, as well as the program categorization and coding under the Edison contract (these data were subsequently posted on the FCC's media ownership website). *See* Perko Decl. at ¶ 22.

32.    On November 16, 2007, plaintiff initiated the instant lawsuit. More than twenty working days had then elapsed since the date that plaintiff filed its administrative appeal (in  February 2007).

33.    Following plaintiff's assertions in its administrative FOIA appeal that MB's disclosures were incomplete, FCC staff subsequently conducted further searches to determine if any additional records responsive to plaintiff's FOIA request exist. *See* Perko Decl. at ¶ 23.

34.    The Commission has determined that there are approximately 1,657 pages

7

of records that MB withheld from release that are at issue in this lawsuit. *See* Perko Decl. at ¶ 24.

35.    Certain records (index nos. 1, 6, 7, 35, and 207) are large computer files containing data from a proprietary and/or copyrighted source. *Id.* These records are spreadsheets of data that reflect a particular page of data, and each page is in essentially the same format as the next (with the exception of no. 207), except that the particular data contained on each page is different. *Id.*

36.    The withheld records fall into three general categories:

(1) **E-mails.** MB withheld approximately 48 pages of e-mails among Commission staff concerning the localism and media ownership studies. *See* Perko Decl at ¶ 24. Many of these e-mails contain proposals and ideas for conducting and analyzing the studies. *Id.* Other e-mails are transmitting memoranda among staff and contain comments on memoranda. *Id.*

(2) **Memoranda.** MB withheld approximately 420 pages of memoranda and briefing papers by Commission staff analyzing data, proposing studies, and reviewing ideas concerning localism and media ownership. *Id.* Also included in this category are two draft MB reports on localism. *Id.*

(3) **Data and Data Analyses.** MB withheld approximately 1327 pages of documents, spreadsheets, and analyses containing specific data. Of these 1327 pages, approximately 861 pages contain copyrighted and/or proprietary data or analyses of the copyrighted and/or proprietary data by FCC staff. *Id.*

The remaining records include preliminary materials exchanged between the FCC and Edison regarding the manner in which Edison was to perform its contract with the

FCC (the records discuss proposed data collection methods, data review and error correction proposals, and staff ideas for the contracts). *Id.* Finally, the records include information that was used in researching potential contractors to perform studies, and discuss FCC contract solicitations and proposed questions and answers for potential contractors. *See* Perko Decl at ¶ 24.

37.    The copyrighted material consists of printouts containing the results of staff searches of three electronic databases: MasterAccess (BIA), EBSCOHost Communications and Mass Media Complete (EBSCO), and EconLit (AEA) (the FCC obtains access to the EconLit database through EBSCO, not AEA). *See* Perko Decl at ¶ 26. It also includes copies of information from the publication *Cable and TV Coverage Atlas* (Warren). *Id.* Finally, the material includes a CD containing the playlists from 1000 radio stations complied by Nielsen BDS that the FCC purchased from Nielsen. *Id.* at ¶ 26.

38.    MasterAccess and the *Cable and TV Coverage Atlas* contain information on broadcast stations and cable systems, including their ownership, market position, audience, and ratings. *Id.* at ¶ 27.

39.    The EBSCO and EconLit databases contain information on scholarly publications, such as their title, authorship, and an abstract. *Id.*

40.    The FCC cannot use and disclose the copyrighted and/or proprietary records described above as it sees fit, because Commission access to and use of this information is governed by licensing agreements and/or copyright notices that preclude release under these circumstances, as discussed below. *See* Perko Decl. at ¶ 25.

41.    The BIA license limits the distribution of research using the database to

"clients." *Id*. at ¶ 29; Attachment H thereto (BIA Publications, Inc. Software License

Agreement, at 1-2) ("**YOU MAY** distribute the results of your research (reports and/or

verbal information) to clients and generally use this software for any legitimate purpose

that it was designed for…"**YOU MAY NOT** . . . grant any rights in this . . . data . . . in

any form to any person, except as provided above, without express written permission

from BIA Publications" (emphasis in original).  The license provides that "all terms and

conditions will remain in effect throughout all renewal periods that extend beyond the

first year." *Id*., Attachment H at 2.

      42.     The EBSCO license, which applies to the "Communication & Mass Media

Complete" and "EconLit" databases, provides that "[a]ll reproduction and distribution of

such printouts [of citations, abstracts, etc.] . . . shall be for internal or personal use." *See*

Perko Decl. at ¶ 30; Attachment I thereto (EBSCO Publishing License Agreement, at

I(C)).

      43.     The EconLit license provides that  "[n]o part of the database may be

duplicated in hard-copy or machine readable form without prior written consent of the

American Economic Association, except that reproduction of up to 50 print copies of

search output is permitted for use within the Subscriber's organization . . . ." *See*

<http://www.oclc.org/support /documentation/firstsearch/databases/dbdetails/details/

Econlit.htm>.

      44.     The Nielsen BDS licensing agreement provides that: "[N]BDS herein

grants Licensee a non-exclusive license to use [N]BDS Licensed Data for its internal

research purposes only. . . . Except as authorized . . . Licensee, its agents and employees

shall not make available to any third party the Licensed Data . . . . " *See* Perko Decl. at

¶ 31; Attachment J thereto (*Nielsen Broadcast Data Systems Licensed Data Agreement,* Exhibit 1 II(1)).

45.    The Commission has not published any study relying on or analyzing the data, nor has the Commission relied on it or proposed to rely on it in any proceeding, thus this limited right of disclosure has not been triggered.  *See* Perko Decl. at ¶ 31.

46.    The Commission's access to the data contained in the Warren *Cable and TV Coverage Atlas* is governed by a copyright notice.  The notice states that "[i]t is against the law to make a copy of this publication or any portion of its contents without our explicit permission."  *See* Perko Decl. at ¶ 32; Attachment K thereto (Warren Communications News, 2000 *Cable and TV Station Coverage Atlas,* at cover page).

47.    The copyrighted materials were obtained from Nielsen BDS, BIA, Warren, and EBSCO, which are commercial companies.  *See* Perko Decl. at ¶ 34.

48.    There was no requirement for these entities to provide the FCC with access to their databases or their materials, and these entities agreed to do so only in exchange for compensation and subject to certain conditions.  *See* Perko Decl. at ¶ 35.

49.    The FCC has no regulatory authority to compel the entities to provide access to this information.  *Id.*

50.    The FCC acquired at cost a conditional license of access and/or use, contingent upon the FCC honoring the non-disclosure requirements set forth in the licensing agreements and/or copyright notices.  *Id.*

51.    These entities may have terminated this arrangement and/or pursued legal action if the FCC did not abide by the terms, *e.g.*, by disclosing data to unauthorized third parties.  *Id.*

52.     The terms of the license agreements indicate that the copyright owners have substantial commercial interests that they wish to assert, and the materials in question are being withheld to protect those interests. *See* Perko Decl at ¶¶ 34, 36.

53.     Commercially valuable data that plaintiff would only be able to obtain otherwise by purchase from the copyright owners at significant cost is properly considered information that is of commercial interest to these entities and which is not customarily made available to the public. *Id.*

54.     If the government were required to release commercially valuable copyrighted or commercial information under FOIA, this would make providers of such information less likely to transact with the government, or cause them to charge exorbitant fees for the government to obtain such information. *Id.* at ¶ 37.

55.     If the government were required to release commercially valuable copyrighted or commercial information under FOIA, this would make commercial providers of such information less likely to sell it to the government, thus impairing the government's ability to obtain information that it needs to carry out its regulatory responsibilities. *See* Perko Decl at ¶ 37.

56.     The records withheld under FOIA Exemption 5 include internal e-mails and memoranda, draft MB reports on localism, and staff's analyses of the copyrighted materials. Copyrighted materials contained within the staff analyses were also withheld under FOIA Exemption 4. *See* Perko Decl at ¶ 39.

57.     The records withheld under FOIA Exemption 5 also include preliminary materials exchanged between the FCC and Edison regarding the manner in which Edison was to complete its contract with the FCC; discuss data collection methods, data review

and error correction proposals, and staff ideas for the contracts; information that was used in researching potential contractors to perform studies; and discuss FCC contract solicitations and propose questions for potential contractors. *Id.* at ¶ 42.

58.    The materials withheld under FOIA Exemption 5 here "present and/or discuss proposals for studies or reports in connection with the Localism in Broadcasting Initiative and/or the Media Ownership proceeding." *See* Perko Decl. at ¶ 39, Attachment F thereto at 6.

59.    The documents are related to Commission deliberations in the localism and media ownership areas. *Id.*

60.    The records are related to policy determinations in specific agency dockets concerning media ownership and localism on which public comment was sought and agency decisions were pending (Dockets MB 06-121, MB 04-233, MB 02-277, MM 01-235, MM 01-317, and MM 00-244), the finalization of various localism and media ownership studies, and the granting of contracts to conduct those studies. *See* Perko Decl. at ¶ 40.

61.    The deliberative process material here involves material used to make policy determinations in specific agency dockets concerning media ownership and localism, decisions regarding the finalization of various localism and media ownership studies, and decisions regarding the granting of contracts to conduct those studies. *Id.* at ¶ 41.

62.    Additionally, the records withheld under Exemption 5 contain staff discussions of the localism and media ownership drafts, and analyses of data collected, study proposals, and study results. *Id.* at ¶ 42.

63.     MB reviewed all of the records to determine whether there were any segregable portions, as required by the FOIA.  *See* Perko Decl. at ¶ 43.

64.     With respect to the vast majority of the records at issue, any non-exempt material contained therein is so inextricably intertwined with the exempt material that any attempt to segregate the non-exempt information would pose an inordinate burden on the agency and/or yield a product with little, if any, informational value.  *Id.*  With respect to index no. 207, however, the non-exempt information that would remain following segregation has been posted on the FCC's website, therefore there is no basis for the FCC to undertake this task with respect to this item.  *Id.*  For these reasons, segregation of non-exempt information is not "reasonably" achievable.  *Id.*

Respectfully submitted,


___/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


___/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


___/s/_____
JUDITH A. KIDWELL
Assistant United States Attorney
555 4th Street, N.W., Room E4905
Washington, D.C. 20530
(202) 514-7250



Of counsel:

Michael A. Krasnow, Esq.
Office of General Counsel
Federal Communications Commission

15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INSTITUTE FOR PUBLIC REPRESENTATION,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 07-2092 (JR)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff brings this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *as amended*, seeking to compel production of certain records pertaining to the Federal Communication Commission's ("FCC" or "Commission") localism initiatives and media ownership proceeding.  The Commission's Media Bureau ("MB") granted in part and denied in part plaintiff's prior administrative request for these records, finding that some records may be released, but that others are protected from disclosure in whole or in part under various FOIA exemptions.[1]

As demonstrated in this Memorandum and the attached Declaration of Michael Perko of the FCC's MB ("Perko Decl.") [Defendant's Exhibit No. 1], some of the records in dispute do not constitute "agency records" subject to disclosure under the FOIA, and

---

[1] The FCC will produce to plaintiff by May 16, 2008 the transcripts / translations of radio programming for 41 radio stations that Edison prepared and provided to the Commission under the parties' contract.  These records total approximately eighty pages, are responsive to plaintiff's FOIA request, and were in the FCC's possession on the date of plaintiff's FOIA request.  The Media Bureau inadvertently did not previously provide them to plaintiff.

others fall squarely within various FOIA exemptions.  There are no genuine issues of material fact regarding these matters, and the FCC is therefore entitled to judgment as a matter of law.

## I. <u>BACKGROUND</u>

The records at issue in this case pertain to the FCC's Localism in Broadcasting Initiative and its 2006 Quadrennial Review of its broadcast ownership rules -- the newspaper/broadcast cross-ownership rule, the radio/television cross-ownership rule, the local television ownership rule, the local radio ownership rule, and the dual network rule. *See In the Matter of 2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, MB Docket No. 06-121 et al., Report and Order and Order on Reconsideration ("Media Ownership Order"), 2008 WL 294635  (released February 4, 2008).  The media ownership rules are designed to foster the Commission's longstanding policies of competition, diversity, and localism.  *See* Media Ownership Order at ¶ 9; *2002 Biennial Review Order*, 18 FCC Rcd at 13627-45, ¶¶ 17-79.

The FCC reviewed the broadcast ownership rules under Section 202(h) of the Telecommunications Act of 1996 ("1996 Act"),[2] which requires the Commission to review its ownership rules (except the national television ownership limit) every four years and "determine whether any of such rules are necessary in the public interest as the

---

[2] *See* Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-112, and Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3 (2004) (codified at 47 U.S.C. § 303 note (2006)) ("2004 Consolidated Appropriations Act").

result of competition."[3]  *See* Media Ownership Order at ¶ 1.  Under Section 202(h), the

Commission "shall repeal or modify any regulation it determines to be no longer in the

public interest." *Id.*; 1996 Act, 110 Stat. at 111-12.

In September 2002, the Commission commenced the statutorily mandated review

of its media ownership rules (the 2002 Biennial Regulatory Review).  *See* Perko Decl. at

¶ 3.  In June 2003, the Commission adopted a *Report and Order and Notice of Proposed*

*Rulemaking* which modified five of the six broadcast ownership rules reviewed in the

2002 Biennial proceeding.  *Id.*  The rule changes were subsequently challenged in the

courts and, on September 3, 2003, in *Prometheus Radio Project v. FCC*, the U.S. Court

of Appeals for the Third Circuit stayed, and subsequently remanded, some of the new

media ownership rules adopted in the 2002 Biennial Review.  *Id.*; 2003 WL 22052896

(3rd. Cir. 2003); 373 F.3d 372 (3rd Cir. 2004).  In June 2006, in response to the

*Prometheus* remand and to comply with statutory requirements, the Commission adopted

a *Further Notice of Proposed Rulemaking* opening its quadrennial review of the media

ownership rules.  *See* Perko Decl. at ¶ 3; 2006 WL 1699354.

Meanwhile, in August 2003, the "Localism in Broadcasting Initiative" was

announced to: (1) establish the Localism Task Force ("LTF") to conduct hearings and

research and ultimately submit a report to the Commission with recommendations,

including regulatory and legislative changes, that could promote broadcast localism; (2)

encourage low-power FM ("LPFM") station development; and (3) issue a Localism

_____

[3] In 2004, Congress revised the then biennial review requirement to require such reviews quadrennially.
Congress also eliminated the national television multiple ownership rule from the quadrennial review
requirement.  *See* 2004 Consolidated Appropriations Act, 118 Stat. at 3.

Notice of Inquiry ("NOI").  *See* Perko Decl. at ¶ 4; 2003 WL 21976279.  The

Commission conducted public hearings on localism and media ownership in 2006 and

2007.  *Id.* at ¶ 5.

On December 18, 2007, the Commission adopted a *Report and Order and Order

on Reconsideration* in its Media Ownership proceeding, as well as a *Report on Broadcast

Localism and NPRM.   Id.*; Media Ownership Order at ¶¶ 1, 9.  The Commission

modified the newspaper/broadcast cross-ownership rule, and generally retained the other

broadcast ownership rules currently in effect.  *See* Media Ownership Order at ¶ 1.  MB

was the lead bureau in all phases of the Commission's localism and media ownership

hearings and proceedings.  *See* Perko Decl. at ¶ 5.

A.    **<u>Statutory Framework</u>**

The FOIA requires federal government agencies to release records to the public

upon request, unless one of nine statutory exemptions applies.  *See NLRB v. Sears,

Roebuck & Co.*, 421 U.S. 132, 136 (1975); *Gilda Industries Inc. v. United States Customs

& Border Protection Bureau*, 2006 WL 2982150 (D.D.C. 2006).  Two such exemptions

are at issue in this case:

<u>Exemption 4:</u>  FOIA Exemption 4 protects from disclosure "trade secrets and

commercial or financial information obtained from a person [that is] privileged or

confidential."  *See* 5 U.S.C. § 552(b)(4).

<u>Exemption 5</u>:  Exemption 5 covers "inter-agency or intra-agency memorandums

or letters which would not be available by law to a party other than an agency in litigation

with the agency."  *See* 5 U.S.C. § 552(b)(5).

### B.    Proceedings Before the Commission

**1.    Plaintiff's FOIA request**

On August 10, 2006, plaintiff filed a FOIA request with the FCC seeking:

> all studies and/or proposals for studies, reports, analytical assessments, and
> factual data gathered or compiled after July 1, 2003, by the FCC or by
> outsiders under contract with the FCC, which relate in any way to the
> localism initiatives announced in August 2003 . . . or to the Commission's
> media ownership rules, including the TV ownership rule, local radio
> ownership rule, newspaper broadcast cross-ownership rule, radio cross-
> ownership rule, dual network rule, and UHF discount ("media ownership
> rules"). We request any contracts the FCC entered into with outsiders to
> conduct studies, analysis, or to provide the FCC with factual data on
> localism and/or media ownership rules. . . . We would expect that this
> request includes any studies, data, or contracts relating to . . . [the] June
> 16, 2004 issuance of a "Presolicitation Notice" regarding a solicitation for
> monitoring "the localism content of a sampling of radio stations
> nationwide" . . . including but not limited to contracts with Edison Media
> Research, Mediaguide, and National Aircheck; and . . . any updates and/or
> critiques of the twelve studies released on October 1, 2002 by the FCC's
> Media Ownership Working Group.

*See* Perko Decl. at ¶ 6; Attachment B thereto, at 1-2 (August 10, 2006 letter from Marvin

Ammori, Staff Attorney, IPR, to Shoko Hair, FOIA Officer, FCC).  By letter dated

August 23, 2006, plaintiff clarified its FOIA request to specify that it sought "not only

completed studies but also any drafts, working papers, or similar documents (whether

partial or complete)."[4]  *See* Perko Decl. at ¶ 7; Attachment C thereto (August 23, 2006

letter from Marvin Ammori to Shoko Hair).  The request was assigned to the FCC's MB

for processing and response.  *See* Perko Decl. at ¶ 6.

Plaintiff's FOIA request was broad-ranging and filed in the midst of the

---

[4] Plaintiff requested a fee waiver for processing its request, which was initially denied, but then granted by
the FCC's Office of General Counsel after plaintiff made a supplemental filing.  *See* Perko Decl. at ¶ 10;
Attachment E thereto.

Commission's deliberations on localism and media ownership.  In recognition of the

importance of public availability of records concerning the localism initiative and media

ownership, the Commission posted on its Internet website a broad array of records related

to those proceedings.  *See* Perko Decl. at ¶ 12.  To process plaintiff's FOIA request, MB

attempted to locate all records responsive to IPR's broad FOIA request.  To begin the

process, in August 2006, relevant Commission staff were contacted by email and asked to

produce any and all documents and records within the scope of the IPR FOIA request

within two weeks.  *Id.* at ¶ 11.  Following the collection of materials, MB staff held

several meetings and spent many hours reviewing documents, including not only the

contracts and related materials released to plaintiff, but more than 150 additional

documents that it withheld from plaintiff pursuant to various FOIA exemptions. *Id.*

Additionally, MB notified four contractors of plaintiff's FOIA request as required

under the Commission's rules, because the contracts that plaintiff sought contain

confidential commercial information.  *See* Perko Decl. at ¶ 9; 47 C.F.R. § 0.461(d)(3).

Each contractor responded: Edison and Tribune opposed release of portions of their

contracts; and Nielsen BDS and Anderson consented to the release of their contracts in

full.  *Id.*

**2.**      **MB's FOIA decision**

On January 4, 2007, MB issued its FOIA decision, which granted in part and

denied in part plaintiff's FOIA request.  *See* Perko Decl. at ¶ 13; Attachment F thereto

(January 4, 2007 letter from Michael S. Perko, Chief, Office of Communications and

Industry Information, Media Bureau to Marvin Ammori).[5]  MB provided plaintiff with copies of various contracts and contractual materials, redacting from the Edison and TMS contracts "commercial information includ[ing] unit pricing data, a detailed description of a proprietary 'fingerprinting' technology licensed to Edison, and an independent financial and credit evaluation of Edison." *Id.*; Attachment F at 1-4.  Moreover, MB referred plaintiff to numerous reports, draft reports, documents and work papers that the Commission had recently posted on the agency's Internet website, and provided plaintiff with paper copies of these records.[6]  *See* Perko Decl. at ¶ 14; Attachment F at 2-3, *citing* www.fcc.gov/ownership/additional.html; *see also FCC Media Bureau Posts Staff Reports and Studies on Media Ownership Webpage* (Dec. 29, 2006), *available at* <http://hraunfoss.fcc.gov/ edocs_public/attachmatch/DOC-269271A1.pdf>.  MB also provided to plaintiff eight DVDs containing approximately one-half of the audio recordings made by Edison under its contract with the Commission, and indicated that the remaining audio files would be provided after they had been reviewed for sound quality and accuracy of labeling.[7]  *See* Perko Decl. at ¶ 15; Attachment F at 3.  MB cautioned plaintiff that "any further copying, transmission or other distribution to any other party may be a violation of the Copyright Act." *Id.*; 17 U.S.C. §§ 101, *et seq.*

 In addition, MB indicated that it was withholding "approximately 1400 pages of

---

[5] The FOIA Decision notes (at 1) that "[p]ursuant to ongoing discussions with . . . IPR, the date for responding to the Request was extended in light of the substantial amount of search and review time required to process the Request."  *See* Perko Decl., Attachment F at 1.

[6] Included in these records was a 4.5 megabyte zip file of "Cluster Analysis Work Papers" that was available on the Internet, but was also provided to plaintiff on a computer disk.

[7] Some of the audio files were not received from Edison until after the FOIA request was filed, but these audio files were nonetheless made available to plaintiff.

internal Commission records that appear[ed] to be responsive to the IPR Request…
includ[ing] data and data analyses; proposals and deliberations on proposals; and internal
communications, including emails, memoranda and briefing papers." *See* Perko Decl. at
¶ 16; Attachment F at 4.  MB explained that the factual data and data analyses withheld
included "approximately 700 pages of material consisting of factual data and data
analyses consisting of spreadsheets and memoranda which apply and analyze factual data
from several proprietary sources…used by Commission staff to examine issues in the
Localism in Broadcasting Initiative and/or the Media Ownership proceeding." *See* Perko
Decl. at ¶ 17; Attachment F at 5.  These materials were "obtained pursuant to agreements
that generally limit the agency's ability to distribute or disclose the information to outside
sources." *Id.*  MB withheld these records under FOIA Exemption 4 because release
"could cause financial or competitive harm to the copyright holders."[8] *Id., citing*
*Weisberg v. Dep't of Justice*, 631 F.2d 824, 827-28 (D.C. Cir. 1980).

MB also withheld under FOIA Exemption 5 "analyses of factual data created by
Commission staff or outside parties under contract with the Commission" because these
records "reflect the deliberative process of agency personnel and contractors." *See* Perko
Decl. at ¶ 18; Attachment F at 6.  Furthermore, MB withheld under Exemption 5
"approximately 700 pages of internal communications, including e-mails, memoranda
and briefing papers that present and/or discuss proposals for studies or reports in
connection with the Localism in Broadcasting Initiative and/or the Media Ownership

---

[8] In April 2008 the FCC notified the copyright holders of this litigation.

proceeding."[9]  *Id.*  These records included "two draft staff reports which provide an

overview of the record developed in the Localism proceeding."  *Id.*  Finally, MB noted

that no segregation and release of non-exempt material was possible.  *See* Perko Decl. at ¶

20; Attachment F at 6.

3.    **Plaintiff's administrative appeal and MB's additional release of records**

    On February 5, 2007, plaintiff filed an application for review (administrative

appeal) of MB's FOIA decision.  *See* Perko Decl. at ¶ 21; Attachment G thereto.  In late

February 2007, MB provided plaintiff with the full set of audio files that Edison had

provided to the FCC at that time, as well as the program categorization and coding under

the Edison contract (these data were subsequently posted on the FCC's media ownership

website).  *See* Perko Decl. at ¶ 22.

    On November 16, 2007, plaintiff initiated the instant lawsuit.  More than twenty

working days had then elapsed since the date that plaintiff filed its administrative appeal

(in  February 2007), thus plaintiff has constructively exhausted its administrative

remedies.  *See* 5 U.S.C. § 552(a)(6)(A) (setting forth deadlines for agency responses to

FOIA requests and appeals); *Oglesby v. U.S. Dept. of Army*, 920 F.2d 57, 62 (D.C. Cir.

1990) ("[i]f the agency has not responded within the statutory time limits, then, under 5

U.S.C. § 552(a)(6)(C), the requester may bring suit").

4.    <u>**Description of the Records Withheld**</u>

    Following plaintiff's assertions in its administrative FOIA appeal that MB's

_____

[9] MB acknowledged that the Commission had posted on the Commission's website other records as a matter
of its discretion that otherwise could have been withheld under FOIA Exemption 5, but stated "we will not
as a matter of our discretion release these deliberative process materials."  *See* Perko Decl. at ¶ 19.

disclosures were incomplete,[10] FCC staff subsequently conducted further searches to determine if any additional records responsive to plaintiff's FOIA request exist.  *See* Perko Decl. at ¶ 23.  The Commission has determined that there are approximately 1,657 pages of records that MB withheld from release that are at issue in this lawsuit.  *Id.* at ¶ 24.  Certain records (index nos. 1, 6, 7, 35, and 207) are large computer files containing data from a proprietary and/or copyrighted source.  *Id.*  These records are spreadsheets of data that reflect a particular page of data, and each page is in essentially the same format as the next (with the exception of no. 207), except that the particular data contained on each page is different.  The withheld records fall into three general categories:

(1) **E-mails.**  MB withheld approximately 48 pages of e-mails among Commission staff concerning the localism and media ownership studies.  *See* Perko Decl at ¶ 24.  Many of these e-mails contain proposals and ideas for conducting and analyzing the studies.  *Id.*  Other e-mails are transmitting memoranda among staff and contain comments on memoranda.  *Id.*

(2) **Memoranda.**  MB withheld approximately 420 pages of memoranda and briefing papers by Commission staff analyzing data, proposing studies, and reviewing ideas concerning localism and media ownership.  *Id.*  Also included in this category are two draft MB reports on localism. *Id.*

(3) **Data and Data Analyses.**  MB withheld approximately 1327 pages of documents, spreadsheets, and analyses containing specific data.  Of these 1327 pages, approximately 861 pages contain copyrighted and/or proprietary data or analysis of the

_____

[10] *See* Attachment G to Perko Decl. (plaintiff's administrative appeal, at 4-8).

copyrighted and/or proprietary data by FCC staff. *Id.*

The remaining records include preliminary materials exchanged between the FCC and Edison regarding the manner in which Edison was to perform its contract with the FCC (the records discuss proposed data collection methods, data review and error correction proposals, and staff ideas for the contracts). *Id.* Finally, the records include information that was used in researching potential contractors to perform studies, and discuss FCC contract solicitations and proposed questions and answers for potential contractors. *See* Perko Decl at ¶ 24. As set forth below, the FCC properly withheld from disclosure the records and information at issue.

## II. STANDARD OF REVIEW

Where no genuine dispute exists as to any material fact, summary judgment is required. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A genuine issue of material fact is one that would change the outcome of the litigation. *Id.* at 247. "The burden on the moving party may be discharged by 'showing' – that is, pointing out to the [Court] – that there is an absence of evidence to support the non-moving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987).

Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must instead proffer specific facts showing that a genuine issue exists for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, to avoid summary judgment, the plaintiff must present some objective evidence that would enable the Court to find he is entitled to relief. In *Celotex Corp. v. Catrett*, the Supreme Court held that, in responding to a proper motion for summary judgment, the

11

party who bears the burden of proof on an issue at trial must "make a sufficient showing

on an essential element of [his] case" to establish a genuine dispute. 477 U.S. 371, 322-23

(1986).

In *Anderson,* the Supreme Court explained the circumstances under which

summary judgment is appropriate:

> If the evidence is merely colorable, . . . or is not significantly
> probative, . . . summary judgment may be granted . . . [T]he mere
> existence of a scintilla of evidence in support of the Plaintiff's
> position will be insufficient; there must be evidence on which the
> jury could reasonably find for the Plaintiff.

*Anderson*, 477 U.S. at 252; *see also Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C.

Cir.1987) (the non-moving party is "required to provide evidence that would permit a

reasonable jury to find" in its favor). In *Celotex*, the Supreme Court further instructed that

the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy and inexpensive determination of every action.'" 477 U.S. at

327 (quoting Fed. R. Civ. P. 1).

The summary judgment standards set forth above also apply to FOIA cases, which

are typically decided on motions for summary judgment.[11] *See Cappabianca v.*

*Commissioner, U.S. Customs Service*, 847 F. Supp. 1558, 1562 (M.D. Fla. 1994) ("once

documents in issue are properly identified, FOIA cases should be handled on motions for

summary judgment") (citing *Miscavige v. I.R.S.*, 2 F.3d 366, 368 (11th Cir. 1993)). In a

---

[11] For purposes of summary judgment, an agency's decision to withhold information from a FOIA requester is subject to *de novo* review by the courts. *Hayden v. National Sec. Agency/Central Sec. Service*, 608 F.2d 1381, 1384 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 937 (1980).

12

FOIA suit, an agency is entitled to summary judgment once it demonstrates that no

material facts are in dispute and that each document that falls within the class requested

either has been produced, not withheld, is unidentifiable, or is exempt from disclosure.

*Students Against Genocide v. Department of State*, 257 F.3d 828, 833 (D.C. Cir. 2001);

*Weisberg v. U.S. Dept. of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980).

An agency satisfies the summary judgment requirements in a FOIA case by

providing the Court and plaintiff with affidavits or declarations and other evidence that

show that the documents are exempt from disclosure. *Hayden*, 608 F.2d at 1384; *Church

of Scientology of California v. U.S. Dept. of Army*, 611 F.2d 738, 742 (9th Cir. 1979).

Summary judgment may be awarded to an agency in a FOIA case solely on the basis of

agency affidavits [or declarations] "when the affidavits describe 'the documents and the

justifications for nondisclosure with reasonably specific detail, demonstrate that the

information withheld logically falls within the claimed exemption, and are not

controverted by either contrary evidence in the record nor by evidence of agency bad

faith.'" *Trans Union LLC v. Federal Trade Com'n*, 141 F. Supp. 2d 62, 67 (D.D.C. 2001)

(quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)); *see also

McGhee v. C.I.A.*, 697 F.2d 1095, 1102 (D.C. Cir. 1983); *Public Citizen Inc. v.

Department of State*, 100 F. Supp. 2d 10, 16 (D.D.C. 2000); *Citizens Com'n on Human

Rights v. Food and Drug Admin.*, 45 F.3d 1325, 1329 (9th Cir. 1995); *Bowen v. U.S.

Food and Drug Admin.*, 925 F.2d 1225, 1227 (9th Cir. 1991). When the pleadings,

supplemented by affidavits or declarations, show no genuine issue as to any material fact

and the defendant is entitled to judgment as a matter of law, summary judgment should be

13

granted to the defendant.  *Perry v. Block*, 684 F.2d 121 (D.C. Cir. 1982).

## III. ARGUMENT

### A.     The Copyrighted Materials Are Not Agency Records.

As stated, approximately 861 pages of the records withheld contain copyrighted data and/or analyses of the copyrighted data by FCC staff.  This material consists of printouts containing the results of staff searches of three electronic databases: MasterAccess (BIA), EBSCOHost Communications and Mass Media Complete (EBSCO), and EconLit (AEA).[12]  *See* Perko Decl at ¶ 26.  It also includes copies of information from the publication *Cable and TV Coverage Atlas* (Warren).  *Id.*  MasterAccess and the *Cable and TV Coverage Atlas* contain information on broadcast stations and cable systems, including their ownership, market position, audience, and ratings.  *Id.* at ¶ 27.  The EBSCO and EconLit databases contain information on scholarly publications, such as their title, authorship, and an abstract.  *Id.*  Finally, the material includes a CD containing the playlists from 1000 radio stations complied by Nielsen BDS that the FCC purchased from Nielsen.  *Id.* at ¶ 26.

The foregoing material is entitled to copyright protection under the Copyright Act. With respect to the electronic databases, they each possess the requisite originality for copyright protection based on the selection and arrangement of the compiled data.  *See Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 348 (1991) (factual compilations may possess the requisite originality for copyright protection based on the selection and arrangement of the compiled data.).  The databases reflect the

---

[12] The FCC obtains access to the EconLit database through EBSCO, not AEA.  *See* Perko Decl. at ¶ 26.

independent selection and arrangement of the data by the publishers and therefore contain sufficient originality to be protected by copyright. *See id.* ("The choice as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws."); *see also id.* at 358-59 ("Presumably, the vast majority of compilations will pass this test     . . . ."). Similarly, as discussed more fully below, the copyright notice for the Warren *Cable and TV Coverage Atlas* and the licensing agreement for the Nielsen BDS CD make clear that these materials too are protected by copyright.

These copyrighted materials are not "agency records" subject to release within the meaning of FOIA, and the Court therefore lacks jurisdiction to compel the FCC to release these materials. *See Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136, 150, (1980) ("[u]nder 5 U.S.C. § 552(a)(4)(B) federal jurisdiction is dependent upon a showing that an agency has (1) improperly (2) withheld (3) agency records"). The FOIA requires agencies to release upon request, with certain exceptions, "records." *See* 5 U.S.C. § 552(a)(3)(A). To constitute an agency record under the FOIA, a document must be (1) either created or obtained by an agency and (2) under agency control at the time of the FOIA request. *Tax Analysts v. United States Dep't of Justice*, 913 F. Supp. 599, 602 (D.D.C. 1996) (*Tax Analysts II*), *aff'd without opinion,* 107 F.3d 923 (D.C. Cir. 1997), *cert. denied,* 522 U.S. 931 (1997), *citing U.S. Dep't of Justice v. Tax Analysts,* 492 U.S. 136, 144-45 (1989) (*Tax Analysts I*). A four-factor test is used in this Circuit to evaluate whether an agency "controls" a record: 1) the intent of the document's creator to retain or

15

relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.  *See In Defense of Animals v. National Institutes of Health*, --- F.Supp.2d ----, 2008 WL 1708413 (D.D.C. 2008), citing *Burka v. U.S. Dep't of Health and Human Services,* 87 F.3d 508, 515 (D.C. Cir. 1996) (quoting *Tax Analysts v. Dep't of Justice,* 845 F.2d 1060, 1069 (D.C. Cir. 1988)).

    The materials that the FCC obtained from BIA, EBSCO, Warren, and Nielsen BDS do not constitute agency records and are not subject to disclosure pursuant to a FOIA request because they are not under the FCC's control.  Commission access to the electronic databases is governed by licensing agreements that reflect the proprietary nature of the databases under the Copyright Act, 17 U.S.C. §§ 101 *et seq.  See* Perko Decl. at ¶ 25.  The BIA license limits the distribution of research using the database to "clients."  *Id.* at ¶ 29; Attachment H thereto (BIA Publications, Inc. Software License Agreement, at 1-2) ("**YOU MAY** distribute the results of your research (reports and/or verbal information) to clients and generally use this software for any legitimate purpose that it was designed for…"**YOU MAY NOT** . . . grant any rights in this . . . data . . . in any form to any person, except as provided above, without express written permission from BIA Publications" (emphasis in original).[13]  The license provides that "all terms and

---

[13] Because FOIA requests may be filed by "any person" (*see* 5 U.S.C. § 552(a)(3)(A)), and are not limited to persons having any particular relationship with the Commission, there is no basis to deem FOIA requesters to be FCC "clients," within any reasonable definition of that term.

conditions will remain in effect throughout all renewal periods that extend beyond the first year." *Id.*, Attachment H at 2.

The EBSCO license, which applies to the "Communication & Mass Media Complete" and "EconLit" databases, provides that "[a]ll reproduction and distribution of such printouts [of citations, abstracts, etc.] . . . shall be for internal or personal use." *See* Perko Decl. at ¶ 30; Attachment I thereto (EBSCO Publishing License Agreement, at I(C)). To the extent that the specific EconLit license may apply to the EconLit data, it also prohibits disclosure. The EconLit license provides that "[n]o part of the database may be duplicated in hard-copy or machine readable form without prior written consent of the American Economic Association, except that reproduction of up to 50 print copies of search output is permitted for use within the Subscriber's organization . . . ." *See* <http://www.oclc.org/support /documentation/firstsearch/databases/dbdetails/details/ Econlit.htm>.

The Nielsen BDS licensing agreement provides that: "[N]BDS herein grants Licensee a non-exclusive license to use [N]BDS Licensed Data for its internal research purposes only. . . . Except as authorized . . . Licensee, its agents and employees shall not make available to any third party the Licensed Data . . . ." *See* Perko Decl. at ¶ 31; Attachment J thereto (*Nielsen Broadcast Data Systems Licensed Data Agreement, Exhibit 1 II(1)).*[14] Similarly, the Commission's access to the data contained in the Warren

---

[14] The agreement permits the Commission to make the data available to the public with call signs masked and, with call signs not masked, to selected third parties that have an interest in Commission orders, reports, or studies that rely on the staff's analysis of the data. *See* Perko Decl., Attachment J at Exhibit 1, section II(2) and (3). That right, however, applies only after the publication of any study that may rely on or analyzes the data or to participants or intended participants in any Commission proceeding in which the Commission relies on or proposes to rely on an analysis of the Licensed Data. *Id.* at section II(4). The

*Cable and TV Coverage Atlas* is governed by a copyright notice. The notice states that "[i]t is against the law to make a copy of this publication or any portion of its contents without our explicit permission." *See* Perko Decl. at ¶ 32; Attachment K thereto (Warren Communications News, 2000 *Cable and TV Station Coverage Atlas,* at cover page). The records' creators thus clearly intended to retain control over the copyrighted materials, and the FCC cannot use and dispose of these records as it sees fit.[15]

In addressing a FOIA request seeking copyrighted records, this court previously concluded that such materials do not constitute "agency records" within the meaning of the FOIA and that the court lacked jurisdiction to compel their release. In *Tax Analysts II*, the court held that the Department of Justice's (DOJ) JURIS database, which was subject to a copyright held by West, a legal publisher, was not an agency record. The court explained first that reference material is not the type of information to which the FOIA was intended to provide access. *See* 913 F. Supp.2d at 607. More importantly, the court concluded that because DOJ was required by the JURIS license agreement to treat JURIS as proprietary and restricted the DOJ's ability to use or disseminate the data contained in the database, DOJ lacked sufficient control over the JURIS database to make the database an agency record. *Id.* As the court stated, "[t]he question is whether the DOJ could 'use and dispose of the [data] as it [saw] fit.'" *Id.* at 603, *quoting Dow Jones*

---

Commission has not published any study relying on or analyzing the data, nor has the Commission relied on it or proposed to rely on it in any proceeding, thus this limited right of disclosure has not been triggered. *See* Perko Decl. at ¶ 31.

[15] Agency personnel have read or relied upon the records to some extent in formulating their analysis of the data contained therein, but the documents were not formally integrated into the agency's record system or files except to the extent that the materials were used and/or retained by FCC personnel for purposes of reference.

& *Company, Inc. v. General Services Administration,* 714 F. Supp. 35, 39 (D.D.C. 1989);

*see also Gilmore v. U.S. Dept. of Energy,* 4 F.Supp.2d 912 (N.D. Cal. 1998) (holding that

the U.S. Dept. of Energy lacked sufficient control over software to make it an "agency

record" under FOIA).

Because the Commission uses the BIA, EBSCO, Warren, and Nielsen BDS data

subject to similar kinds of restrictions, the materials obtained from these sources do not

constitute agency records and are not subject to disclosure pursuant to a FOIA request.[16]

Accordingly, because the information in question was not under agency control, it does

not constitute an agency record under FOIA.  *See Tax Analysts II,* 913 F. Supp.2d at 603,

citing *Goland v. CIA,* 607 F.2d 339, 347 (D.C. Cir.1979) (rejecting plaintiff's argument

that agency's possession of a document *per se* dictates document's status as an "agency

record," and holding instead that crucial question was whether document was "subject to

the free disposition of the agency"), *cert. denied,* 445 U.S. 927 (1980); *Paisley v. CIA,*

712 F.2d 686, 692-93 (D.C. Cir. 1983) (same); *Washington Post v. United States Dep't of*

*Defense,* 766 F. Supp. 1, 16-17 (D.D.C. 1991) (citing *Goland* to hold that transcript

transferred by Congress to agency for limited purpose did not become agency record

because document was not subject to free disposition of agency).

**B.     The FCC Properly Withheld the Copyrighted Materials Pursuant to**
**FOIA Exemption 4.**

Even if the records containing the copyrighted data are considered agency records

within the purview of the FOIA, they are protected from disclosure by FOIA Exemption 4

---

[16] In light of the restrictions on the FCC's use of these materials, it is not dispositive that the materials
consist of data extracted from the database or other compilations, rather than the compilations themselves,
as in *Tax Analysts II.*  The exception is the Nielsen BDS playlists, which comprise the entire compilation

19

as confidential commercial records.  This case concerns the portion of Exemption 4 that

protects confidential commercial or financial information.  *See* 5 U.S.C. § 552(b)(4).

This exemption applies when the information is "(1) commercial or financial, (2)

obtained from a person, and (3) privileged or confidential."  *Id.*; *Pub. Citizen Health

Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).  The information that the

FCC withheld from disclosure satisfies all of the foregoing criteria.

### 1.    Commercial or Financial Information

The terms "commercial" and "financial" are given their ordinary meanings for

purposes of FOIA Exemption 4.  *See Judicial Watch, Inc. v. Export-Import Bank*, 108 F.

Supp. 2d 19, 28 (D.D.C. 2000) (citing *Public Citizen Health Research Group v. FDA*,

704 F.2d 1289, 1290 (D.C. Cir. 1983), and *Washington Post Co. v. HHS*, 690 F.2d 252,

266 (D.C. Cir. 1982)).  Records are deemed to be "commercial" so long as the submitter

has a "commercial interest" in them.  *See Public Citizen*, 704 F.2d at 1290.

As discussed above, the records are copyrighted material and analysis containing

copyrighted data from several proprietary sources that the Commission obtained pursuant

to agreements that generally limit the Agency's ability to distribute or disclose the

information to outside sources.  The proprietary sources make this information available

to others for purchase at substantial cost.  This information therefore constitutes

information that is of commercial interest to the proprietary sources.

### 2.    Obtained from a Person

Records are considered to be "obtained from a person" for purposes of FOIA

---

itself, and therefore is properly withheld under *Tax Analysts II*.

Exemption 4 so long as they were submitted by a "partnership, corporation, association, or public or private organization other than an agency." *See* 5 U.S.C. § 551(2); *Allnet Communication Services, Inc. v. FCC,* 800 F. Supp. 984, 988 (D.D.C. 1992). The records here were obtained from Nielsen BDS, BIA, Warren, and EBSCO, which are commercial companies. *See* Perko Decl. at ¶ 34. The records were thus obtained from a "person" as that term applies to Exemption 4.

### 3.    Confidential Information

To determine whether information is confidential, it must first be determined whether the requested information was submitted voluntarily to the government or whether its submission was required. *See McDonnell Douglas Corp. v. NASA,* 180 F.3d 303, 304 (D.C. Cir. 1999). If the information was submitted voluntarily, then the information is "confidential for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc). If the government requires the submission of information, then the information is "confidential" if its disclosure is "likely either '(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.'" *Pub. Citizen Health Research Group v. FDA*, 185 F.3d at 903 (quoting *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974)).

The information at issue – data that the FCC obtained from proprietary sources at cost – was voluntarily submitted. As with any arms-length business transaction, there

21

was no requirement for these entities to provide the FCC with access to their databases or their materials, and these entities agreed to do so only in exchange for compensation and subject to certain conditions. *See* Perko Decl. at ¶ 35. The FCC has no regulatory authority to compel the entities to provide access to this information. *Id*. Rather, the FCC acquired at cost a conditional license of access and/or use, contingent upon the FCC honoring the non-disclosure requirements set forth in the licensing agreements and/or copyright notices. *Id*. These entities may have sought to terminate this arrangement and/or pursue legal action if the FCC did not abide by the terms, *e.g.*, by disclosing data to unauthorized third parties. *Id*. Therefore, the information should be considered voluntarily submitted for purposes of assessing confidentiality.

>    **a.    The records would customarily not be released to the public.**

The data at issue is "confidential" because the proprietary sources identified above do not customarily release such information to the public, except at substantial cost. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d at 880. FOIA Exemption 4 has been held to be applicable to certain copyrighted material that is the subject of a FOIA request. *See Gilmore v. U.S. Dep't of Energy,* 4 F. Supp.2d 912, 922 (N.D. Cal. 1998) (finding that CLERVER software would be confidential and protected by FOIA Exemption 4 if it were considered an agency record); *see also* Department of Justice, Office of Information and Privacy, *Copyrighted Material and the FOIA,* FOIA Update Vol. IV, No. 4 (Fall 1983) (*Copyrighted Material and FOIA*) (*available at* <http://www.usdoj.gov/oip/ foia_updates/Vol_IV_4/page3.htm>) ("The only appropriate approach for protecting copyrighted documents under the FOIA is through the application

of Exemption 4 . . . . ").  Documents prepared by the federal government that contain "summaries or reformulations of information supplied by a source outside of the government" may also be withheld under Exemption 4.  *See Judicial Watch, Inc. v. Export-Import Bank,* 108 F.Supp.2d 19, 28 (D.D.C. 2000) (citing *Gulf and W. Indus.,* 615 F.2d at 529-30).

Exemption 4 is correctly applied to the records at issue because the material is commercially valuable and the license agreements and notices make clear on their face that the copyright owners expect users to treat the data as proprietary and confidential. The terms of the license agreements indicate that the copyright owners have substantial commercial interests that they wish to assert, and the materials in question are being withheld to protect those interests.  *See* Perko Decl at ¶¶ 34, 36.  Commercially valuable data that plaintiff would only be able to obtain otherwise by purchase from the copyright owners at significant cost is properly considered information that is of commercial interest to these entities and which is not customarily made available to the public.  *Id.*

Moreover, if the government were required to release commercially valuable copyrighted or commercial information under FOIA, this would make providers of such information less likely to transact with the government, or cause them to charge exorbitant fees for the government to obtain such information.  *Id.* at ¶ 37.  Indeed, "[i]t is a matter of common sense that the disclosure of information the Government has secured from voluntary sources on a confidential basis will both jeopardize its continuing ability to secure such data on a cooperative basis and injure the provider's interest in preventing its unauthorized release.  *See Critical Mass Energy Project v. Nuclear Regulatory*

23

*Comm'n,* 975 F.2d at 879.  If the government were required to release commercially valuable copyrighted or commercial information under FOIA, this would make commercial providers of such information less likely to sell it to the government, thus impairing the government's ability to obtain information that it needs to carry out its regulatory responsibilities.[17]  *See* Perko Decl at ¶ 37.  As with any arms length business transaction, the proprietary sources and the contractor were not required to enter into agreements with the Commission to provide access to the data.  If these vendors determine that doing business with the FCC, regardless of pledges of confidentiality, could result in their proprietary information being disclosed, they would be less likely to do business with the FCC.  *See Comstock Int'l, Inc. v. Export-Import Bank,* 464 F. Supp. 804, 808 (D.D.C. 1979) (holding that because submitters of information were "reluctant to negotiate agreements with the agency absent assurances of confidentiality," disclosure would interfere with agency's ability to fulfill its statutory mandate).  Or they might charge an exorbitant fee to do business with the government.

The FCC relies on the proper FOIA exemptions to protect outside entities from disclosure of confidential commercial information that is submitted to the Commission. Disclosure of potentially sensitive commercial information would hinder the FCC's ability to do business with outside entities.  These entities would be reluctant to do

---

[17] The copyrighted material has "intrinsic commercial value" – it can be sold like any other commodity in the marketplace, bringing to its private owner the economic benefit of his proprietary interest. Yet, this proprietary interest can be lost when a record is submitted to the government and then requested under the FOIA, unless it is withheld as exempt.  To conclude otherwise would be to allow the ready vitiation of substantial private proprietary interests in valuable documents submitted to the government: a result surely not intended by Congress in enacting the FOIA. *Cf. Worthington Compressors, Inc. v. Costle,* 662 F.2d 45, 51 (D.C. Cir. 1981).

24

business with the FCC if it could reveal to competitors or possible customers detailed and

proprietary data that would otherwise be available only for purchase. If the information is

freely available, there is no reason for anyone to purchase it from these entities, and the

value of their copyrights effectively will have been reduced to zero. This information is

properly protected from disclosure under FOIA Exemption 4. For the above stated

reasons, the copyrighted materials in question do not comprise agency records under

FOIA and, even if they were determined to constitute agency records, they would be

exempt from disclosure under FOIA Exemption 4.

**C.     The FCC Properly Withheld The Records Pursuant to  
FOIA Exemption 5.**

The records withheld under FOIA Exemption 5 include internal e-mails and

memoranda, draft MB reports on localism, and staff's analyses of the copyrighted

materials.[18]  *See* Perko Decl at ¶ 39.  They also include preliminary materials exchanged

between the FCC and Edison regarding the manner in which Edison was to complete its

contract with the FCC; discuss data collection methods, data review and error correction

proposals, and staff ideas for the contracts; information that was used in researching

potential contractors to perform studies; and discuss FCC contract solicitations and

propose questions for potential contractors.  *Id.* at ¶ 42.  FOIA Exemption 5 permits

agencies to withhold "inter-agency or intra-agency memorandums or letters that would

not be available by law to a party . . . in litigation with the agency."  *See* 5 U.S.C. §

552(b)(5).  Under this exemption, the Commission may withhold documents "that are

---

[18] Copyrighted materials contained within the staff analyses are also properly withheld under FOIA
Exemption 4, for the reasons explained above.

25

normally privileged in the civil discovery context." *See Sears Roebuck*, 421 U.S. at 149.

The exemption incorporates several privileges, but most importantly here, includes the

deliberative process privilege. *Id.* This privilege exempts from disclosure predecisional

materials that reflect the consultative and decision-making process through which agency

policies are developed. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854,

866 (D.C. Cir. 1980) (*Coastal States*); *see also Vaughn v. Rosen*, 523 F.2d 1136, 1144

(D.C. Cir. 1975) (*Vaughn*) (predecisional materials must be part of give-and-take by

which a decision is made); *Mapother v. United States Dep't of Justice*, 3 F.3d 1533, 1537

(D.C. Cir. 1993) (deliberative process exemption covers materials that are pre-decisional

and deliberative); *Coastal States Gas*, 617 F.2d at 866 (same). Three policy purposes

constitute the bases for this privilege: (1) to encourage open, frank discussions on matters

of policy between subordinates and superiors; (2) to protect against premature disclosure

of proposed policies before they are finally adopted; and (3) to protect against the public

confusion that might result from disclosure of reasons and rationales that were not in fact

ultimately the grounds for an agency's action. *See Coastal States,* 617 F.2d at 866.

Additionally, recommendations and opinions of agency personnel expressed prior to

adoption of agency policy, including draft decisions and reports, are exempt from

disclosure under Exemption 5. *See, e.g., Sears Roebuck,* 421 U.S. at 152-53 n.18; *Access*

*Reports v. Department of Justice,* 926 F.2d 1192, 1194-95 (D.C. Cir. 1979).

The materials withheld under FOIA Exemption 5 here "present and/or discuss

proposals for studies or reports in connection with the Localism in Broadcasting Initiative

and/or the Media Ownership proceeding." *See* Perko Decl. at ¶ 39, Attachment F thereto

26

at 6.  The documents are clearly related to Commission deliberations in the localism and

media ownership areas.  *Id.*  An agency need not identify any specific decision, but it

must establish "what deliberative process is involved, and the role played by the

documents in issue in the course of that process."  *See Sears Roebuck*, 421 U.S. at 151

n.18; *Coastal States*, 617 F.2d at 868.  Here, the records are related to policy

determinations in specific agency dockets concerning media ownership and localism on

which public comment was sought and agency decisions were pending (Dockets MB 06-

121, MB 04-233, MB 02-277, MM 01-235, MM 01-317, and MM 00-244, all cited by

plaintiff in its FOIA Request), the finalization of various localism and media ownership

studies, and the granting of contracts to conduct those studies.  *See* Perko Decl. at ¶ 40.

The deliberative process material here involves material used to make policy

determinations in specific agency dockets concerning media ownership and localism,

decisions regarding the finalization of various localism and media ownership studies, and

decisions regarding the granting of contracts to conduct those studies.  *Id.* at ¶ 41.

Additionally, the records withheld under Exemption 5 contain staff discussions of the

localism and media ownership drafts, and analyses of data collected, study proposals, and

study results.  *Id.* at ¶ 42.  Such documents are quintessentially the type of records that

"reflect[s] the give-and-take of the consultative process." [19]

---

[19] The deliberative process privilege was not waived when the Chairman provided to Congress certain
internal documents.  In providing the documents, the Commission specifically stated, "The provision of
these documents to you should not be interpreted as a waiver by the Commission of any privileges with
respect to third parties."  Letter to Senator Barbara Boxer from Chairman Kevin Martin (undated).  By
providing these documents to Congress, the Commission did not waive any FOIA exemptions asserted here.
The FOIA provides that "[t]his section is not authority to withhold information from Congress."  5 U.S.C.
§ 552(d).  In *Murphy v. Dep't of the Army*, 613 F.2d 1151, 1155-56 (D.C. Cir. 1979), the D.C. Circuit
observed that if "disclosure of information to Congress [were] disclosure to the whole world," it would be
"inconsistent with the obvious purpose of the Congress to carve out for itself a special right of access to

**D.    The Records Are Not Segregable.**

The FOIA requires that, if a requested record contains information that is exempt from disclosure under one of the FOIA exemptions, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." *Oglesby*, 79 F.3d at 1176 ("[i]f a document contains exempt information, the agency must still release 'any reasonably segregable portion' after deletion of the nondisclosable portions") quoting 5 U.S.C. § 552(b); *Trans-Pac. Policing Agreement v. U.S. Customs Service*, 177 F.3d 1022, 1028 (D.C. Cir. 1999) (district courts have a duty to consider segregability in FOIA cases). Further, "[i]t has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Ctr., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).

In this case, MB reviewed all of the records to determine whether there were any segregable portions, as required by the FOIA. *See* Perko Decl. at ¶ 43; 47 C.F.R. § 0.461(f)(5) ("If there is a statutory basis for withholding part of a document only from inspection, that part will be deleted and the remainder will be made available for inspection."). The FOIA requires only "reasonable" segregation and the release of nonexempt materials. *See* 5 U.S.C. § 552(b) (emphasis supplied) ("[a]ny *reasonably segregable* portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."). With respect to

---

privileged information not shared by others." Failure to protect information disclosed to Congress "would effectively transform [this] section . . . into a congressional declassification scheme." *Id. See also Rockwell v. Dep't of Justice*, 235 F.3d 598, 604-05 (D.C. Cir. 2001) (no waiver of Exemption 5 protection for documents provided to a congressional oversight subcommittee).

the vast majority of the records at issue, any non-exempt material contained therein is so inextricably intertwined with the exempt material that any attempt to segregate the non-exempt information would pose an inordinate burden on the agency and/or yield a product with little, if any, informational value. *See* Perko Decl. at ¶ 43. With respect to index no. 207, however, the non-exempt information that would remain following segregation has been posted on the FCC's website, therefore there is no basis for the FCC to undertake this task with respect to this item. *Id.* For these reasons, segregation of non-exempt information is not "reasonably" achievable. *Id.*

## IV. <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant defendant's motion for summary judgment.

Respectfully submitted,


___/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


___/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


___/s/_____
JUDITH A. KIDWELL
Assistant United States Attorney
555 4th Street, N.W., Room E4905
Washington, D.C. 20530
(202) 514-7250

Of counsel:

Michael A. Krasnow, Esq.
Office of General Counsel
Federal Communications Commission

30

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INSTITUTE FOR PUBLIC REPRESENTATION, ) ) ) ) Plaintiff, ) ) v. ) ) FEDERAL COMMUNICATIONS COMMISSION, ) ) ) Defendant. ) ) | Civil Action No. 07-2092 (JR) |

## DECLARATION OF MICHAEL S. PERKO

1.      I am presently employed as Chief of the Office of Communications and Industry Information ("OCII"), Media Bureau ("MB"), Federal Communications Commission ("FCC" or "Commission"). I have served in this capacity since March 25, 2002, the day the Commission's former Mass Media and Cable Services Bureaus were merged to establish MB. As Chief, I direct and supervise the staff in carrying out the duties of the Office. The Office's responsibilities include responding to inquiries from Members of Congress and their staffs, preparing material for FCC personnel participating in Congressional hearings and meetings, providing analysis of legislative proposals concerning specific matters within the jurisdiction of MB, and processing Freedom of Information Act ("FOIA") requests filed with the Commission that are referred to the MB for response.

2.      The information set forth in this Declaration is based upon my official knowledge acquired in my official management position in the OCII, MB, FCC.

3.      In September 2002, the Commission commenced the statutorily mandated review of its media ownership rules (the 2002 Biennial Regulatory Review). In June 2003, the Commission adopted a *Report and Order and Notice of Proposed Rulemaking* which modified five of the six broadcast ownership rules reviewed in the 2002 Biennial proceeding. The rule changes were subsequently challenged in the courts and, on September 3, 2003, in *Prometheus Radio Project v. FCC*, the U.S. Court of Appeals for the Third Circuit stayed, and later remanded, some of the new media ownership rules adopted in the 2002 Biennial Review. In June 2006, in response to the *Prometheus* remand and to comply with statutory requirements, the Commission adopted a *Further Notice of Proposed Rulemaking* opening its quadrennial review of the media ownership rules.

4.     In August 2003, the "Localism in Broadcasting Initiative" was announced to: (1) establish the Localism Task Force ("LTF") to conduct hearings and research and ultimately submit a report to the Commission with recommendations, including regulatory and legislative changes, that could promote broadcast localism; (2) encourage low-power FM ("LPFM") station development; and (3) issue a Localism Notice of Inquiry ("NOI").

5.     The Commission conducted public hearings on localism and media ownership in 2006 and 2007. The Media Bureau was the lead bureau in all phases of the Commission's localism and media ownership hearings and proceedings. On December 18, 2007, the Commission adopted a *Report and Order and Order on Reconsideration* in its Media Ownership proceeding, as well as a *Report on Broadcast Localism and NPRM*.

**IPR's FOIA Request**

6.     On August 10, 2006, the Institute for Public Representation ("IPR") filed a request with the FCC for records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *as amended*. The request was assigned to the FCC's MB for processing and response. IPR's FOIA request sought:

> all studies and/or proposals for studies, reports, analytical assessments, and factual data gathered or compiled after July 1, 2003, by the FCC or by outsiders under contract with the FCC, which relate in any way to the localism initiatives announced in August 2003 . . . or to the Commission's media ownership rules, including the TV ownership rule, local radio ownership rule, newspaper broadcast cross-ownership rule, radio cross-ownership rule, dual network rule, and UHF discount ("media ownership rules"). We request any contracts the FCC entered into with outsiders to conduct studies, analysis, or to provide the FCC with factual data on localism and/or media ownership rules. . . . We would expect that this request includes any studies, data, or contracts relating to . . . [the] June 16, 2004 issuance of a "Presolicitation Notice" regarding a solicitation for monitoring "the localism content of a sampling of radio stations nationwide" . . . including but not limited to contracts with Edison Media Research, Mediaguide, and National Aircheck; and . . . any updates and/or critiques of the twelve studies released on October 1, 2002 by the FCC's Media Ownership Working Group.

*See* Attachment B hereto, at 1-2 (August 10, 2006 letter from Marvin Ammori, Staff Attorney, IPR, to Shoko Hair, FOIA Officer, FCC).

7.     By letter dated August 23, 2006, IPR clarified its FOIA request to specify that it sought "not only completed studies but also any drafts, working papers, or similar documents (whether partial or complete)." *See* Attachment C hereto, (August 23, 2006 letter from Marvin Ammori to Shoko Hair).

2

8.     By letter dated September 8, 2006, MB notified IPR that it required additional time to process IPR's FOIA request.  *See* Attachment D hereto (September 8, 2006 letter from Michael S. Perko to Marvin Ammori).

9.     MB notified four contractors of plaintiff's FOIA request as required under the Commission's rules, because the contracts that plaintiff sought contain confidential commercial information.  Each contractor responded: Edison and Tribune opposed release of portions of their contracts; and Nielsen BDS and Anderson consented to the release of their contracts in full.

10.     IPR requested a fee waiver for processing its request, which was initially denied, but then granted by the FCC's Office of General Counsel after IPR made a supplemental filing.  *See* Attachment E hereto (September 25, 2006 letter from Joel Kaufman, Associate General Counsel, FCC, to Angela J. Campbell, IPR).

11.     MB attempted to locate all records responsive to IPR's broad FOIA request.  To begin the process, in August 2006, relevant Commission staff was contacted by email and was requested to produce any and all documents and records within the scope of the IPR FOIA request within two weeks.  Following the collection of materials, MB staff held several meetings and spent numerous hours reviewing documents, including the contracts and related materials released to IPR, and more than 150 additional documents that it withheld from IPR pursuant to various FOIA exemptions.

12.     The Commission posted on its Internet website a broad array of records related to the Localism and Media Ownership proceedings.  *See* <www.fcc.gov/ownership/ additional.html> (70 documents  (more than 2,000 pages plus a zip file of 4.5 MB) consisting of memos, studies and reports, draft or final, regarding broadcast media ownership, minority ownership, competition in the multichannel video programming market, and localism  that were worked on over the past several years).  The studies were prepared for the now completed 2002 biennial ownership review, the now completed cable ownership proceeding, the 2003 localism initiative, and the now completed 2006 quadrennial review.  As a matter of discretion, the Commission posted in December 2006 certain internal documents that it was legally entitled to withhold under the deliberative process privilege of FOIA Exemption 5 in light of the unique circumstances present – principally, the Commission's consideration of its media ownership rules and the very strong level of public interest in the proceeding.

## MB's Administrative FOIA Decision

13.     On January 4, 2007, MB issued its FOIA decision, which granted in part and denied in part IPR's FOIA request.  *See* Attachment F hereto (January 4, 2007 letter from Michael S. Perko to Marvin Ammori).  MB provided IPR with copies of various contracts and contractual materials, redacting from the Edison and TMS contracts "commercial information includ[ing] unit pricing data, a detailed description of a proprietary 'fingerprinting' technology licensed to Edison, and an independent financial and credit evaluation of Edison." *Id*. at 1-4.

14.     MB referred IPR to numerous reports, draft reports, documents and work papers that the Commission had recently posted on its Internet website, and provided IPR with paper copies of these records. Included in these records was a 4.5 megabyte zip file of "Cluster Analysis Work Papers" that was available on the Internet but was also provided to IPR on a computer disk.   *Id.* at 2-3.

15.     MB also provided IPR with eight DVDs containing approximately one-half of the audio recordings made by Edison under its contract with the Commission, and indicated that the remaining audio files would be provided after they had been received from Edison and reviewed for sound quality and accuracy of labeling. *Id.* at 3.  Some of the audio files were not received from Edison until after the FOIA request was filed, but these audio files were nonetheless made available to IPR.  MB cautioned IPR that "any further copying, transmission or other distribution to any other party may be a violation of the Copyright Act." *Id.*; 17 U.S.C. §§ 101, *et seq.*

16.     MB indicated that it was withholding "approximately 1400 pages of internal Commission records that appear[ed] to be responsive to the IPR Request… includ[ing] data and data analyses; proposals and deliberations on proposals; and internal communications, including emails, memoranda and briefing papers." *Id.* at 4.

17.     MB withheld under FOIA Exemption 4 "approximately 700 pages of material consisting of factual data and data analyses consisting of spreadsheets and memoranda which apply and analyze factual data from several proprietary sources . . . used by Commission staff to examine issues in the Localism in Broadcasting Initiative and/or the Media Ownership proceeding." *Id.* at 5.  These materials were "obtained pursuant to agreements that generally limit the agency's ability to distribute or disclose the information to outside sources." *Id.*  MB withheld these records under FOIA Exemption 4 because release "could cause financial or competitive harm to the copyright holders." *Id.* at 5.

18.     MB also withheld under FOIA Exemption 5 "analyses of factual data created by Commission staff or outside parties under contract with the Commission" because these records "reflect the deliberative process of agency personnel and contractors." *Id.* at 6  Furthermore, MB withheld pursuant to Exemption 5 "approximately 700 pages of internal communications, including e-mails, memoranda and briefing papers that present and/or discuss proposals for studies or reports in connection with the Localism in Broadcasting Initiative and/or the Media Ownership proceeding." *Id.*   These records included "two draft staff reports which provide an overview of the record developed in the Localism proceeding." *Id.*

19.     MB acknowledged that the Commission had posted on the Commission's website other records as a matter of its discretion that otherwise could have been withheld under FOIA Exemption 5 but stated "we will not as a matter of our discretion release these deliberative process materials." *Id.*

20.     Finally, MB noted that no segregation and release of non-exempt material was

possible.  *Id.*

**IPR's Administrative Appeal of MB's FOIA decision and Subsequent Developments**

21.     On February 5, 2007, IPR filed an application for review (administrative appeal) of MB's FOIA decision.  *See* Attachment G hereto.

22.     In late February 2007, MB provided IPR the full set of audio files that Edison had provided to the FCC at that time, as well as the program categorization and coding under the Edison contract (the program categorization and coding data were subsequently posted on the FCC's media ownership website).

23.     Following IPR's assertions in its administrative appeal that MB's disclosures were incomplete, MB staff conducted further searches to determine if any additional records responsive to IPR's FOIA request exist.

24.     MB has determined that there are approximately 1,657 pages of records that MB withheld from release that are at issue in this lawsuit.  The records withheld are indexed in Attachment A hereto.  As noted in the attached index, certain records (index nos. 1, 6, 7, 35, and 207) are large computer files containing data from a proprietary and/or copyrighted source.  These records are spreadsheets of data that reflect a particular page of data, and each page is in essentially the same format as the next, except that the particular data contained on each page is different.[1]  The index sets forth the approximate size of the computer file.  The withheld records fall into three general categories:

    **(1) E-mails.**  MB withheld approximately 48 pages of e-mails among Commission staff concerning the localism and media ownership studies.  Many of these e-mails contain proposals and ideas for conducting and analyzing the studies.  Other e-mails are transmitting memoranda among staff and contain comments on memoranda.

    **(2) Memoranda.**  MB withheld approximately 420 pages of memoranda by Commission staff analyzing data, proposing studies, and reviewing ideas concerning localism and media ownership.  Also included in this category are two draft MB reports on localism.

    **(3) Data and Data Analyses.**  MB withheld approximately 1327 pages of documents, spreadsheets, and analyses containing specific data.  Of these 1327 pages, approximately 861 pages contain copyrighted and/or proprietary data or analysis of the copyrighted and/or proprietary data by FCC staff.

    The remaining records include preliminary materials exchanged between the FCC and Edison regarding the manner in which Edison was to perform its contract with the FCC (the records discuss proposed data collection methods, data review and error correction proposals, and staff ideas for the contracts).  Finally, the records include

---

[1] Index no. 207 contains data that is not all in the same format from one page to the next.

information that was used in researching potential contractors to perform studies, and discuss FCC contract solicitations and proposed questions and answers for potential contractors.

**The Copyrighted Materials**

25.     The FCC cannot use and disclose the copyrighted and/or proprietary records described above as it sees fit, because Commission access to and use of this information is governed by licensing agreements and/or copyright notices that preclude release under these circumstances, as discussed below.

26.     The records consist of the printouts containing the results of staff searches of three electronic databases: MasterAccess (BIA), EBSCOHost Communications and Mass Media Complete (EBSCO), and EconLit (the FCC obtains access to the EconLit database through EBSCO).  It also includes copies of information from the publication *Cable and TV Coverage Atlas* (Warren).   Finally, the material includes a CD containing the playlists from the 1000 stations compiled by Nielsen BDS that the FCC purchased from Nielsen.

27.     MasterAccess and the *Cable and TV Coverage Atlas* contain information on broadcast stations and cable systems, including their ownership, market position, audience, and ratings.  The EBSCO and EconLit databases contain information on scholarly publications, such as their title, authorship, and an abstract.

28.     Commission access to the electronic databases is governed by licensing agreements, as described below.

29.     The BIA license limits the distribution of research using the database. *See, e.g.,* Attachment H hereto (BIA Publications, Inc. Software License Agreement), at 1-2 ("**YOU MAY** distribute the results of your research (reports and/or verbal information) to clients and generally use this software for any legitimate purpose that it was designed for…"**YOU MAY NOT** . . . grant any rights in this . . . data . . . in any form to any person, except as provided above, without express written permission from BIA Publications" (emphasis in original).  The license provides that "all terms and conditions will remain in effect throughout all renewal periods that extend beyond the first year." *Id.* at 2.

30.     The EBSCO license, which applies to the "Communication & Mass Media Complete" and "EconLit" databases, provides that "[a]ll reproduction and distribution of such printouts [of citations, abstracts, etc.] . . . shall be for internal or personal use." *See, e.g.,* Attachment I hereto (EBSCO Publishing License Agreement), at ¶ I(C).  To the extent that the specific EconLit license may apply to the EconLit data, it also prohibits disclosure.  The EconLit license provides that  "[n]o part of the database may be duplicated in hard-copy or machine readable form without prior written consent of the American Economic Association, except that reproduction of up to 50 print copies of search output is permitted for use within the Subscriber's organization . . . ." *See*

6

<http://www.oclc.org/support/documentation/firstsearch/databases/dbdetails /details/ Econlit.htm>.

31.     The Nielsen BDS licensing agreement provides that: "[N]BDS herein grants Licensee a non-exclusive license to use [N]BDS Licensed Data for its internal research purposes only. . . . Except as authorized . . . Licensee, its agents and employees shall not make available to any third party the Licensed Data . . . . " *See, e.g.*, Attachment J hereto (*Nielsen Broadcast Data Systems Licensed Data Agreement)*, at Exhibit 1 II(1). The agreement permits the Commission to make the data available to the public with call signs masked and, with call signs not masked, to selected third parties that have an interest in Commission orders, reports, or studies that rely on the staff's analysis of the data. *Id.* at Exhibit 1 II(2) and (3). That right, however, applies only after the publication of any study that may rely on or analyzes the data or to participants or intended participants in any Commission proceeding in which the Commission relies on or proposes to rely on an analysis of the Licensed Data. *Id.* at Exhibit 1 II(4). The Commission has not published any study relying on or analyzing the data, nor has the Commission relied on it or proposed to rely on it in any proceeding, thus this limited right of disclosure has not been triggered.

32.     Similarly, the Commission's access to the data contained in the Warren *Cable and TV Coverage Atlas* is governed by a copyright notice. The notice states that "[i]t is against the law to make a copy of this publication or any portion of its contents without our explicit permission." *See, e.g.,* Attachment K hereto (Warren Communications News, 2000 *Cable and TV Station Coverage Atlas*), at cover page.

**FOIA Exemption 4**

33.     The copyrighted and/or proprietary material described above was withheld from release under FOIA Exemption 4.

34.     Nielsen BDS, BIA, Warren, and EBSCO are commercial entities. This material constitutes information that is of commercial interest to these entities and it is customarily not released to the public by the entities from whom it was obtained; it is available to others for purchase at substantial cost.

35.     There was no requirement for these entities to provide the FCC with access to their databases or materials, and these entities agreed to do so only in exchange for compensation. The FCC has no regulatory authority to compel the entities to provide access to this information. The FCC acquired at cost a conditional license of access and/or use, contingent upon the FCC honoring the non-disclosure requirements set forth in the licensing agreements and/or copyright notices. These entities may have sought to terminate this arrangement and/or pursue legal action if the Commission did not abide by the terms, *e.g.*, by disclosing data to unauthorized third parties.

36.     The material is commercially valuable and the license agreements and notices make clear that the copyright owners expect users to treat the data as proprietary and

confidential. The terms of the license agreements indicate that the copyright owners have substantial commercial interests that they wish to assert, and the materials in question are being withheld to protect those interests.

37.    If the government were required to release commercially valuable copyrighted information under FOIA, this would make commercial providers of such information less likely to sell it to the government, or cause them to charge exorbitant fees for the government to obtain such information, thus impairing the government's ability to obtain information that it needs to carry out its regulatory responsibilities.

38.    Copyrighted materials contained within the staff analyses, and the records derived from copyrighted databases under license to the Commission, were also withheld under FOIA Exemption 4, for the reasons explained above.

## FOIA Exemption 5

39.    All of the remaining categories of records, as well as staff's analyses of the copyrighted materials, were withheld under FOIA Exemption 5. These records present and/or discuss proposals for studies or reports in connection with the Localism in Broadcasting Initiative and/or the Media Ownership proceeding. The documents are related to Commission deliberations in the localism and media ownership areas.

40.    The records are related to policy determinations in specific agency dockets concerning media ownership and localism on which public comment has been sought and agency decisions were pending (Dockets MB 06-121, MB 04-233, MB 02-277, MM 01-235, MM 01-317, and MM 00-244), the finalization of various localism and media ownership studies, and the granting of contracts to conduct those studies.

41.    The deliberative process material here involves material used to make policy determinations in specific agency dockets concerning media ownership and localism on which public comment was sought, decisions regarding the finalization of various localism and media ownership studies, and decisions regarding the granting of contracts to conduct those studies. The documents were prepared in order to assist an agency decisionmaker in arriving at his decision.

42.    Additionally, the records withheld under Exemption 5 contain staff discussions of the localism and media ownership drafts, and analyses of data collected, study proposals, and study results. They also include preliminary materials exchanged between the FCC and Edison regarding the manner in which Edison was to complete its contract with the FCC; discuss data collection methods, data review and error correction proposals, and staff ideas for the contracts; information that was used in researching potential contractors to perform studies; and discuss FCC contract solicitations and propose questions for potential contractors. The documents reflect the give-and-take of the consultative process.

**Segregability**

43.    With respect to the vast majority of the records at issue, any non-exempt material contained therein is so inextricably intertwined with the exempt material that any attempt to segregate the non-exempt information would pose an inordinate burden on the agency and/or yield a product with little, if any, informational value.  With respect to index no. 207, however, the non-exempt information that would remain following segregation has been posted on the FCC's website, therefore there is no basis for the FCC to undertake this task with respect to this item.  For these reasons, segregation of non-exempt information is not "reasonably" achievable.

44.    Pursuant to 28 U.S.C. § 1746, I, Michael S. Perko, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on this ⟨9TH⟩ day of May, 2008.

Michael S. Perko

# **Attachment A**

| # | Pages / file size | Description | Exemption |
|---|---|---|---|
| 1 | 54.6 MB | A computer file of copyrighted and/or proprietary radio station song playlist data for 1,000 stations purchased from Nielsen BDS. | 4 |
| 2 | 36 | Thirty-six pages of spreadsheets created by FCC staff entitled "Selected Studies in Communications And Mass Media (Since 2003)" compiled by FCC staff from a copyrighted and/or proprietary database (EBSCOHost Communication and Mass Media Complete). | 4, 5 |
| 3 | 17 | Seventeen pages of spreadsheets created by FCC staff entitled "Economic Working Papers on Media Bureau K: Drive" surveying existing literature on media ownership. | 5 |
| 4 | 36 | Thirty-six pages of spreadsheets created by FCC staff from copyrighted and/or proprietary data (BIA) pertaining to U.S. media markets. | 4, 5 |
| 5 | 101 | One-hundred-and-one pages of spreadsheets created by FCC staff entitled "Summary of Publications" compiled from copyrighted and/or proprietary database (EconLit) surveying existing literature on media ownership | 4, 5 |
| 6 | 0.9 MB | A computer file created by FCC staff entitled "Master List of Radio Survey Sample" containing copyrighted and/or proprietary data (BIA). | 4, 5 |
| 7 | 4.1 MB | A computer file created by FCC staff from copyrighted and/or proprietary data (BIA) regarding information on radio stations from which the Edison sample was drawn. | 4, 5 |
| 8 | 2 | Two-page spreadsheet provided from Edison to FCC staff concerning data falling within contractual responsibilities for FCC staff's assessment and review. | 5 |
| 9 | 4 | Four pages of a proposed coding scheme from Edison to FCC staff. | 5 |
| 10 | 3 | Three-page document created by FCC staff entitled "Radio Localism Project (135 Unrecorded Stations)" containing copyrighted and/or proprietary data from BIA. | 4, 5 |
| 11 | 10 | Ten pages of spreadsheets created by FCC staff containing copyrighted and/or proprietary data from BIA. | 4, 5 |
| 12 | 25 | Twenty-five-page dataset created by FCC staff on June 1, 2004, from copyrighted and/or proprietary data (BIA) containing information on TV and radio stations in California and Hawaii. | 4, 5 |
| 13 | 1 | One-page dataset created by FCC staff on January 5, 2004, from copyrighted and/or proprietary source (BIA) on radio stations in the San Francisco, CA market. | 4, 5 |
| 14 | 1 | One-page spreadsheet created by FCC staff entitled "Newspaper/Broadcast Combos" created using a copyrighted third-party source (Broadcasting & Cable Yearbook) containing data on markets with newspaper-broadcast ownership combinations. | 4, 5 |
| 15 | 14 | Fourteen-page dataset created by FCC staff on June 1, 2004, from copyrighted and/or proprietary source (BIA) containing information on TV and radio stations in Maine. | 4, 5 |
| 16 | 51 | Fifty-one-page dataset created by FCC staff on June 1, 2004, from copyrighted and/or proprietary source (BIA) containing information on TV and radio stations in South Dakota, North Dakota, Iowa, Minnesota, Wyoming, Utah and Wisconsin. | 4, 5 |
| 17 | 21 | Twenty-one-page dataset created by FCC staff on October 6, | 4, 5 |

1

| | | | |
|---|---|---|---|
| | | 2003, from copyrighted and/or proprietary source (BIA) containing information on TV and radio stations in North Carolina. | |
| 18 | 4 | Four-page dataset created by FCC staff on November 5, 2003, from copyrighted and/or proprietary source (BIA) containing data on radio stations in the San Antonio, TX market. | 4, 5 |
| 19 | 6 | Six-page dataset created by FCC staff entitled "TV Stations Owned by Citadel, Corporate Media, NESPK, Inc., Pegasus and Saga Comm." created from copyrighted and/or proprietary source (BIA) containing information on TV and radio stations. | 4, 5 |
| 20 | 6 | Six-page Excel file created by FCC staff from copyrighted and/or proprietary source (BIA) concerning radio stations in radio markets located in the New York or Chicago DMAs. | 4, 5 |
| 21 | 6 | Six-page Excel file created by FCC staff from copyrighted and/or proprietary source (BIA) concerning radio stations located in counties in the New York and Chicago DMAs. | 4, 5 |
| 22 | 91 | Ninety-one pages of spreadsheets created by FCC staff entitled "Master List of Radio Survey Sample" created by FCC staff in August 2005 from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 23 | 6 | Six-page file entitled "Bin Study" created by FCC staff from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 24 | 2 | Two-page file labeled "Crosstab.rtf" created by FCC staff on March 22, 2005 from copyrighted and/or proprietary data (BIA). | 4, 5 |
| 25 | 1 | One-page file created by FCC staff entitled "Table 3: Size of Population and Sample by Strata" created from copyrighted and/or proprietary data (BIA). | 4, 5 |
| 26 | 1 | One-page spreadsheet created by FCC staff addressing preliminary Edison data. | 5 |
| 27 | 1 | Preliminary version of a one-page spreadsheet created by FCC staff documenting "bins" created from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 28 | 2 | Two pages of files created by FCC staff labeled "chart 1 no data.xls" and "chart 2 no data.xls" containing tables created from copyrighted and/or proprietary source (BIA) that illustrate audience share changes for Clear Channel stations. | 4, 5 |
| 29 | 8 | Eight pages of tables created by FCC staff entitled "Localism Project - FY 2004" created from Consolidated Data Broadcast Service (CDBS) for consideration of possible localism study. | 5 |
| 30 | 18 | Eighteen-page file created by FCC staff labeled "CrossOwnership.xls" created primarily from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 31 | 68 | Sixty-eight pages of charts created by FCC staff entitled "Summary of Unrecorded Stations on Localism Bins" created on January 23, 2006, created from copyrighted and/or proprietary source (BIA) and Edison data containing information on categories of stations. | 4, 5 |
| 32 | 6 | Six-page document created by FCC staff entitled "Bin Study" containing tables that break down select categories of radio station data from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 33 | 81 | Eighty-one-page file created by FCC staff labeled "135 Dark Stations 2-1-06.xls" containing tables (entitled "Radio Localism Project 135 Unrecorded Stations") concerning Edison data. | 5 |
| 34 | 81 | Eighty-one-page file created by FCC staff labeled "135 Dark Stations 3-13-06.xls" containing tables (entitled "Radio Localism Project 135 Unrecorded Stations") concerning Edison data. | 5 |
| 35 | 31.9 MB | A preliminary version of a computer file created by FCC staff | 4, 5 |

| | | labeled "binstudy dec_5.xls" containing a table created from copyrighted and/or proprietary source (BIA). | |
|---|---|---|---|
| 36 | 2 | Two pages of preliminary radio station data from copyrighted and/or proprietary source (BIA) entitled "Rank Changes between Spring 2002 and Spring 2004 by Rank in spring 2002" and "Change in Station's Rank in Market from Spring 2002 to Spring 2004." | 4, 5 |
| 37 | 4 | Preliminary version of a file created by FCC staff labeled "TV MKT LIST with sta count.xls" containing a four-page table of copyrighted and/or proprietary data from BIA entitled "All 210 TV Markets with Station Count." | 4, 5 |
| 38 | 16 | Sixteen-page file created by FCC staff labeled "OUTOFMARKET.xls" containing a TV data table created from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 39 | 30 | Thirty pages of data, including a five-page file labeled "Query1.xls", a four-page file labeled "Query2.xls", a four-page file labeled "Query3.xls", a five-page file labeled "Query5.xls", a two-page file labeled "Query6.xls", and a ten-page file labeled "Query7.xls." Files were created by FCC staff and contain data runs from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 40 | 1 | One-page file created by FCC staff labeled "Stations_new_Crosstab.xls" containing TV data created from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 41 | 5 | Five-page file created by FCC staff labeled "Stations_new_Crosstab1.xls" containing TV data created from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 42 | 46 | Forty-six pages of tables created by FCC staff from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 43 | 5 | Five-page file created by FCC staff labeled "STATCOUNT.TXT" containing radio data created from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 44 | 5 | Five-page file created by FCC staff containing data created from copyrighted and/or proprietary source (BIA) and two public sources (2002 FCC Media Ownership Study and the Census Bureau) for use in staff analyses of media ownership issues. | 4, 5 |
| 45 | 3 | Three-page file created by FCC staff labeled "OwnerCount.txt" containing a dataset created from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 46 | 8 | Eight-page file created by FCC staff labeled "Arbitron_Spring2005.xls" containing a radio data table created from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 47 | 6 | Six-page file created by FCC staff labeled "TV_Market_Info.xls" containing a table created from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 48 | 4 | Four-page file created by FCC staff labeled "BIA_ARBITRON.XLS" containing a table created from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 49 | 7 | Seven-page file labeled "ChangeInRank.xls" containing tables which illustrate changes in radio station rankings, and which were created from copyrighted and/or proprietary source (BIA). | 4, 5 |
| 50 | 1 | One-page e-mail among FCC staff dated July 17, 2006, subject "Literature Search for Media Ownership," discussing methods used to search copyrighted and/or proprietary databases (Communications and Mass Media Complete, EconLit, and Worldwide Political Sciences Abstract) of scholarly articles and | 4, 5 |

| | | the relevance of the search results. | |
|---|---|---|---|
| 51 | 1 | One-page e-mail among FCC staff dated July 21, 2006, subject "Final Installment of Media Ownership Literature" regarding search results from copyrighted and/or proprietary database (EBSCOHost Communication and Mass Media Complete) and a list of articles considered most relevant. | 4, 5 |
| 52 | 1 | One-page e-mail chain among FCC staff dated August 7, 2006, subject "RE: ISO input on Media Ownership Studies," discussing preliminary/draft analyses of scholarly literature on media ownership. | 5 |
| 53 | 1 | One-page e-mail between FCC staff dated August 11, 2005, subject "Top Media Owners" regarding data on companies' television, radio, and newspaper holdings, including data from proprietary source (BIA). | 4, 5 |
| 54 | 1 | One-page e-mail chain among FCC staff, dated September 2, 2005, subject "RE: BIA Radio Information????" discussing FCC analysis of radio ownership statistics from a proprietary source (BIA) as they relate to the radio ownership rule. | 4, 5 |
| 55 | 1 | One-page e-mail between FCC staff dated September 14, 2004, subject "Can you email me," discussing preliminary FCC analysis of changes in radio stations' changes in format and market share from 2002 to 2004. | 5 |
| 56 | 1 | One-page e-mail chain among FCC staff dated October 14, 2004, subject "RE: Data request," discussing radio station ownership in Maine and particular groups and owners. | 5 |
| 57 | 3 | Three-page internal FCC memorandum dated October 21, 2003, Subject: "Questions for the Radio Localism Survey," proposing questions for the radio localism survey and discussing survey design. | 5 |
| 58 | 2 | Two-page internal FCC memo/table, dated October 12, 2005, subject: "Non-recorded Stations," discussing data gathering techniques and their effect on the precision of study results and recommending and proposing optional courses of action. | 5 |
| 59 | 1 | One-page e-mail among FCC staff, dated October 18, 2005, subject "Seeking advice on the 'Lost' radio stations," discussing a memo regarding data-gathering techniques and their effect on the precision of study results and staff disagreements. | 5 |
| 60 | 1 | E-mail chain among FCC staff dated December 12, 2003, subject "RE: Your comments of the radio report draft," discussing/analyzing a draft of a report on radio ownership. | 5 |
| 61 | 15 | Internal FCC memorandum dated August 22, 2006 (with handwritten note, "10-13-04"), subject "Radio Format Change," discussing FCC staff members' assessments of data from copyrighted and/or proprietary source (BIA) and possible models to determine certain variables. | 4, 5 |
| 62 | 22 | Internal FCC memorandum dated December 8, 2004, subject "Television Affiliation Change and Fluidity," discussing staff analysis of television station data from copyrighted and/or a proprietary source (BIA). | 4, 5 |
| 63 | 15 | Internal FCC memorandum dated August 22, 2006, subject "Television Affiliation Change," discussing FCC staff members' analysis of data from copyrighted and/or proprietary source (BIA) and possible methods / models to analyze data. | 4, 5 |
| 64 | 2 | Two-page e-mail chain among FCC staff dated August 7, 2006, subject "RE: My comments on [FCC staff member's] media | 5 |

| | | | |
|---|---|---|---|
| | | ownership study proposals."  Evaluation and commentary on 2002 media ownership studies and recommended procedures for proposed studies. | |
| 65 | 4 | Four-page e-mail chain among FCC staff dated August 17, 2006, subject "RE: IAD thoughts on media ownership studies." Evaluation and comments on the strength and relevance of 2002 media ownership studies, and proposed modifications and procedures. | 5 |
| 66 | 1 | One-page e-mail chain among FCC staff dated August 10, 2006, subject "RE: Media ownership studies?"  Discussion of internal procedures related to media ownership studies. | 5 |
| 67 | 2 | Two-page e-mail among FCC staff dated August 7, 2006, subject "My comments on [FCC staff member's] media ownership study proposals."  Evaluation of relevance/usefulness of media ownership studies and proposed procedures. | 5 |
| 68 | 1 | One-page e-mail among FCC staff dated August 7, 2006, subject "Request from [FCC staff member] re thoughts on media ownership studies."  Request for staff members' evaluation/suggestions for completed/future media ownership studies, and proposals for future studies. | 5 |
| 69 | 2 | Two-page e-mail chain between FCC staff dated November 24, 2004, subject "RE: Dec. 2 Meeting."  FCC staff members suggest and discuss various proposed approaches to media ownership studies. | 5 |
| 70 | 4 | Memo between FCC staff, dated March 31, 2006, subject "Summary of Media General's Ex Parte Communication."  Staff summary, evaluation, and analysis of an *ex parte* filing. | 5 |
| 71 | 3 | Three-page e-mail among FCC staff dated August 5, 2004, subject: "Change in audience share of radio station acquired by Clear Channel since the TeleCom Act (3/96)."  Staff analysis of information from copyrighted and/or proprietary source (BIA) and evaluation of that analysis. | 4, 5 |
| 72 | 3 | Three-page internal FCC memo, dated June 26, 2004, RE: "Creating Radio Markets using Arbitron Data."  Discussion of preliminary staff analysis and conclusions using data from copyrighted and/or proprietary source (Arbitron's Maximiser Database). | 4, 5 |
| 73 | 1 | E-mail among FCC staff dated Aug. 25, 2004, subject "TV Market Share Changes."  Analysis and discussion of copyrighted and/or proprietary BIA TV market data and possible comparisons of data. | 4, 5 |
| 74 | 15 | Internal FCC memorandum, dated Nov. 9, 2004, subject "Radio Format Change," discussing FCC staff members' assessments of data from copyrighted and/or proprietary source (BIA), and preliminary opinions of what data may show. | 4, 5 |
| 75 | 2 | E-mail chain between FCC staff members dated July 8, 2004, subject "RE: [FCC staff member's] comments on [two FCC staff members'] localism paper."  Preliminary staff analysis and discussion of a localism study and suggested revisions. | 5 |
| 76 | 3 | Internal FCC memo dated April 2, 2004, subject "Do Local Owners Deliver More Localism? Some evidence from Local Broadcast News."   Preliminary analysis of suggestions for revision of a paper on localism. | 5 |
| 77 | 2 | Internal FCC memo dated June 7, 2004, subject "Research Paper: Vertical relationships and localism."  Proposal for a research paper on the effect of vertical integration on the | 5 |

| | | provision of local programming in the radio industry. | |
|---|---|---|---|
| 78 | 14 | Internal FCC memo dated January 21, 2004, subject "Revision of the sample of broadcast television stations." Revisions and discussion of sample used for a proposed localism study and suggested approaches. | 4, 5 |
| 79 | 1 | E-mail among FCC staff dated June 8, 2005, subject "TV survey, 6/8 version." E-mail discussing a revised draft survey. | 5 |
| 80 | 2 | E-mail among FCC staff dated May 31, 2006, subject "Some ideas on cross ownership," discussing thoughts regarding newspaper-broadcast cross ownership, proposed studies, comments, and possible authors. | 5 |
| 81 | 1 | E-mail between FCC staff dated June 28, 2006, subject "Eighth study," proposing content/design of a media ownership study. | 5 |
| 82 | 1 | E-mail between FCC staff dated September 6, 2005, subject "More thoughts," suggesting an approach for a study of radio ownership. | 5 |
| 83 | 1 | Email between FCC staff dated September 5, 2005, subject "Study ideas," suggesting an approach for a study of radio ownership. | 5 |
| 84 | 2 | Email chain between FCC staff Sept. 3, 2005, subject "Fw: BIA Radio Information." Discussion of copyrighted and/or proprietary data from BIA. | 4, 5 |
| 85 | 2 | Internal FCC memo dated September 2, 2005, "Re: Sources for Economic Studies," offering suggestions for the design of a cross-ownership study and potential study authors. | 5 |
| 86 | 3 | Three-page E-mail chain between FCC staff dated Sept. 2, 2005, subject "RE: authors," discussing the strengths and weaknesses of potential study authors. | 5 |
| 87 | 1 | One-page e-mail between FCC staff dated September 2, 2005, subject "Nielsen study markets," offering suggestions for the design of a study and possible authors. | 5 |
| 88 | 1 | One-page e-mail between FCC staff with handwritten notes, dated August 29, 2005, subject "Broadcast ownership," discussing suggestions and potential studies evaluating newspaper cross-ownership rules. | 5 |
| 89 | 1 | One-page e-mail between FCC staff and dated Sept. 6, 2005, subject "refinement," discussing views on modifications to the radio ownership rule. | 5 |
| 90 | 4 | Draft "Technical Appendix" of an FCC order discussing methods to be used for a media ownership study and the application of those methods to radio market data. | 5 |
| 91 | 4 | Internal FCC memo dated March 14, 2006, subject "Resolving the Issue of Non-Response." Discussion of data from Edison Media and recommendations how to use that data and/or additional data and for future approaches to working with Edison. | 5 |
| 92 | 4 | Internal FCC memo dated March 17, 2006, subject "Resolving the Issue of Non-Response." Discussing data from Edison Media and recommendations how to use that data and/or additional data and possible approaches to working with Edison in the future. | 5 |
| 93 | 4 | Internal FCC memo dated March 14, 2006, subject "Resolving the Issue of Non-Response." Discussing data from Edison Media and recommendations how to use that data and/or additional data and possible approaches to working with Edison in the future. | 5 |
| 94 | 3 | Internal FCC memo dated February 24, 2006, subject "Resolving the Issue of Non-Responses/Missing Values." Discussion of data | 5 |

| | | | |
|---|---|---|---|
| | | collection by Edison Media and economists' recommendations for how to use that data and/or additional data and recommending approaches to working with Edison. | |
| 95 | 3 | Internal FCC memo dated January 21, 2004, subject "Revision to the sample of broadcast television stations."  Discussion of sample to be used for a proposed study of TV stations and how data will be collected and procedures. | 5 |
| 96 | 1 | Internal FCC memorandum dated October 21, 2003, subject "Questions for the Radio Localism Survey," listing suggested questions for a survey. | 5 |
| 97 | 6 | Draft internal FCC memorandum dated August 15, 2006, subject "FCC Media Ownership Working Group Studies."  Summary of 12 media ownership studies released as part of FCC's 2002 Biennial Review, along with staff assessment and discussion of criticisms of the studies. | 5 |
| 98 | 7 | Draft internal FCC memo dated August 26, 2005, subject "FCC Media Ownership Working Group Studies."  Summary of 12 media ownership studies released as part of FCC's 2002 Biennial Review, along with staff assessment and discussion of criticisms of the studies. | 5 |
| 99 | 12 | Internal FCC memo dated September 1, 2005, subject "Re: Economic studies to support newspaper cross-ownership limits." Discussion of options how the FCC might design its media ownership studies and talking points on the proposed studies. | 5 |
| 100 | 1 | Internal FCC memo dated September 5, 2005, "Re: Sources for Economic Studies," discussing whom the FCC might hire for some of its media ownership studies and possible study sizes. | 5 |
| 101 | 2 | Internal FCC memo entitled "Possible Talking Points on Newspaper/Broadcast Cross-Ownership," dated 3/28/06. Proposed talking points discussing data from Media General and other possible sources of information. | 5 |
| 102 | 8 | Internal FCC memo dated April 20, 2006, subject "Re: Competition in television markets."  Discussion of design possibilities for a study of the economics of newspaper-TV cross-ownership and possible approaches. | 5 |
| 103 | 1 | E-mail among FCC staff dated April 24, 2006, subject "Competition in TV markets."  Discussion of how the FCC might design its studies of competition in broadcast TV markets. | 5 |
| 104 | 38 | Draft internal FCC memo titled "Media Ownership Rule Waivers" dated November 2005.  Includes staff summaries of compiled factual information from various sources, including proprietary/copyrighted sources (Warren, BIA, Broadcasting/Cable Yearbook 2001). | 4, 5 |
| 105 | 4 | Internal FCC memo discussing and recommending procedures for media ownership study ideas and design.  Also includes evaluative discussion of the 2002 FCC Media Ownership Studies. | 5 |
| 106 | 4 | Preliminary coding sheets that Edison created for the FCC. | 5 |
| 107 | 1 | Preliminary sample of data coding that Edison provided to the FCC. | 5 |
| 108 | 4 | Preliminary coding sheets that Edison created for the FCC. | 5 |
| 109 | 13 | Preliminary data that Edison provided to the FCC, including a detailed report of the content aired on an FM radio station. | 5 |
| 110 | 122 | Preliminary data that Edison provided to the FCC, including an account of a radio station's aired content, and information about that content. | 5 |

| 111 | 2 | FCC staff memo with handwritten title: "BDS playlist briefing paper June 2.doc, 6/16/05." Notes on research proposal, including proposed research questions, proposed methods, and proposed time frame. | 5 |
|---|---|---|---|
| 112 | 20 | Dataset containing proprietary data from BDS Nielsen. Handwritten title: "Chosen BDS Sample Final Jan 24.xls, 3/3/05." Typed title: "Sample for Nielson Study (Song Playlist)." | 4 |
| 113 | 3 | FCC staff memo entitled "Proposal for Acquiring Data to Determine Localism in Radio." Discussion of options regarding how to gather data on localism in radio, including descriptions of cost and content of MediaBase database and other options for data gathering and proposed approaches. | 5 |
| 114 | 1 | FCC staff memo titled "Measuring Local Content on the Radio." Discussion of sampling methods, possible options to obtain sample data, and projected costs of studies of localism. | 5 |
| 115 | 1 | FCC staff memo titled "Alternative Sampling Proposal for Localism in Radio" with handwritten date 2/11/04. Discusses advantages and drawbacks to an additional sampling method for studies on localism. | 5 |
| 116 | 5 | Five-page document titled "Questions from Aircheck and Responses" with handwritten date 8/31/04. Draft of the FCC's response to questions that Aircheck submitted regarding an RFP for a radio study. | 5 |
| 117 | 4 | Four-page document titled "Questions on Solicitation SOL04-000009" with handwritten "Questions from Aircheck and responses.doc, 8/26/04." Discusses efficiency, completeness, costs, schedule, and other issues and possibilities in response to RFP for a radio study. | 5 |
| 118 | 2 | Internal FCC memo dated 9/9/04 discussing a proposal to purchase data from Nielsen Broadcast Data Systems, including cost and number of stations to be included. | 5 |
| 119 | 2 | Document created by FCC staff that lists proposed coding categories, titled "Categories" with handwritten note "Categories MB 102504.doc, 10/29/04." | 5 |
| 120 | 3 | FCC staff memo titled "Research Questions for Edison Data Sample" dated 11/15/04. Discussion of goals and challenges of the study of localism in radio and limits inherent in the data collection process, followed by proposed research questions and ways to organize the data. | 5 |
| 121 | 2 | Internal FCC memo titled "Categories and Characteristics for Edison Data" dated December 3, 2004. Lists general and secondary proposed categories for study coding data. | 5 |
| 122 | 3 | Internal FCC memo titled "Overview of Edison Radio Data Gathering Project," dated 12/15/04, describing in detail the proposed design and structure of a database to be created from data gathered by Edison. | 5 |
| 123 | 1 | Internal FCC memo titled "Error Rate Proposal Meeting," dated January 12, 2006. Discussion of negotiations between FCC and Edison regarding the acceptable error rate for data Edison would collect and possible counter proposals. | 5 |
| 124 | 4 | Internal FCC memo titled "Issues on Edison's Coding of Radio Data" dated 1/12/05. Discussion of negotiation/agreement between FCC and Edison regarding the categorization and classification of data Edison would collect and possible additional items to discuss. | 5 |

| 125 | 2 | Internal FCC memo titled "Miscellaneous Stations" and "Precision Analysis for Miscellaneous Bin," both dated 2/9/05, discussing and evaluating statistical analysis and classification of ""miscellaneous" radio station data. | 5 |
|-----|---|---|---|
| 126 | 1 | Internal FCC memo titled "Analysis of Making Five Minute Shift on Variance using Simulations," dated 4/11/05, comparing possible ways that two different "assumptions" might affect statistical analysis of the Edison data. | 5 |
| 127 | 2 | Internal FCC memo titled "Outstanding Issues and Recommendations for Edison, after 5-25 Telephone Call," dated 6/2/05, discussing details of the arrangement between FCC and Edison, including suggestions and recommendations regarding several possibilities for collecting and categorizing data. | 5 |
| 128 | 3 | Internal FCC memo titled "Analysis of Adding Religious Stations to the Confidence Interval," with handwritten note "Analysis of Adding Religious Stations to the Confidence Interval II.doc, 2/23/05." Discussion of the possible effect on the analysis of the Edison data if additional "religious" format stations were added to the sample, including copyrighted and/or proprietary data from BIA. | 4, 5 |
| 129 | 16 | Early draft of the technical appendix to an FCC localism study. Document entitled "Localism Technical Appendix: Sampling," and analysis of copyrighted data. | 4, 5 |
| 130 | 5 | Draft version of a letter to radio station operators from the FCC Localism Task Force dated January 4, 2005 and draft of the enclosure. Enclosure is titled "Background Information on the Survey and Questionnaire" and discusses proposed methodology of study. | 5 |
| 131 | 1 | Internal FCC memo titled "Localism Fields and Other Issues, June 6, 2005" discussing ways that the FCC might refine the categories that Edison would use to collect data for FCC localism study. | 5 |
| 132 | 2 | Internal FCC memo "Summary of meeting with Tom Webster on September 9, 2005," discussing meeting between FCC and external contractor regarding progress in gathering of study data. | 5 |
| 133 | 2 | Internal FCC memo titled "Edison Data Quality Control Plan," handwritten date 9/13/05. Preliminary discussion of how the FCC localism staff would measure and test the percentage of errors in data delivered by outside contractor. | 5 |
| 134 | 3 | Preliminary document from Edison Media with headline "FCC Coding FAQ (updates in red)" and handwritten date 10/6/2005. Explains updates to coding sheets to be used in data collection for FCC study. | 5 |
| 135 | 1 | FCC staff document titled "Information Sheet for Unrecordable Stations or Segments." Preliminary version of a form to be used during data collection "for each recording segment for which [data collector] could not obtain usable audio." | 5 |
| 136 | 1 | Internal FCC memo with handwritten title, "Localism proposal.doc, 11/6/05." Proposal for study of local radio, including potential sample design, description of data-gathering techniques, and proposed budget. | 5 |
| 137 | 6 | FCC staff's draft of a questionnaire to be sent to radio stations as part of a study. Document titled "Questionnaire for Radio Stations [Version: 2/04/05]" with date 8/23/2006. | 5 |
| 138 | 2 | Internal FCC memo with handwritten title "Substitute stations re-record analysis2.doc, 2/23/06." Document discusses Edison's | 5 |

| | | | |
|---|---|---|---|
| | | difficulties obtaining audio recordings for certain radio stations potential impact on study results, and possible agreement between FCC and Edison to address the issue. | |
| 139 | 1 | FCC staff document titled "Information Sheet for Problem Stations."  Preliminary version of a form to be used during data collection "for each recording segment for which [data collector] could not obtain usable audio." | 5 |
| 140 | 2 | Internal FCC memo titled "Error Checking the Localism Data," dated 5/8/06.  Proposal for error-checking data that Edison provided to the FCC. | 5 |
| 141 | 2 | Internal FCC memo titled "Plan for Localism Data Correction" discussing error-checking and error-correction processes the FCC would use to verify the integrity of data provided from Edison, including comments on importance and challenges of error-checking and correction. | 5 |
| 142 | 2 | Internal FCC memo titled "Instructions for Auditors by Field" dated 6/6/06.  Discussion of plans for error-checking and possible instructions to FCC auditors assigned to help check Edison data for errors, as well as notes on "quality control." | 5 |
| 143 | 2 | Internal FCC memo titled "Instructions Localism Radio Project Code-Checkers (Song Titles and Artists only)."  Discussion of plans for error-checking and possible instructions for FCC auditors assigned in two specific fields, "Song Titles" and "Artists." | 5 |
| 144 | 1 | Internal FCC memo discussing proposed peer review plans for a research study by FCC staff economists and Edison Media Research. | 5 |
| 145 | 1 | Internal FCC memo discussing proposed peer review plans for a research study by FCC staff economists and BDS Nielsen. | 5 |
| 146 | 9 | Internal FCC memo with name of FCC staff member handwritten in top-right corner.  Discussion of possible media economics questions related to the Third Circuit remand of the broadcast ownership rules released on July 2, 2003 for Commission consideration. | 5 |
| 147 | 2 | Internal FCC memo discussing an FCC staff research study on localism and possible biases resulting from the way the data was collected.  Titled "Comments on the Paper 'Do Local Owners Deliver More Localism? Some Evidence From Local Broadcast News." | 5 |
| 148 | 3 | Internal FCC memo discussing an FCC staff research study including notes on the data collection and possible biases resulting from that. | 5 |
| 149 | 2 | Internal FCC memo discussing a preliminary study proposal, including methods for data collection and analysis and an estimated timeframe.  Titled "Preliminary Proposal to Measure Hours Per Week of Local Programming on Broadcast Stations." | 5 |
| 150 | 16 | Draft version of a survey titled "TV Station Survey" written by FCC staff. | 5 |
| 151 | 4 | Internal FCC memo titled "BASELINE METRICS FOR DESCRIBING LOCALISM IN THE BROADCASTING INDUSTRY (RADIO & OVER-THE-AIR TELEVISION."  Proposed project titles, brief descriptions, and suggestions as to which FCC staff members could execute the projects. | 5 |
| 152 | 2 | Internal FCC memo dated June 3, 2005.  Proposal for a study of "Localism in radio playlists" including proposed research questions, methods, and time frame for releasing a working | 5 |

| | | paper. | |
|------|-----|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-----|
| 153 | 4 | Preliminary FCC staff memo discussing proposals for several studies on media ownership, including notes on which studies likely would be done in-house and which would be done by external contractors. | 5 |
| 154 | 14 | Internal FCC memo discussing the potential for error in statistical analysis of "localism" and ways to accurately calculate and communicate statistics and findings on localism. | 5 |
| 155 | 1 | "Radio Programming on Sample Recordings," dated January 23, 2004. Preliminary FCC staff effort to code audio data recorded by FCC staff. | 5 |
| 156 | 2 | Draft internal FCC staff memo titled "Quality Control Plan." Discussion of how the FCC localism staff would measure and test the percentage of errors in data delivered by Edison | 5 |
| 157 | 2 | Draft internal FCC memo titled "Edison Data Quality Control Plan" with handwritten date "9/14." Discussion of how the FCC localism staff would measure and test the percentage of errors in data delivered by Edison. | 5 |
| 158 | 3 | Internal FCC memo, untitled, discussing 3 proposed research questions and descriptions of the studies that the author recommends for addressing those questions. | 5 |
| 159 | 3 | Internal FCC memo titled "Comments on Proposed Media Ownership Studies, [FCC staff member name]" discussing the extent to which proposed studies do or do not address questions raised by Commissioners, discussion of the nature and scope of the studies, and ways the study proposals might be revised or expanded to address key questions. | 5 |
| 160 | 2 | Internal FCC memo titled "The Nielsen Media Usage Study" discussing the Nielsen study's merits, and proposing ways to design a new version of the study that would address additional questions that emerged since the original study. | 5 |
| 161 | 3 | Internal FCC memo titled "Localism Research Timeline." Discusses agreements between FCC and outside contractors regarding timeline, nature of studies, and payment arrangements | 5 |
| 162 | 2 | "Projected Localism Projects" with handwritten date 4/19/04 and several handwritten notes. Discusses proposed projects, including suggestions as to who would execute the projects, how the data would be collected, and estimated completion dates. | 5 |
| 163 | 2 | Internal FCC memo dated November 17, 2005, discussing Localism Task Force mission, research proposals, external contracts, and budget. | 5 |
| 164 | 16 | Draft TV station survey created by FCC staff, dated June 8, 2005. | 5 |
| 165 | 6 | FCC staff draft of a questionnaire to be sent to radio stations as part of a study. Titled "Questionnaire for Radio Stations [Version: 2/04/05]." | 5 |
| 166 | 2 | Two-page list of variable names from one of the 2002 media ownership studies. | 5 |
| 167 | 4 | Preliminary FCC staff listing of variables and description of data to be gathered, including detailed notes regarding software, programming, input variables, output variables, and notes on datasets. | 5 |
| 168 | 7 | Preliminary version of a list that the FCC provided to Edison. List includes categories and examples of items that fit in each category, followed by a table in which programming segments from an FM radio station are listed by time of day and | 5 |

| | | categorized, followed by sections that note characteristics about the programming. | |
|---|---|---|---|
| 169 | 9 | Preliminary version of a list that the FCC provided to Edison. List includes categories and examples of items that fit in each category, followed by a table in which programming segments from an FM radio station are listed by time of day and categorized, followed by sections that note characteristics about the programming. | 5 |
| 170 | 2 | Preliminary description of "Religious Categories" and subcategories and of "Advertisement Categories" and subcategories that FCC staff provided to Edison. Document labeled at bottom as "Categories and Characteristics October 29 fixed.xls. Religious." | 5 |
| 171 | 3 | Preliminary list of categories and subcategories, such as "News" with subcategories "General News," "Traffic," and "Weather" that the FCC provided to Edison. Labeled at bottom as "Categories and Characteristics.xls Categories of Programming." | 5 |
| 172 | 6 | Preliminary version of a table created by FCC staff labeled "FCC Dark & Off The Air Station tracking sheet 4-3-06.xls Sheet 1." Includes data collected about radio stations, including call sign, AM/FM, frequency, city, and state. | 5 |
| 173 | 3 | Preliminary data that Edison provided as part of its contract with the FCC. Excel spreadsheet labeled "Trial Transcriptions.xls" listing call sign and a minute-by-minute account of type of programming aired and other characteristics of programming aired on an FM radio station. | 5 |
| 174 | 8 | Preliminary data that the FCC collected from Consolidated Data Broadcast System (CDBS) and used to help determine study design. Document lists AM/FM frequency, city, and state of transmitter sites within 100 miles of various FCC field offices across the United States. | 5 |
| 175 | 17 | Preliminary data that the FCC collected from Consolidated Data Broadcast System (CDBS) and used to help determine study design. Document lists AM/FM frequency, city, and state of transmitter sites within 200 miles of various FCC field offices across the United States. | 5 |
| 176 | 2 | Draft of an FCC staff memo titled "Measuring Local Content on the Radio" discussing sampling methods, ways to obtain sample data, and projected costs of studies of localism. | 5 |
| 177 | 2 | Internal FCC memo dated April 8, 2005 and titled "Proof that offsetting the start time of the segments cannot affect the expected mean of the sample." | 5 |
| 178 | 2 | Internal FCC memo ("Subject: 2005 Radio and Records Music Diversity Study") discussing research questions, background information, proposed study, and time frame for study of diversity among radio station play lists. Handwritten date 5/4/05. | 5 |
| 179 | 6 | Internal FCC memo dated August 26, 2005. "SUBJECT: 2002 Biennial Review – Media Ownership Working Group (MOWG) Studies." Discussing and assessing 12 media ownership studies released as part of the FCC's 2002 Biennial Review of broadcast ownership rules, including authors' findings, criticisms, and staff comments. | 5 |
| 180 | 3 | Internal FCC memo titled "Budget Request for Research for the Localism Task Force" discussing proposed studies and sample sizes, projected costs for data and analysis, and proposed follow- | 5 |

| | | up to the studies. | |
|---|---|---|---|
| 181 | 1 | Internal FCC memo titled "Notes from TV meeting 8/18/04" describing ideas discussed at an FCC Media Bureau meeting on TV ownership issues. | 5 |
| 182 | 2 | FCC draft memo titled "Projected Localism Projects" discussing proposed projects, including suggestions as to who would execute the projects, how the data would be collected, and estimated completion dates. | 5 |
| 183 | 6 | FCC draft memo dated August 26, 2005, "SUBJECT: 2002 Biennial Review – Media Ownership Working Group (MOWG) Studies." Discussion of 12 media ownership studies released as part of the FCC's 2002 Biennial Review of broadcast ownership rules, including authors' findings, principal criticisms, and staff comments. | 5 |
| 184 | 2 | Spreadsheet created by FCC staff from copyrighted and/or proprietary data (BIA) including information about station market, call letters, ownership, action taken, and reasons. | 4, 5 |
| 185 | 6 | Spreadsheet compiled by FCC staff from copyrighted and/or proprietary data (BIA) titled "TV Station News Contacts" listing information regarding news stations and news directors. | 4 |
| 186 | 21 | Spreadsheet compiled by FCC staff from copyrighted and/or proprietary data (BIA) titled "TV Station News Contacts" listing information regarding news stations and news directors. | 4 |
| 187 | 2 | E-mail chain among FCC staff dated March 17, 2004, subject "FW: At your mtg later today," discussing staff member's study proposal and possible methods of analysis. | 5 |
| 188 | 2 | FCC staff memo discussing study design and sampling for a possible study of localism in radio. | 5 |
| 189 | 2 | Draft memo titled "Questions and Answers to Mediabase and Edison" in which FCC staff proposes answers to questions that Mediabase and Edison asked for the purposes of preparing a bid. | 5 |
| 190 | 1 | Draft of an internal FCC memo, dated October 6, 2005, subject: "Non-recorded Stations So Far," discussing data gathering techniques and their effect on the precision of study results. | 5 |
| 191 | 5 | Draft version of a letter to radio station operators from the FCC Localism Task Force and a draft of the enclosure. Enclosure is titled "Background Information on the Survey and Questionnaire" and discusses purposes and methodology of study. | 5 |
| 192 | 6 | Spreadsheets created by FCC staff listing radio stations and their distances from FCC field offices. | 5 |
| 193 | 1 | Spreadsheet created by FCC staff listing the number of radio stations in proximity to 29 FCC field offices. | 5 |
| 194 | 2 | Two maps showing radio stations in the United States for use as part of study design for the radio study. | 5 |
| 195 | 6 | Draft Media Bureau report on broadcast localism. | 5 |
| 196 | 37 | Draft Media Bureau report on broadcast localism. | 5 |
| 197 | 1 | E-mail among FCC staff dated April 24, 2006, subject "Competition in TV markets," discussing possible ideas to identify competitive broadcast television markets. | 5 |
| 198 | 8 | Internal FCC staff memo dated April 20, 2006, subject "Re: Competition in television markets." Discusses use of standard economic techniques to approach the issue of newspaper-TV cross-ownership and possible application of these techniques. | 5 |
| 199 | 2 | Internal FCC staff memo titled "Possible Talking Points on Newspaper/ Broadcast Cross-Ownership" dated 3/28/06. | 5 |

| | | Proposed talking points regarding cross-ownership and list of two sources of additional information. | |
|---|---|---|---|
| 200 | 4 | Internal FCC staff memo proposing possible approach for examining newspaper-broadcast cross-ownership regulation, including examples of types of graphs that might be used for economic analysis. | 5 |
| 201 | 1 | Internal FCC memo dated September 7, 2005, "Re: Sources for Economic Studies." Lists and discusses possible contractors to conduct FCC media ownership studies. | 5 |
| 202 | 1 | Internal FCC memo titled "Talking Points on the Proposed Studies." Draft of talking points supporting four proposed media ownership studies. | 5 |
| 203 | 4 | Internal FCC memo discussing four proposed studies on cross-ownership issues. | 5 |
| 204 | 4 | Internal FCC memo discussing the research components of four proposed studies on cross-ownership issues. | 5 |
| 205 | 3 | Internal FCC memo dated September 1, 2005 discussing proposed research questions and studies on cross-ownership issues. | 5 |
| 206 | 3 | E-mail chain among FCC staff dated May 31, 2006, subject "Data on curtailments" containing copyrighted and/or proprietary data (BIA) and preliminary FCC staff analysis of that data. | 4, 5 |
| 207 | 1.2 MB | A computer file created by FCC staff that contains copyrighted and/or proprietary data (BIA) regarding changes in television stations' provision of news programming. This file is a collection of data from BIA and public sources covering the same subject matter. | 4, 5 |

# **Attachment B**

## Patricia Quartey

| | |
|---|---|
| **From:** | Marvin Ammori [ammorim@gmail.com] |
| **Sent:** | Thursday, August 10, 2006 3:27 PM |
| **To:** | FOIA |
| **Cc:** | Angela Campbell |
| **Subject:** | FOIA Request |
| **Attachments:** | FOIA letter ownership issues-2.pdf |

Please find FOIA request attached.

--
Marvin Ammori
Citizens Communications Center Project
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C.  20001
(202) 662-9545

*********
CONFIDENTIALITY NOTICE - This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain information that is confidential or legally privileged.  If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED.  If you have received this transmission in error, please immediately notify the sender by telephone or return e-mail and delete the original transmission and its attachments without reading or saving in any manner.  Thank you.
*********



GEORGETOWN UNIVERSITY LAW CENTER
### INSTITUTE FOR PUBLIC REPRESENTATION

Hope M. Babcock
Angela J. Campbell
David C. Vladeck
  Directors
Marvin Ammori
Jillian M. Cutler
Emma E. Garrison
Jennifer L. Prime+*
Emily Read
Kristi M. Smith
  Staff Attorneys

600 New Jersey Avenue, NW, Suite 312
Washington, DC 20001-2075
Telephone 202-662-9535
TDD: 202-662-9538
Fax 202-662-9634

August 10, 2006

Shoko Hair
FOIA Officer
Federal Communications Commission
445 12th Street, S.W., Room 1-A835
Washington, D.C. 20554

Re: **Freedom of Information Act Request**

Dear Ms. Hair:

This letter, submitted on behalf of the Institute for Public Representation ("IPR"), constitutes a request under the Freedom of Information Act, 5 U.S.C. § 552, and the applicable Federal Communications Commission ("FCC" or "Commission") regulations, 47 C.F.R. § 0.441 *et seq.*

We request all studies and/or proposals for studies, reports, analytical assessments, and factual data gathered or compiled after July 1, 2003, by the FCC or by outsiders under contract with the FCC, which relate in any way to the localism initiatives announced in August 2003, *see* Public Notice, "FCC Chairman Powell Launches 'Localism in Broadcasting' Initiative" (August 20, 2003), at http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-238057A1.pdf, or to the Commission's media ownership rules, including the TV ownership rule, local radio ownership rule, newspaper broadcast cross-ownership rule, radio television cross-ownership rule, dual network rule, and UHF discount ("media ownership rules"). We request any contracts the FCC entered into with outsiders to conduct studies, analysis, or to provide the FCC with factual data on localism and/or the media ownership rules. We are not requesting any records that have already been placed in Dockets MB 06-121, MB 04-233, MB 02-277, MM 01-235, MM 01-317, and MM 00-244.

We would expect that this request includes any studies, data, or contracts, relating to: 1) the FCC's June 16, 2004 issuance of a "Presolicitation Notice" regarding a solicitation for monitoring "the localism content of a sampling of radio stations nationwide," *see* Presolicitation Notice, available at http://www.fbo.gov/servlet/Documents/R/330520, including but not limited

*Admitted to the Indiana Bar only   +Practice Supervised by Members of the D.C. Bar

to contracts with Edison Media Research, Mediaguide, and National Aircheck; and 2) any updates and/or critiques of the twelve studies released on October 1, 2002 by the FCC's Media Ownership Working Group.  See *FCC Seeks Comment on Ownership Studies Released by Media Ownership Working Group and Establishes Comment Deadlines for 2002 Biennial Regulatory Review of Commission's Ownership Rules*, 17 FCC Rcd 19140 (2002).

We expect that the most likely locations of the requested records are in the offices of the Media Bureau, Media Ownership Task Force, Localism Task Force, Office of Strategic Planning & Policy Analysis, Office of Plans and Policy, the Office of the Chief Economist, the Industry Analysis Division, and the Chairman's Office.

We request a waiver of processing fees pursuant to 5 U.S.C. § 552(a)(4) and 47 C.F.R. § 0.470(e).  Disclosure of the information is in the public interest because it is likely to contribute significantly to the public understanding of the operations or activities of the government and is not in the commercial interest of the requesters.  IPR is a public interest legal clinic established at Georgetown University Law Center in 1971.  IPR teaches and trains law students to understand the operations and activities of government, and to participate in the process of developing or challenging government regulations.  IPR provides counsel for groups and individuals who are otherwise unable to obtain effective legal representation on matters that have a significant impact on issues of broad public importance.  IPR will not use the documents obtained pursuant to this request to further any commercial interests.

In the interest of expedition, we ask that you begin immediate processing of this request while our waiver request is reviewed.  Please be advised that, in the event that a full waiver cannot be granted, IPR will pay up to $500.00 for the cost of reproduction, so the search can proceed.  Pursuant to 47 C.F.R. § 0.470(a)(2), the reproductions costs do not include first 100 pages because IPR is an educational and noncommercial entity.

Please direct all communications regarding this request to Marvin Ammori at (202) 662-9545, ma455@law.georgetown.edu, or the address given above.  We look forward to your reply to this request within twenty business days, as provided under 5 U.S.C. § 552(a)(6)(A)(i) and 47 C.F.R. § 0.461(g).  Thank you for your assistance in this matter.

Sincerely,


Marvin Ammori
Staff Attorney

# **Attachment C**

**Patricia Quartey**

| | |
|---|---|
| **From:** | Marvin Ammori [ammorim@gmail.com] |
| **Sent:** | Thursday, August 24, 2006 10:04 AM |
| **To:** | FOIA |
| **Cc:** | Angela Campbell |
| **Subject:** | Re: FOIA Request |
| **Attachments:** | FOIA letter ownership clarification letter.pdf |

Dear Ms. Hair,
Please find attached a letter of clarification, clarifying a FOIA request we submitted on August 10, 2006.

Thank you.

On 8/10/06, **Marvin Ammori** <ammorim@gmail.com> wrote:
> Please find FOIA request attached.
>
> --
> Marvin Ammori
> Citizens Communications Center Project
> Institute for Public Representation
> Georgetown University Law Center
> 600 New Jersey Ave., N.W.
> Washington, D.C. 20001
> (202) 662-9545
>
> *********
> CONFIDENTIALITY NOTICE - This e-mail transmission, and any documents, files or previous e-
> mail messages attached to it may contain information that is confidential or legally privileged. If you
> are not the intended recipient, or a person responsible for delivering it to the intended recipient, you
> are hereby notified that you must not read this transmission and that any disclosure, copying, printing,
> distribution or use of any of the information contained in or attached to this transmission is
> STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify
> the sender by telephone or return e-mail and delete the original transmission and its attachments
> without reading or saving in any manner. Thank you.
> *********

--
Marvin Ammori
Citizens Communications Center Project
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
(202) 662-9545

2/12/2007

**********
CONFIDENTIALITY NOTICE - This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain information that is confidential or legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by telephone or return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.
**********

2/12/2007



*GEORGETOWN UNIVERSITY LAW CENTER*
## INSTITUTE FOR PUBLIC REPRESENTATION

Hope M. Babcock
Angela J. Campbell
David C. Vladeck
    Directors
Marvin Ammori
Jillian M. Cutler
Emma E. Garrison
Jennifer L. Prime+*
Emily Read
Kristi M. Smith
    Staff Attorneys

600 New Jersey Avenue, NW, Suite 312
Washington, DC 20001-2075
Telephone: 202-662-9535
TDD: 202-662-9538
Fax: 202-662-9634

August 23, 2006

Shoko Hair
FOIA Officer
Federal Communications Commission
445 12th Street, S.W., Room 1-A835
Washington, D.C. 20554

**Re: Clarification of August 10, 2003 Freedom of Information Act Request**

Dear Ms. Hair:

On August 10, 2003 the Institute for Public Representation submitted a Freedom of Information Act ("FOIA") request to the Federal Communications Commission ("Commission"). After reviewing our letter we determined that a clarification to our request may assist the Commission in producing responsive records.

Although the Commission has a duty to construe FOIA request "liberally," *see, e.g., Valencia-Lucena v. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999); *Nation Magazine, Washington Bureau v. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995); *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *Truitt v. Dep't of State*, 897 F.2d 540, 544 (D.C. Cir. 1990), and our request is not ambiguous, we clarify that our request includes not only completed studies but also any drafts, working papers, or similar documents (whether partial or complete). We look forward to you response within twenty business days of our August 10 request, as provided under 5 U.S.C. § 552(a)(6)(A)(i) and 47 C.F.R. § 0.461(g). Thank you for your assistance in this matter.

Sincerely,

Marvin Ammori
Staff Attorney

*Admitted to the Indiana Bar only   +Practice Supervised by Members of the D.C. Bar

# **Attachment D**



Federal Communications Commission
Washington, D.C. 20554

September 8, 2006

In Reply Refer To:
FOIA 2006-483

Mr. Marvin Ammori
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Suite 312
Washington, D.C. 20001-2075

Dear Mr. Ammori:

    This letter concerns the Freedom of Information Act ("FOIA") request submitted on behalf of the Institute for Public Representation which the Federal Communications Commission received on August 11, 2006 (FOIA 2006-483). Commission records indicate that the deadline for the Commission to respond to the FOIA is September 8, 2006.

    As you know, the Commission makes every effort to act on a FOIA request within twenty (20) working days after it is received by the Commission's FOIA Control Office. Under certain circumstances, however, the Commission may extend the time for action on a request by ten (10) working days. As discussed in a September 7, 2006 telephone conversation with your colleague, Ms. Coriell Wright, pursuant to Commission rules (*see* 47 C.F.R. § 0.461(g)(3)), we have extended the time for action on FOIA 2006-483 by ten (10) working days.

    If you have any questions regarding this matter, please do not hesitate to contact me.

                         Sincerely,

                         Michael S. Perko
                         Chief, Office of Communications and
                             Industry Information
                         Media Bureau

# **Attachment E**



Federal Communications Commission
Washington, D.C. 20554

September 25, 2006

Angela J. Campbell, Esq.
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, NW
Suite 312
Washington, DC 20001-2075

Re: FOIA Control No. 2006-483
Supplement to Request for Fee Waiver

Dear Ms. Campbell:

On August 30, 2006, we denied the request of the Institute for Public
Representation (IPR) for a fee waiver for its Freedom of Information Act (FOIA) request
for various documents related to the Commission's localism initiatives and to the
Commission's media ownership rules. On September 25, 2006, you filed a supplement to
your fee waiver request explaining why you meet the criteria set forth in 5 U.S.C. §
552(a)(4)(A)(iii) and 47 C.F.R. § 0.470(e). We have reviewed your supplemental filing
and conclude that you meet these criteria for a FOIA fee waiver in this instance.
Accordingly, we will treat your September 25, 2006 supplemental filing as a petition for
reconsideration and grant your request for a fee waiver.

Sincerely,

Joel Kaufman
Associate General Counsel

cc:    FOIA Officer
       Michael Perko, MB

# __Attachment F__



Federal Communications Commission
Washington, D.C. 20554

January 4, 2007

In Reply Refer To:
FOIA 2006-483

Mr. Marvin Ammori
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Suite 312
Washington, D.C. 20001-2075

Dear Mr. Ammori:

This letter is in response to the above-referenced Freedom of Information Act ("FOIA") request submitted on behalf of the Institute for Public Representation ("IPR") (the "Request") seeking:

> all studies and/or proposals for studies, reports, analytical assessments, and factual data gathered or compiled after July 1, 2003, by the FCC or by outsiders under contract with the FCC, which relate in any way to the localism initiatives announced in August 2003...or to the Commission's media ownership rules, including the TV ownership rule, local radio ownership rule, newspaper broadcast cross-ownership rule, radio television cross-ownership rule, dual network rule and UHF discount ("media ownership rules"). We request any contracts the FCC entered into with outsiders to conduct studies analysis, or to provide the FCC with factual data on localism and/or the media ownership rules.

The IPR Request was received by the Federal Communications Commission's FOIA Control Office on August 11, 2006. Pursuant to ongoing discussions with you and other staff of IPR, the date for responding to the Request was extended in light of the substantial amount of search and review time required to process the Request.

In accordance with the Request, Commission staff has conducted a review of agency files and located materials responsive to the Request from the period July 1, 2003, through August 10, 2006, the date of the Request. Enclosed herewith are certain materials responsive to the Request collected as a result of those efforts. Other materials located within the scope of the Request are being withheld for the reasons explained below.

## A. **MATERIALS PROVIDED**

### 1. Solicitations, Contract Proposals and Contracts

- Solicitation for "Radio Station Localism Study" issued by the Commission on June 15, 2004 (Solicitation No. SOL04000009);
- "Technical Proposal" submitted by Edison Media Research ("Edison") on July 15, 2004, in response to Solicitation No. SOL04000009;
- Agreement dated September 10, 2004, between Edison and the Commission (Contract No. CON04000011), including four modifications to the agreement (dated April 28, 2004; March 10, 2006; May 26, 2006; and June 8, 2006). As explained below, we are granting Edison's request that we redact certain competitively sensitive material from these documents pursuant to FOIA Exemption 4, 5 U.S.C. § 552(b)(4);
- Agreement dated September 20, 2004, between Simon P. Anderson ("Anderson") and the Commission (Purchase Order No. PUR04000759);
- Agreement dated September 24, 2004, between Tribune Media Services ("TMS") and the Commission (Purchase Order No. PUR04000808). As discussed below, we are granting TMS's request that certain competitively sensitive material be redacted from the agreement pursuant to FOIA Exemption 4; and
- Agreement dated September 30, 2004, between Nielsen Broadcast Data Systems ("NBDS") and the Commission (Purchase Order No. PUR04000862).

### 2. Reports, Studies, Papers and Drafts Thereof

The Commission recently made several reports, studies and papers, and drafts thereof, relating to its media ownership rules available on the Commission's website. We are enclosing a printout from the website listing these documents, as well as copies of each document available on the website (http://www.fcc.gov/ownership/additional.html). Several, but not all, of these posted documents are responsive to the FOIA request. It should be noted that some of these responsive materials contain internal agency deliberations and normally would be withheld under FOIA Exemption 5, 5 U.S.C. § 552(b)(5) of the FOIA. These documents also may be predecisional and do not necessarily represent the final determinations of the Commission. Nevertheless, the Commission has exercised its discretion in deciding to release these records to the public and to IPR. Of the documents posted on the website, the following are responsive to the Request:

- "Localism and Welfare" (draft dated June 2005);
- "Do Local Owners Deliver More Localism?" (draft dated July 2004);
- "Do Local Owners Deliver More Localism?" (draft dated June 17, 2004);
- "Do Local Owners Deliver More Localism?" (draft dated May 12, 2004);
- "Do Local Owners Deliver More Localism?" (draft dated March 29, 2004);
- "Do Local Owners Deliver More Localism?" (draft dated March 26, 2004);
- "Do Local Owners Deliver More Localism?" (draft dated February 27, 2004);

Mr. Marvin Ammori                                    Page 3 of 7

- "Do Local Owners Deliver More Localism?" (draft dated February 18, 2004);
- "Do Local Owners Deliver More Localism?" (draft dated January 15, 2004);
- "Review of the Radio Industry, 2003" (draft dated September 2003);
- "Review of the Radio Industry, 2003" (draft undated);
- "Summary of Ideas on Newspaper-Broadcast Cross-Ownership" (dated June 15, 2006);
- "The Evolving Structure and Changing Boundaries of the U.S. Television Market in the Digital Era" (dated June 1, 2006);
- "The Evolving Structure and Changing Boundaries of the U.S. Television Market in the Digital Era" (draft undated);
- "Financial Health of the Newspaper Industry" (dated June 2006);
- "FCC Radio Market Structure and Diversity Paper" (draft dated Spring 2005);
- "FCC Radio Market Structure and Diversity Paper" (draft undated);
- "Political Representation, Voter Information and Government Allocations: A Theory of Optimal Localism" (draft dated November 29, 2004);
- "Preliminary Analysis for Diversity and Localism in Radio Playlists Study" (draft dated August 2004);
- "Localism Paper" (draft dated July 2, 2004);
- "Defining Localism from an Economics Perspective" (dated March 3, 2004);
- "Defining Localism from an Economics Perspective" (dated February 27, 2004);
- "Appendix A" (draft undated);
- "Background on Localism in Broadcasting" (draft undated);
- "Spreadsheet" (draft undated);
- "Stages 1 through 5" (draft undated); and
- "Cluster Analysis Work Papers – Zip File 4.5 MB" (undated) (copy of this file on enclosed CD-ROM).

3. Sound Recordings

    We also have located audio files provided by Edison pursuant to the agreement with the Commission dated September 10, 2004. To date, pursuant to this agreement, the Commission has received digital audio recordings from Edison for approximately 1000 radio station broadcasts. The recording of the broadcasts of each individual station is approximately two hours in length, and the totality of the audio recordings constitute approximately 65 gigabytes of data.

    We have enclosed a set of eight DVDs containing approximately half of the digital audio recordings that the Commission is to receive from Edison. The remaining files will be provided once they have been received and reviewed by staff for sound quality and accuracy of labeling. (It also is possible that there may be minor corrections to the audio data that we are providing today based on additional staff review of the Edison data.) We are providing these materials to IPR with the understanding that any further copying, transmission or other distribution to any other party may be a violation of the Copyright Act.

### B.  MATERIALS IDENTIFIED BUT NOT PROVIDED

Under the FOIA, the Commission generally is required to disclose reasonably described agency records requested by any person.  The Commission, however, may withhold documents from disclosure that fit within one or more of applicable exemptions provided in the FOIA (5 U.S.C. § 552(b)) and the corresponding Commission's rules (47 C.F.R. § 0.457(a)-(g)).  Two exemptions of particular relevance to the IPR FOIA Request are Exemption 4 (confidential commercial information) and Exemption 5 (deliberative process).

1.  Confidential Commercial Information Contained in Contracting Materials

Exemption 4 of the FOIA permits the Commission to withhold from disclosure records containing either "trade secrets or commercial or financial information obtained from a person [that is] privileged or confidential."  Commercial or financial information is privileged or confidential if disclosure is likely to cause substantial harm to the competitive position of the person from whom the information was obtained.  As you are aware, we sought the views of the contractors (Edison, TMS, NBDS and Anderson) as to whether the contracting materials contained confidential commercial information.  *See* 47 C.F.R. § 0.461(d)(3).  NBDS and Anderson did not object to the release of the contracting records in their entirety, but Edison and TMS indicated that the records contained confidential commercial information that should be withheld pursuant to FOIA Exemption 4.  This commercial information includes unit pricing data, a detailed description of a proprietary "fingerprinting" technology licensed to Edison, and an independent financial and credit evaluation of Edison Media Research.  IPR received notice of Edison's and TMS's filings.  We tentatively agree with Edison and TMS that the commercial information Edison and TMS specified that is contained in the contracting materials would cause substantial competitive harm to those entities if released pursuant to this FOIA Request.  *See McDonnell Douglas Corp. v. United States Department of the Air Force*, 375 F.3d 1182 (D.C. Cir. 2004), *reh'g en banc denied*, No. 02-5342 (D.C. Cir. Dec. 16, 2004) (upon demonstration of competitive harm unit pricing information may be withheld under Exemption 4).  Therefore, as noted above, we are releasing copies of the Commission's agreements with Edison and TMS, redacting the competitively sensitive materials pursuant to FOIA Exemption 4.

2.  Internal Commission Records

As we now discuss, we are withholding pursuant to FOIA Exemptions 4 and/or 5 approximately 1400 pages of internal Commission records that appear to be responsive to the IPR Request.  These documents include data and data analyses; proposals and deliberations on proposals; and internal communications, including emails, memoranda and briefing papers.

*Exemption 5.*  Under FOIA Exemption 5 "inter-agency or intra-agency memorandums or letters that would not be available by law to a party ... in litigation with the agency" may be withheld.  Exemption 5 "exempt[s] those documents ... that are normally privileged in the civil discovery context."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  Among the privileges incorporated in Exemption 5 is the deliberative process privilege, which allows the

Mr. Marvin Ammori                                                    Page 5 of 7

Commission to withhold documents from disclosure that normally would not be available to private parties through the discovery process in litigation, and by extension not through FOIA, because "their disclosure would tend to restrain the commitment of ideas to writing, would tend to inhibit communication among Government personnel, and would, in some cases, involve premature disclosure of their contents." To qualify under the deliberative process privilege of Exemption 5, the materials requested must be predecisional and deliberative. *Petroleum Info. Corp. v. Dep't of the Interior,* 976 F.2d 1429, 1434 (D.C. Cir. 1992).

     ***Exemption 4 and Copyrighted Materials.*** Among the records located in response to the IPR Request are a number of records that are copyrighted or contain copyrighted materials. We conclude for purposes of this FOIA that these are records of the Commission. *See* Weisberg v. Department of Justice, 631 F.2d 824, 827-28 (D.C. Cir. 1980). The Commission obtained the copyrighted data pursuant to agreements that limit the agency's ability to distribute or disclose the information to outside sources. Under Exemption 4 of FOIA, copyrighted materials may be considered "trade secrets [or] commercial or financial information obtained from a person and privileged or confidential." *See* Department of Justice, Office of Information and Privacy, *Copyrighted Material and the FOIA,* FOIA Update Vol. IV, No. 4 (Fall 1983*). See also Weisberg, supra* (copyright holder is indispensable party in FOIA case because the Copyright Act and the FOIA might subject the government to conflicting obligations). If the records are subject to copyright protection and the release of such records could cause financial or competitive harm to the copyright holders, they may be withheld under FOIA Exemption 4. Accordingly, the factual data obtained from these sources has been withheld.

### a. Factual Data and Data Analyses

     This category includes approximately 700 pages of material consisting of spreadsheets and memoranda which apply and analyze factual data obtained from several proprietary sources (such as, but not limited to, BIA Publications, Warren Communications, EBSCO Industries and the American Economic Association). These data and analyses have been used by Commission staff to examine issues in the Localism in Broadcasting Initiative and/or the Media Ownership proceeding.

     The factual data in this category are either derived from or copied wholesale from copyrighted databases or publications owned by sources other than the Commission. The Commission obtained this data pursuant to agreements that generally limit the agency's ability to distribute or disclose the information to outside sources. As discussed above, copyrighted materials may be considered "privileged and confidential" and may be withheld under Exemption 4 of the FOIA. Moreover, the release of such materials could cause financial or competitive harm to the copyright holders. We find the material involved here is subject to copyright protection and the release of such materials could cause financial or competitive harm to the copyright holders. Accordingly, the factual data obtained from these sources has been withheld.

The other materials in this category are analyses of factual data created by Commission staff or outside parties under contract with the Commission. These analyses of the data (including staff manipulation of the data for analytical purposes) reflect the deliberative process of agency personnel and contractors. Release of these materials would tend to reveal the staff's view of the facts and the law. The disclosure of such documents would thus represent an unwarranted intrusion into the Commission's deliberative process and they accordingly will be withheld pursuant to Exemption 5.

To the extent that any portion of these documents contain nonexempt material, such as factual data obtained from a public source, our review of the records indicates that material is so inextricably intertwined with the deliberative materials in the records that an attempt to segregate the nonexempt information would pose an inordinate burden on the agency and yield a product with little, if any, informational value. We therefore conclude that no segregable portions of the records may be released. *Neufeld v. IRS*, 646 F.2d 661, 663 (D.C. Cir. 1981); *Assassination Archives & Research Center v, CIA*, 177 F. Supp.2d 1, 9 (D.D.C. 2001).

### b. Proposals and Deliberations on Proposals

This category includes approximately 700 pages of internal communications, including e-mails, memoranda and briefing papers, that present and/or discuss proposals for studies or reports in connection with the Localism in Broadcasting Initiative and/or the Media Ownership proceeding. Materials in this category are internal, deliberative products which are both predecisional and reflect the agency "give-and-take" of the consultative process. Consequently, these materials fall under the "deliberative process" privilege of Exemption 5 of FOIA and, as a result, have been withheld. We note that we have waived the deliberative process privilege for the documents that have been posted on the Internet (as described above), but we did not waive and will not waive the privilege for consultative e-mails and other such documents, and we will not as a matter of our discretion release these deliberative process materials.

### c. Reports and Studies

In this category, we have identified two staff draft reports which provide an overview of the record developed to date in the Localism proceeding. The staff reports are 6 pages and 37 pages in length. These reports are internal, deliberative products which are both predecisional and reflect the agency consultative process. Consequently, the staff reports fall under the "deliberative process" privilege of Exemption 5 of FOIA and have been withheld.

No fees will be assessed for the processing of the IPR FOIA Request. *See* letter from Joel Kaufman, Associate General Counsel, to Angela Campbell, Esq. (Sept. 25, 2006) (granting fee waiver request pursuant to 47 C.F.R. § 0.470(e)).

Mr. Marvin Ammori                                              Page 7 of 7


      You may file an application for review of this decision by delivering or mailing it to the
Commission's Office of General Counsel, 445 12th Street, S.W., Washington, D.C. 20554, within
30 days of the date of this letter, in accordance with Commission rule 0.461(j)
(47 C.F.R. § 0.461(j)).

                                  Sincerely,



                                  Michael S. Perko
                                  Chief, Office of Communications and
                                      Industry Information
                                  Media Bureau


Enclosures

cc:    Edison Media Research (without enclosures)
       Nielsen Broadcast Data Systems (without enclosures)
       Simon P. Anderson (without enclosures)
       Tribune Media Services (without enclosures)

# **Attachment G**

*Before the*
FEDERAL COMMUNICATIONS COMMISSION
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Freedom of Information Act Request | ) | FOIA Control No. 2006-483 |
| Concerning Localism Proceeding or Media | ) | |
| Ownership Rules | ) | |
| | ) | |

## APPLICATION FOR REVIEW OF FREEDOM OF INFORMATION ACTION

Of Counsel:

Julie M. Nichols
Avra van der Zee
Law Students
Georgetown University Law Center

Angela J. Campbell, Esq.
Marvin Ammori, Esq.
Coriell Wright, Esq.
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, DC  20001
(202) 662-9535

February 5, 2007

# SUMMARY

The Institute for Public Representation ("IPR") seeks review, pursuant to the Freedom of Information Act, 5 U.S.C. § 552(a)(6), and FCC rules, 47 C.F.R. §§ 0.461 and 1.115, of the Federal Communications Commission Response to its FOIA Request, submitted August 10, 2006 and clarified by a letter dated August 23, 2006. IPR sought all studies and/or proposals for studies, reports, analytical assessments, and factual data, including any drafts, working papers, completed studies, or similar documents (whether partial or complete), as well as any contracts the FCC entered into with outsiders to conduct studies, analysis, or to provide the FCC with factual data which relate in any way to the localism initiatives or to the Commission's media ownership rules. On January 4, 2007, after almost five months, the FCC responded by producing four contracts with outside parties, as well as copies of documents that the FCC had posted on its website on December 29, 2006. In its Response the FCC stated that it was withholding approximately 1400 additional pages of responsive materials under FOIA Exemptions 4 and 5.

IPR believes that the FCC should have provided it with far more documents than it did and that the FCC has failed to provide some non-exempt records responsive to the FOIA Request. However, because of the lack of description of the some 1,400 pages withheld, it is impossible for IPR to tell whether the FCC conducted an inadequate search or is improperly claiming documents exempt from disclosure, or both. This problem is compounded by conclusory claims and the lack of detail provided in asserting Exemptions 4 and 5, as well as the FCC's unexplained assertions regarding the segregability of non-exempt portions of the materials.

Under its rules the FCC must accompany any denial of a FOIA request with a statement setting forth *specific* grounds for denial. The FCC has failed to provide IPR information

ii

regarding which specific records are being withheld and the grounds for claiming that they are exempt from disclosure. IPR requests that the FCC either provide all the documents responsive to the FOIA Request or provide a complete, detailed list of the specific documents being withheld and the reason(s) for withholding them. IPR believes that such a list is necessary to allow IPR to assess the validity of the FCC's claimed exemptions and to avoid needless litigation.

# TABLE OF CONTENTS

Summary ................................................................................................................ ii

TABLE OF CONTENTS ......................................................................................... iv

BACKGROUND ..................................................................................................... 1

ARGUMENT .......................................................................................................... 4

I.     The FCC Failed to Provide Documents Responsive to the Search Request that Were Not Subject to Exemption ...................................................................... 4

       A.     The FCC Should Have Provided Contract Deliverables........................... 4

       B.     The FCC Should Have Provided Other Contracts Referenced in the FOIA Response and Factual Data Referenced in One of the Responsive Documents ........................................................................................ 7

II.    The FOIA Response Lacks Specific Description of the Materials Claimed to be Exempt and Provides Insufficient Information to Evaluate the Claims of Exemption ......................................................................................... 9

       A.     The Commission Improperly Withheld Documents Under Exemption 4. .......... 10

            1.     The Withheld Records are Not Trade Secrets........................... 11

            2.     The Withheld Records are Not Privileged or Confidential Commercial Information.................................................. 12

       B.     The FOIA Response Improperly Applies Exemption 5........................ 16

       C.     The FCC Fails to Justify it Refusal to Segregate Non-Exempt Material............. 17

CONCLUSION ....................................................................................................... 18

*Before the*
FEDERAL COMMUNICATIONS COMMISSION
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Freedom of Information Act Request | ) FOIA Control No. 2006-483 |
| Concerning Localism Proceeding or Media | ) |
| Ownership Rules | ) |
| | ) |

**APPLICATION FOR REVIEW OF FREEDOM OF INFORMATION ACTION**

The Institute for Public Representation ("IPR") seeks review, pursuant to the Freedom of

Information Act, 5 U.S.C. § 552(a)(6), and FCC rules, 47 C.F.R. §§ 0.461 and 1.115, of the letter

dated January 4, 2007 from Michael S. Perko, Chief, Office of Communication and Industry

Information, Media Bureau to Marvin Ammori ("FOIA Response").

**BACKGROUND**

On August 10, 2006, IPR submitted a FOIA Request that was clarified by a letter dated

August 23, 2006 ("FOIA Request").  IPR sought "all studies and/or proposals for studies,

reports, analytical assessments, and factual data gathered or compiled after July 1, 2003, by the

FCC or by outsiders under contract with the FCC, which relate in any way to the localism

initiatives announced in August 2003 . . . or to the Commission's media ownership rules."[1]  The

request included "not only completed studies but also any drafts, working papers, completed

studies, or similar documents (whether partial or complete)."[2]  IPR specifically sought "any

contracts the FCC entered into with outsiders to conduct studies, analysis, or to provide the FCC

with factual data on localism and/or the media ownership rules."[3]  It also asked for "any studies,

---

[1] FOIA Request at 1.
[2] *Id.*
[3] *Id.*

data, or contracts, relating to" a specific Presolicitation Notice "including but not limited to contracts with Edison Media Research, Mediaguide, and National Aircheck."[4]

After almost five months, the FCC responded by letter dated January 4, 2007 with the FOIA Response. Regarding the Presolicitation Notice, the FCC provided the solicitation, a technical proposal submitted by Edison Media Research ("Edison"), the contract with Edison and four modifications to it. The FCC also provided copies of three other agreements with the following: 1) Simon P. Anderson, 2) Tribune Media Services ("TMS"), and 3) Nielsen Broadcast Data Systems ("NBDS").

In addition, the FCC provided copies of documents that the FCC had posted on its website on December 29, 2006. The FOIA Response identified 27 of these documents, totaling approximately 580 pages, as responsive to IPR's FOIA Request.[5] The FOIA Response notes that some of these posted documents contain internal agency deliberations that normally would be withheld under Exemption 5, but that the Commission had exercised is discretion in releasing these records to the public.

The FCC also provided "a set of eight DVDs containing approximately half of the digital audio recordings that the Commission is to receive from Edison." The FCC states that the "remaining files will be provided once they have been received and reviewed by staff for sound quality and accuracy of labeling."[6]

The FOIA Response also states that it identified but is "withholding pursuant to FOIA Exemptions 4 and/or 5 approximately 1,400 pages of internal Commission records that appear to be responsive to the IPR Request. These documents include data and data analysis; proposals

---

[4] *Id.* at 1-2.
[5] FOIA Response at 2-3. This total does not include the "cluster studies" provided on a disk.
[6] *Id.* at 3.

and deliberations on proposals; and internal communications, including e-mails, memoranda and briefing papers."[7]

About half of the withheld materials consist of "spreadsheets and memoranda which apply and analyze factual data obtained from several propriety sources (such as, but not limited to BIA Publications, Warren Communications, EBSCO Industries and the American Economic Association)."[8] The FOIA Response states that the "factual data in this category are either derived from or copied wholesale from copyrighted databases or publications owned by sources other than the Commission." The FOIA Response asserts that release of this material could cause financial or competitive harm to the copyright holders. The "other materials in this category are analyses of factual data created by Commission staff or outside parties under contract with the Commission."[9] The FOIA Response asserts that "[r]elease of these materials would tend to reveal the staff's view of the facts and the law."[10] Further, the FOIA Response asserts that any nonexempt factual material "is so inextricably intertwined with the deliberative material" that it may not be segregated.[11]

The remaining 700 pages includes emails, memoranda, and briefing papers that the FOIA Response asserts "are internal, deliberative products which are both predecisional and reflect the agency 'give-and-take' of the consultative process," and thus fall under Exemption 5.[12] The FOIA Response withheld under Exemption 5 two draft staff reports of 6 and 37 pages in length, which provide an overview of the record developed to date in the Localism proceeding.[13]

---

[7] *Id.* at 4.
[8] *Id.* at 5.
[9] *Id.* at 6.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

## ARGUMENT

IPR believes that the FCC should have provided it with far more documents than it did. However, because of the lack of description of the 1,400-some pages withheld, it is impossible for IPR to tell whether the FCC conducted an inadequate search or is improperly claiming documents exempt from disclosure, or both. This problem is compounded by the conclusory claims and lack of detail provided in asserting Exemptions 4 and 5. Under the FCC's own rules, it must accompany any a denial of a FOIA request "with a statement setting forth *specific* grounds for denial."[14] The FCC has failed to address the justifications for invoking these exemptions with sufficient specificity, therefore, IPR requests that the FCC either provide all the documents responsive to the FOIA Request, or provide a complete, detailed list, akin to a Vaughn Index, of the specific documents being withheld and the reason(s) for withholding them. IPR believes that such a list is necessary to allow IPR to assess the validity of the FCC's claimed exemptions and to avoid needless litigation.

## I.   THE FCC FAILED TO PROVIDE DOCUMENTS RESPONSIVE TO THE SEARCH REQUEST THAT WERE NOT SUBJECT TO EXEMPTION

The FCC is required to conduct a search "reasonably calculated to uncover all relevant documents."[15] IPR believes that the FCC may not have conducted a reasonable search under the prevailing standard because it should have uncovered and produced several non-exempt documents that were not addressed in the FCC's FOIA Response.

### A.   The FCC Should Have Provided Contract Deliverables

The FCC did provide copies of contracts between the FCC and Edison Media Research, Simon Anderson, TMS, and NBDS. Each contract required the contractor to provide specific

---

[14] 47 C.F.R. §0.461(f)(1).
[15] *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).

factual data or studies within a specific time period that has already expired.    Yet, the FCC

provided IPR with only some of data that was to have been submitted under the Edison contract,

a single draft article by Simon Anderson, and no data (or at least nothing identifiable as such)

that should have been submitted under the TMS and NBDS contracts.

Under the Contract between Edison and the FCC, dated September 10, 2004, for

$357,755, Edison was obligated to record two hours of programming (in 20 minute segments) for

approximately 1000 radio stations identified by the FCC, transcribe these recordings,[16] and code

them according to the categories provided by the FCC.  The program categories included news,

public affairs, announcements, music, entertainment/leisure, religion (non music),

fundraising/charity, advertising, and sports programming.[17]  As noted above, the FCC did

provide to IPR copies of about half of the recorded programming.  However, it did not provide,

nor does the FOIA Response even reference, either the program transcriptions or the program

categorizations.[18]  IPR believes that these deliverables were clearly covered by the FOIA

---

[16] The contract was modified to require transcriptions only for foreign language programming and all local news and pubic affairs programming, except for traffic and weather reports. Contract Modification No. 0002, at ¶3.

[17] The coding scheme and guidance for coding are included as attachments to the second contract modification.

[18] These program categorizations are factual data that are not subject to Exemption 5. The categorizations in question here are strikingly similar to the Bureau of Land Management's efforts to reorganize factual data in the District of Columbia Court of Appeals case, *Petroleum Info. Corp. v. U.S. Dep't of Interior,* 976 F.2d 1429, 1438 (D.C. Cir. 1992).  There, the court found that the compilation and categorization of the data, "while challenging and important, is essentially technical and facilitative." *Id.* at 1437.  Because the court found that disclosure of the data would not "tend to diminish candor within an agency," the court held that the data was not protected under deliberative process and ordered it to be released. *Id.* at 1436.  The court's reasoning is equally applicable here.  The data collected and categorized pursuant to the Edison Media contract is a technical compilation of broadcast recordings. There is nothing in the release of this compilation that would tend to expose the decision making process of FCC staff, nor would it "bear on the formulation or exercise of agency policy-oriented judgment." *Id.* at 1435, 1437-38.

5

Request, and that IPR is entitled to them, or at the very least, is entitled to an explanation for the FCC's failure to produce them.

Under the Contract with Simon Anderson, dated September 24, 2004, for a total of $12,000, Professor Anderson was supposed to "adapt and/or apply his theoretical analysis as developed and reporting in [a previously published article] Market Provision of Broadcasting: A Welfare Analysis to an analysis of 'localism' as supplied by advertiser-supported radio and television stations in local broadcast markets."[19] He was to prepare within nine months, "a scholarly research paper of a quality such that it can be released to the public as a Media Bureau Research Paper." The Work Statement required three separate "deliverables:" Theory Development at seven months, Regulatory Analysis at eight months, and Describe Possible Econometric Applications of the Theory at nine months. Yet, the FCC did not provide IPR with such a Media Bureau Research Paper or any of the three deliverables. The only document by Professor Anderson provided to IPR was a paper (apparently a draft) dated June 2005 entitled Localism and Welfare.

Under the contract with TMS, signed September 27, 2004, TMS was to provide television program lists known as Archive Data and program information via its Research TV service.[20] However, the FCC did not provide this data to IPR, even though the Agreement specifically provides that the FCC "shall be permitted to reproduce the data for purposes of making it available to third parties" under certain conditions that would apply here. Moreover, in response to an email from the FCC, TMS did not object to the FCC's disclosure of this data.[21]

---

[19] Anderson Statement of Work at 2.
[20] TMS, Commercial Licensed Data Agreement, Ex. 1. The amount of this contract has been redacted at Tribune's request.
[21] Email from Beth Fulkerson, Senior Counsel to TMS, to Michael Perko, Chief, Office of Communications & Industry Information, Media Bureau (September 22, 2006). TMS did object

Similarly, under the $10,000 contract with NBDS dated September 30, 2004, NBDS was to provide playlist data for a sample of 250 radio stations. This agreement also allows the FCC to share the data with third parties including third parties affected by the Commission's decisions, academics engaged in research that may relate to broadcast localism, and third parties that are participants in, or intend to participate in, any FCC proceeding in which the FCC relies on proposes to rely on its analysis of the licensed data.[22]

It may be that the FCC believes that missing factual data is exempt from disclosure under Exemptions 4 or 5. However, without a more detailed description, it is impossible to tell. Moreover, to the extent that the FCC is claiming such exemptions, IPR challenges the breadth of those claims below in Part III.

     **B.**     **The FCC Should Have Provided Other Contracts Referenced in the FOIA Response and Factual Data Referenced in One of the Responsive Documents**

Not only did the FCC withhold factual data that should have been provided in response to the Edison, Anderson, TMS and NBDS contracts, it also withheld factual data obtained from several other sources "such as, but not limited to, BIA Publications, Warren Communications, EBSCO Industries, and the American Economic Association."[23] The FCC claims that it "obtained this data pursuant to agreements that generally limit the agencies ability to distribute or disclose the information to outside sources."[24] Despite the existence of these agreements, which the FCC admits are responsive to IPR's request, the FCC only provided the Edison, Anderson,

---

to the disclosure of "sensitive pricing information," which was redacted on the copies provided to IPR. *Id.* IPR is not challenging the withholding of the pricing information.
[22] Exhibit 1 to Agreement between NBDS and FCC, Ex.1 Part II (Permitted Uses).
[23] FOIA Response at 5.
[24] *Id.*

TMS, and NBDS contracts.[25]  The FCC further alludes to the existence of additional agreements, also responsive to IPR's request, but fails to disclose even the names of these parties.[26]  The FOIA does not allow an agency to categorically conceal the identity of outside contracting parties without justification.  Thus, at a minimum, the FCC must identify and provide copies of all relevant contracts.

The FCC also failed to provide information collected by FCC regarding the curtailment of local television news programming.  Reference is made to this information in the paper prepared by Leslie Marx, former FCC Chief Economist, entitled Summary of Ideas on Newspaper-Broadcast Cross-Ownership.[27]  She states that "we collected information on such curtailments from press reports" and that "Diego Ruiz and Andrew Harrison were involved in this effort."[28]  She further notes that they "used information provided by Media General as a starting point and added information on additional curtailments as we could find it."[29]  Though responsive to IPR's request, neither the press reports nor the information supplied by Media General have been provided to IPR and no explanation was given for why they were not produced.  Thus, again, the FCC should provide copies of these records.

---

[25] Id.

[26] Id.

[27] Leslie M. Marx, Summary of Ideas on Newspaper-Broadcast Cross-Ownership, at 11 (June 15, 2006).  This document was one of the ones provided to IPR and identified as responsive to the FOIA Request.

[28] Id. at 11 & n. 12.

[29] Id. at 11 & n. 13.

## II.    THE FOIA RESPONSE LACKS SPECIFIC DESCRIPTION OF THE MATERIALS CLAIMED TO BE EXEMPT AND PROVIDES INSUFFICIENT INFORMATION TO EVALUATE THE CLAIMS OF EXEMPTION

The legislative intent behind the FOIA favors disclosure of governmental records where specific governmental interests would not be significantly harmed.[30] This disclosure requirement is to be "construed broadly, the exemptions narrowly."[31] An agency is required to state the reasons why the material is being withheld from disclosure.[32] In addition, the FCC rules require that "[i]f the Commission is prohibited from disclosing the records in question, the request for inspection will be denied with a statement setting forth the *specific grounds* for denial."[33]

Instead of providing specific information about the materials being withheld, however, the FOIA Response simply provides the number of pages withheld and groups the materials into broad, general categories, such as "factual data," "analyses of factual data," "internal communications, including e-mail, memoranda and briefing papers,"[34] The FOIA Response fails to specifically apply any of tests its sets out to the actual exemptions it claims. Without saying *how* or *why* the withheld material fits within the scope of an exemption, the FOIA Response simply concludes that the materials are withheld under that exemption. Indeed, it is not even clear sometimes which exemption is being claimed.[35]

---

[30] *Vaughn v. Rosen*, 523 F.2d 1136, 1142 (D.C. Cir. 1975) (*citing Soucie v. David*, 448 F.2d 1067, 1080 (D.C. Cir. 1971)).

[31] *Id.* (quoting *Soucie*, 448 F.2d at 1080; *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973)).

[32] *See Oglesby v. Department of the Army*, 920 F.2d 57, 65 (D.C. Cir. 1990).

[33] 47 C.F.R. § 0.461(f)(1) (emphasis added).

[34] Indeed, the only specific documents described are "two staff draft reports, which provide an overview of the record developed to date in the Localism proceeding." FOIA Response at 6.

[35] On page 4, the FOIA Response asserts that it is "withholding pursuant to FOIA Exemptions 4 *and/or* 5 approximately 1400 pages of internal Commission records." (emphasis added). It appears that approximately 700 pages consist of factual data and data analyses claimed to fall under Exemption 4 and another 700 pages consist of internal FCC communications that are claimed to fall under Exemption 5. However, the FCC also seems to be claiming that factual

For example, when claiming Exemption 5, the FOIA Response provides a generalized overview of the law and states some of the tests that have been applied by courts in the past to determine whether a document is pre-decisional or deliberative. In reference to the 700 pages of internal communications claimed under Exemption 5 in section B(2)(b) of the FOIA Response, the only reason the FCC gives for withholding this category of documents is that "[m]aterials in this category are internal, deliberative products which are both predecisional and reflect the agency 'give-and-take' of the consultative process. Consequently, these materials fall under the 'deliberative process' privilege of Exemption 5 of FOIA and, as a result, have been withheld."[36] The FCC provides no specific description of the documents such that a reasonable person could apply the Exemption 5 test.

Similarly, the FCC's claims under Exemption 4 are also incomplete or conclusory. Regarding the factual data, the FCC states "the Commission obtained this data pursuant to agreements that generally limit the agency's ability to distribute or disclose the information to outside sources."[37] However, the FCC failed to name all of the data sources or to provide copies of the contracts. Similarly, the FCC provided no basis for its claim that the release of these "materials could cause financial or competitive harm to the copyright holders."[38] Specific examples of the inadequacy of the FCC's response are detailed below.

### A. The Commission Improperly Withheld Documents Under Exemption 4.

Even without the list of documents and the reasons for withholding, IPR believes that the FCC has failed to adequately justify withholding documents under Exemption 4. Exemption 4

---

data may be exempt under Exemption 5 because it is inextricably intertwined with deliberative material. FOIA Response at 6.
[36] *Id.*
[37] *Id.* at 5.
[38] *Id.*

covers "[1] trade secrets and [2] commercial or financial information obtained from a person and privileged or confidential."[39] Without specifying exactly which category of Exemption 4 might apply, the FCC claims that "a number of records" are "copyrighted or contain copyrighted materials" and that the materials were obtained "pursuant to agreements that limit the agency's ability to distribute or disclose the information to outside sources."[40] The Commission further claims further that under Exemption 4, "copyrighted materials may be considered 'trade secrets [or] commercial or financial information obtained from a person and privileged and confidential.'"[41] It asserts that "*If* the records are subject to copyright protection and the release of such records could cause financial or competitive harm to the copyright holders, they may be withheld. Accordingly, the factually data obtained from obtained from these sources has been withheld."[42] It is unclear whether the factual data referred to in the FCC Response includes factual data provided by Edison, Tribune and Nielsen, or is limited to other sources such as those specifically mentioned, i.e., BIA Publications, Warren Communications, EBSCO Industries and American Economics Association.

Contrary to the FCC's claims, however, Exemption 4 does not apply here. The withheld records are neither trade secrets nor "confidential" commercial information under FOIA.

### 1.    The Withheld Records are Not Trade Secrets

While it is unclear whether the FCC is claiming the records are trade secrets, it is clear that they are not trade secrets. Exemption 4 covers "trade secrets," but trade secrets are defined under FOIA in their "narrower common law sense": "a secret, commercially valuable plan,

---

[39] 5 U.S.C. § 552(b)(4).
[40] FOIA Response at 5.
[41] *Id.* (citing *OIP Guidance: Copyrighted Materials and the FOIA*, 4 OFFICE OF INFO. & PRIVACY, DEP'T OF JUSTICE, FOIA UPDATE No. 4 (1983), *available at* http://www.usdoj.gov/oip/foia_updates/Vol_IV_4/page3.htm).
[42] *See* FOIA Response at 5.

formula, process, or devise that is used for the making, preparing, compounding, or processing of trade commodities."[43] The commercially available, and noncommercial, databases vaguely referenced in the FCC's response do not meet this definition, as they are neither secret nor used in producing trade commodities.

### 2.    The Withheld Records are Not Privileged or Confidential Commercial Information

It is also unclear whether or how the FCC claims the second category in Exemption 4 applies, but it does not apply here.  Exemption 4 applies to "(a) commercial or financial information (b) obtained from a person and (c) privileged or confidential."  Even assuming the records are commercial and obtained from persons, they are neither privileged nor confidential.

The records are not privileged under any existing privilege.[44]  There is no existing privilege for copyrighted works or for licensed databases.

The records are also not confidential.  Ignoring the relevant judicial tests for confidentiality, the FCC suggests that the work can be withheld because it is copyrighted.  But this argument has not merit.[45]  Even assuming this factual data is subject to copyright,[46] courts

---

[43] *Public Citizen Health Research Group v. Food & Drug Admin.*, 704 F.2d 1280, 1288 (D.C. Cir. 1983).  In addition, the trade secret must be the "end product of either innovation or substantial effort."  *Id.*

[44] *Cf. Wash. Post. Co. v. HHS*, 690 F.2nd 252, 268 n.50 (D.C. Cir. 1982) (claiming "in light of the explicit reference in the legislative history to particular privileges . . . we do not believe that "privileged" and "confidential" should be treated as synonymous.") (citations omitted).

[45] The FCC claims that the information is "either derived or copied wholesale from copyrighted databases or publications owned by sources other than the Commission."  FOIA Response at 5 (referring to competitive harm).

[46] Despite the FCC's emphasis on copyright, it is unclear whether all of the materials are in fact protected by copyright.  IPR seeks *factual* data, and the Supreme Court has explicitly held that factual data is not subject to copyright protection.  FOIA Response at 4-6; *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co*, 499 U.S. 340, 348 (1991).  The FCC admits that many of the withheld agency records merely "contain copyrighted materials," and it has not segregated out the non-copyrighted materials for disclosure.  FOIA Response at 5.

have correctly rejected the argument that copyrighted materials are automatically exempt.[47] Exempting all copyrighted work would, as the D.C. Circuit noted, "allow an agency 'to mask its processes or functions from public scrutiny' simply by asserting a third party's copyright."[48]  An agency could then claim to exempt even widely published news articles, which are subject to copyright, as being "confidential."  Copyright attaches automatically to almost every fixed communication with minimal expressiveness, and most of this communication is not confidential.[49]

The judicial test for whether commercial or financial material is confidential is either (1) if the information is of a kind that the provider would not customarily release to the public; or (2) if its disclosure is likely either (a) to impair the government's ability to obtain necessary information in the future; or (b) to cause substantial harm to the competitive position of the person from whom the information was obtained.[50]

This material is not confidential because it is of the type that the providers would customarily make available to the public.  These providers, in fact, do make this information customarily available to the public.  They sell and license the information.  Certainly publications are made available to the public, and often databases are as well.  The FCC even

---

[47] *Weisberg v. U.S. Dep't of Justice*, 631 F.2d 824, 827-28 (D.C. Cir. 1980) (rejecting the argument that copyrighted materials are not agency records).
[48] *Weisberg*, 631 F.2d at 828.
[49] *See Venetian Casino Resort v. Equal Employment Opportunity Comm'n*, 453 F. Supp. 2d 157 (D.D.C. 2006).
[50] *See Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 766, 770 (D.C. Cir. 1974), *clarified by Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (1992). While *Critical Mass* applies one test for voluntary disclosures and another for mandatory disclosures, this information is not confidential under either test, as discussed in the text.  *See Critical Mass*, 975 F.2d 871.

13

acknowledges that it withheld publicly available materials obtained from a public source, claiming it is non-segregable from exempt materials.[51]

The material is also not confidential because it neither impairs the government's ability to receive such information in the future nor would disclosure cause substantial competitive harm as recognized by FOIA. The FCC has not even claimed that disclosing the material would impair its ability to license such information in the future. Indeed, in this case, the FCC cannot claim impairment because the FCC already acquired this data without promising to keep it confidential, as discussed below, and can do so in the future.[52]

Nor does the material cause substantial competitive harm under FOIA. For material to be properly withheld, disclosure must cause "substantial harm to the competitive position of the person from whom the information was obtained."[53] Although the FCC asserts that release of the records here "*could* cause financial or competitive harm to the copyright holders,"[54] it does not demonstrate that any party would be substantially harmed—much less that a copyright holder would suffer adverse effects in the market. Courts have found substantial competitive harm in cases involving a company's detailed financial data,[55] business plans,[56] or data describing a company's work force which could reveal labor costs and competitive vulnerability.[57] The data in such cases was sensitive, secret, internal business data that would permit competitors unfair

---

[51] FOIA Response at 6.

[52] Even if the FCC did promise to keep the information confidential, "government's promise of confidentiality is not dispositive." *Wash. Post Co. v. HHS*, 690 F.2d 252, 268 (D.C. Cir. 1982).

[53] *See Nat'l Parks & Conservation Ass'n*, 498 F.2d at 770. *See also Weisberg*, 631 F.2d at 830 & n.39.

[54] *Id.*

[55] *See, e.g., Nat'l Parks & Conservation Ass'n*, 547 F.2d at 684.

[56] *See, e.g., Nat'l Cmty. Reinvestment Coal. v. Nat'l Credit Union Admin.*, 290 F.Supp.2d 124, 135 (D.D.C. 2003).

[57] *See, e.g., Pub. Citizen Health Research Group v. Nat'l Insts. of Health*, 209 F. Supp. 2d 37, 46-47 (D.D.C. 2002).

14

advantages.  Here the data is not sensitive, secret, internal data.  The FCC has not shown that the information is the type of commercially sensitive material such as financial data that would have any impact on their business.[58]  Moreover, one of the parties providing data, American Economic Association, is a not-for-profit scholarly organization which promotes economic research.[59]  It is difficult to imagine how releasing factual data provided by this organization would result in substantial commercial harm to this non-profit organization.

Even if this data were somehow confidential under FOIA, some parties already consented to its release, while the FCC could simply ask the other parties for consent.  The FCC claims that the licensing agreements limit its ability to disclose factual data, but it fails to provide copies of any such agreements.  Indeed, the agreements that the Commission does provide explicitly permit disclosure.[60]  Moreover, the FCC does not state that the suppliers have specifically objected to the release of the data to IPR.  Upon receiving IPR's FOIA request, the Commission

---

[58] If the FCC were concerned that IPR might somehow pass this factual information to competitiors, it has other means of protecting the information short of withholding it.  For example, the FOIA Response itself states that it providing the sound recording with the "understanding that any further copying, transmission or other distribution to any other party may be a violation of the Copyright Act."  FOIA Response at 3.

[59] *See* General Information, American Economic Association *available at* http://www.vanderbilt.edu/AEA/gen_info.htm

[60] TMS' agreement provides: "The licensee shall be permitted to reproduce the data for purposes of making it available to third parties, provided that such third parties shall not be permitted to further reproduce the data except for purpose of interpreting or analyzing it, may not sell or otherwise distribute it in any fashion, and may not use it for commercial purposes."*See* TMS Commercial Licensed Data Agreement, Exhibit 1.  Similarly, the NBDS' contract states that the FCC "shall be permitted to reproduce the data for purposes of making it available to the public, provided that the call signs are masked" and "shall be permitted to make the Licensed Data available to selected third parties without masking the call sign provided that such third parties shall not be permitted to reproduced the data except for purposes of manipulate it, may not sell or otherwise distribute it in any fashion, and may not use it for commercial purposes."  *See* NBDS Contract, Ex. 1, provision 2 & 3.   The contracts with Dr. Simon Anderson and Edison Media Research contain no confidentiality provisions restricting release of the information here.  The FCC has not provided any other contracts that could restrict their ability to release the information.

"sought the views of the contractors (Edison, TMS, NBCS and Anderson) as to whether the

contracting materials contained confidential information,"[61] and none put forth significant

objections.[62]  If the FCC is concerned about confidentiality, it should have contacted the other

parties, as it is its normal practice under 47 CFR § 0.461(d)(3).  Had the FCC notified the other

data sources of the pending request, it may well have learned that these contractor similarly had

no (or only limited) objections.

### B.    The FOIA Response Improperly Applies Exemption 5.

In addition to claiming Exemption 4, the FOIA Response also claims to withhold

documents under Exemption 5.[63]  To withhold records under this exemption, the FCC has the

burden of providing that the materials are both pre-decisional *and* deliberative[64]

To satisfy the first prong of Exemption 5, the government must establish the existence of

a pre-decisional process.[65]  It is insufficient to simply aver that a document is used in policy

determinations; rather the government must show that the document is "a direct part of the

deliberative process in that it makes recommendations or expresses opinions on legal or

policy matters."[66]  The FCC has withheld 700 pages of proposals and deliberations on

---

[61] FOIA Response at 4.  IPR received copies of these emails.

[62] NBDS and Anderson raised no objections.  TMS and Edison objected to release of pricing information and a few other types of information that was of a confidential nature and was redacted.  Edison further stated that "anything else, as far as we are concerned, does not materially impact our business and can be released to satisfy the FOIA request."  Email of Tom Webster, Vice President, Edison Media Research, to David Savolalne, Media Bureau, FCC (Sept. 25, 2006, 09:30 EST).

[63] It is unclear whether the FCC is asserting Exemption 5 as to only 700 pages not covered under Exemption 4 or whether to all 1400 pages.

[64] *See Mapother v. U.S. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

[65] *Vaughn*, 523 F.2d at 1143.

[66] *Id.* at 1144.

16

proposals as pre-decisional,[67] yet fails to explain how and to which decisions the materials

pertain.  Whereas the FCC vaguely invokes the Localism and Media Ownership Proceedings

in general, the courts have held that agencies must "identify a specific decision to which the

document is pre-decisional."[68]  The FOIA Response Letter insufficiently linked the withheld

documents to the determination of any FCC policies or rules.

To satisfy the second prong of the test, the FCC must show that the communication is "a

direct part of the deliberative process in that it makes recommendations or expresses opinions

on legal or policy matters,"[69] or put another way, "reflect[s] the give-and-take of the

consultative process."[70]  Because of the overly broad, general categories in which the FCC

discusses the information and the conclusory claims of exemption for all withheld materials,

it is impossible to determine if the documents satisfy this prong of the test.  Thus, the FCC

must release those documents which it cannot rightfully withhold or must clarify why any

continued refusal to release certain documents is legitimate under Exemption 5.

### C.    The FCC Fails to Justify it Refusal to Segregate Non-Exempt Material

Generally, facts in predecisional documents must be segregated and disclosed unless they

are "inextricably intertwined" with exempt portions.[71]  The D.C. Circuit has held that claims of

---

[67] FOIA Response at 6.

[68] *Maricopa Audubon Soc'y v. Forest Serv.* 108 F.3d 1089, 1094 (9th Cir. 1997). *See also Senate of Puerto Rico v. DOJ*, 823 F.2d 574, 585-86 (D.C. Cir. 1987); *Paisley v. CIA*, 712 f.2d 686, 698 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984) ("To ascertain whether the documents at issue are pre-decisional, the court must first be able to pinpoint an agency decision or policy to which these documents contributed. The agency bears the burden of establishing the character of the decision, the deliberative process involved, and the role played by the documents in the course of that process.").

[69] *Vaughn*, 523 F.2d at 1143-44.

[70] *Animal Legal Def. Fund, Inc. v. Dept. of Air force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999) (quoting Senate of Puerto Rico, 823 F.2d at 585).

[71] *Mead Data Center Inc. v. Dep't of Airforce*, 566 F.2d 242, 260 (D.C. Cir. 1977).

non-segregabilty must be made with the same degree of detail as claims of exemption.[72]  Many

other courts have indicated that the agency must respond on the issue "with reasonable

specificity,"[73] and that conclusory language is insufficient.[74]

The FOIA Response states categorically:

> To the extent that any portion of these documents contain nonexempt material,
> such as factual data obtained from a public source, our review of the records
> indicates that material is so inextricably intertwined with the deliberative
> materials in the records that an attempt to segregate the nonexempt information
> would pose an inordinate burden on the agency and yield a product with little, if
> any, informational value.  We therefore conclude that no segregable portions of
> the records may be released.[75]

It does not list the documents that contain such intertwined material nor provide any kind of

specific justification for why the whole document should be withheld.  Again, the FCC has given

IPR no reasonably specific information in its response that would allow us to prepare an

adequate appeal on the matter.

## CONCLUSION

In sum, the FCC has failed to provide some non-exempt records responsive to the FOIA

Request.  Additionally, the FCC has failed to provide IPR information regarding which specific

records are being withheld and the grounds for claiming that they are exempt from disclosure.

Hence, IPR requests that the agency either provide all requested materials or clarify what

specific documents are being withheld and why.  This information is necessary to provide IPR

with sufficient information to determine whether further appeal is necessary and could well

---

[72] *Id.* at 260-62.

[73] *Animal Legal Def. Fund*, 44 F. Supp. 2d at 301. (*quoting Armstrong v. Executive Office of President*, 97 F.3d 575, 578 (D.C. Cir. 1996)).

[74] *See Dorsett v. United States Dep't of the Treasury*, 307 F. Supp. 2d 28, 41 (D.D.C. 2004); *Animal Legal Def. Fund*, 44 F. Supp. 2d at 301; *Bay Area Lawyers Alliance for Nuclear Arms Control v. Dep't of State*, 818 F. Supp. 1291, 1300 (N.D. Cal. 1992). *See also Patterson v. IRS*, 56 F.3d 832, 839 (7th Cir. 1995).

[75] FOIA Response at 6.

18

avoid the need for litigation.  We would be happy to discuss this request with the appropriate

Commission staff.  We look forward to receiving the FCC's reply within 20 working days from

the date of this appeal as required by 5 U.S.C. §552(a)(6)(A)(ii) and 47 C.F.R. 0.461(k).

Of Counsel:                                    Respectfully Submitted,


                                               Angela J. Campbell, Esq.
Julie M. Nichols                               Marvin Ammori, Esq.
Avra van der Zee                               Coriell Wright, Esq.
Georgetown University Law Center

                                               Institute for Public Representation
Law Students                                   Georgetown University Law Center
                                               600 New Jersey Avenue, N.W.
                                               Washington, D.C. 20001
Dated: February 5, 2007                        (202) 662-9535

## CERTIFICATE OF SERVICE

I, Coriell Wright, hereby certify that on this 5th day of February, 2007, I caused a true and

correct copy of the foregoing Application for Review of Freedom of Information Action, along

with courtesy copies via email, to be served by First Class Mail upon:

Samuel Feder, Esq.
General Counsel
Federal Communications Commission
445 12th Street SW
Washington, DC 20554
Email: sam.feder@fcc.gov

Tom Webster, Vice President
Edison Media Research
6 W. Cliff Street
Somerville, NJ 08876
Email: twebster@edisonresearch.com

Dr. Simon P. Anderson
Department of Economics
University of Virginia
2015 Ivy Road, Rm. 305
Charlottesville, VA 22903
Email: sa9w@unix.mail.virginia.edu

Beth A. Fulkerson, Esq.
Senior Counsel/Intellectual Property & Interactive
Tribune Media Services, Inc.
435 N. Michigan Avenue, Suite 1500
Chicago, IL 60611
Email: bfulkerson@tribune.com

Vincent Martino
Nielsen Broadcast Data Systems
1 N. Lexington Ave., 14th Fl
White Plains, NY 10601
Email: martino@bdsonline.com

Additionally, courtesy copies have been sent via email to the following:

Mr. Michael S. Perko
Chief, Office of Communications and Industry Information
Media Bureau
Federal Communications Commission
445 12th Street SW
Washington, DC 20554
Email: michael.perko@fcc.gov

Heather Dixon, Esq.
Legal Advisor to Chairman Kevin J. Martin
Federal Communications Commission
445 12th Street SW
Washington, DC 20554
Email: heather.dixon@fcc.gov

Bruce Gottlieb, Esq.
Senior Legal Advisor to Commissioner Michael J. Copps
Federal Communications Commission
445 12th Street SW
Washington, DC 20554
Email: bruce.gottlieb@fcc.gov

Rudy Brioché, Esq.
Legal Advisor to Commissioner Johnathan S. Adelstein
Federal Communications Commission
445 12th Street SW
Washington, DC 20554
Email: rudy.brioche@fcc.gov

Chris Robbins, Esq.
Acting Legal Advisor to Commissioner Deborah Taylor Tate
Federal Communications Commission
445 12th Street SW
Washington, DC 20554
Email: chris.robbins@fcc.gov

Cristina Chou Pauzé, Esq.
Legal Advisor to Commissioner Robert M. McDowell
Federal Communications Commission
445 12th Street SW
Washington, DC 20554
Email: cristina.pauze@fcc.gov

# **Attachment H**

# BIA Publications, Inc.
# Software License Agreement

It is important that you carefully read this notice before proceeding with MasterAccess database software installation.

Please be aware that this product is copyrighted material and to copy this product, in whole or in part, for any reason other than to have a single backup copy, constitutes a violation of copyright laws and can lead to the imposition of penalties and fines.

By continuing, you agree to be bound by all of the terms and conditions of this license agreement. If you do not accept the following terms, do not continue. Contact BIA Publications, Inc. ("BIA Publications") at (703) 818-2425 for instructions on returning MasterAccess.

## SOFTWARE LICENSE AGREEMENT

BIA Publications licenses (not sells) this software data to you. It is important you understand that you are only granted a non-exclusive, non-transferable license to use this copy of the program and the data contained therein according to the following terms:

YOU MAY use one copy of the software on a single computer. You may install the software on more than one computer (i.e., a laptop or home computer) so long as your copy of the program is not also being used at the same time on a different machine. If you purchased multiple licenses, then at any given time, you may have as many copies in concurrent use as you are licensed for. YOU MAY use this data for any legitimate purpose connected with your business provided it does not violate any of the exclusions or conditions listed below.
YOU MAY distribute the results of your research (reports and/or verbal information) to clients and generally use this software for any other legitimate purpose that it was designed for.
YOU MAY export the data into other software packages, as long as the person(s) accessing the data is deemed an authorized/additional user of the MasterAccess program.

YOU MAY NOT make copies of the program or data for the purpose of commercial or mass distribution to anyone not associated with you, the licensee.
YOU MAY NOT distribute the program or data files to clients or anyone not directly affiliated with you, the licensee, for the purpose of allowing them to conduct their own searches.
YOU MAY NOT distribute Arbitron or Nielsen ratings information to any non-subscribing party. Radio audience estimates are Copyright © 1995 The Arbitron Company. Television audience estimates are Copyright © 1995 the A.C. Nielsen Company.
YOU MAY NOT use this data as the starting point for a derivative work including but not limited to a different database that you intend to distribute, either by sale or giveaway, in whole or in part.
YOU MAY NOT use this program on more computers concurrently than you are licensed for.
YOU MAY NOT make any changes to the software. Specifically you cannot modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy (except for one backup copy) this program, data or accompanying documentation.

- 1 -

YOU MAY NOT rent, transfer, sublease or grant any rights in this program, data or accompanying documentation in any form, to any person, except as provided above, without express written permission from BIA Publications.

## LIMITED WARRANTY

BIA Publications warrants the physical media and physical documentation to be free of defects in materials and workmanship for the term of the license agreement. If you encounter defects in materials or workmanship during the license term, contact BIA Publications for a replacement.

The entire and exclusive liability and remedy for breach of this limited warranty shall be limited to replacement of defective media or documentation. It shall not include or extend to any claim for or right to recover other damages, including, but not limited to loss of profit, data, or any other damages or other similar claims. In no event will BIA Publication's liability for any damages to you or any other person ever exceed the price paid for the license to use this software, regardless of the form of the claim.

BIA Publications specifically disclaims all other warranties, representations, or conditions, express or implied, including but not limited to any implied warranty or fitness for a particular purpose. Specifically, BIA Publications makes no representation that the software, data or documentation are error free or meet any particular user's standards, requirements or needs. BIA Publications will not be liable for any loss of profit or any other commercial damage resulting from the use of this product.

## GENERAL

In addition to the above, you agree to use reasonable efforts to protect the software and data from unauthorized use, reproduction, distribution or publication. The initial term of this agreement will be one year from the date below, however, all terms and conditions will remain in effect throughout all renewal periods that extend beyond the first year. This agreement is governed by the laws of the Commonwealth of Virginia.

If you have any questions, please contact BIA Publications, 14595 Avion Parkway, Suite 500, Chantilly, VA 22021 (703) 818-2425, (703) 803-3299 FAX.

Agreed: _____        Date: _28/1/96_

Signature

_F C C_

Company Name

This agreement allows you to run MasterAccess on __*__ computer(s) at the same time.

*See Attached Letter*

-2-

# **Attachment I**

### EBSCO PUBLISHING LICENSE AGREEMENT

By using the services available at this site or by making the services available to Authorized Users, the Authorized Users and the Licensee agree to comply with the following terms and conditions (the "Agreement"). For purposes of this Agreement, "EBSCO" is EBSCO Industries, Inc.; the "Licensee" is the entity or institution that makes available databases and services offered by EBSCO; the "Sites" are the Internet websites offered or operated by Licensee from which Authorized Users can obtain access to EBSCO's databases and services; and the "Authorized User(s)" are employees, students, registered patrons, walk-in patrons, or other persons affiliated with Licensee or otherwise permitted to use Licensee's facilities and authorized by Licensee to access Databases. EBSCO disclaims any liability for the accuracy, completeness or functionality of any material contained herein, referred to, or linked to. Publication of the servicing information in this content does not imply approval of the manufacturers of the products covered. EBSCO assumes no responsibility for errors or omissions nor any liability for damages from use of the information contained herein. Persons engaging in the procedures included herein do so entirely at their own risk.

### I. LICENSE

A. EBSCO hereby grants to the Licensee a nontransferable and non-exclusive right to use the databases made available by EBSCO (the "Databases") according to the terms and conditions of this Agreement. The Databases made available to Authorized User are the subject of copyright protection, and the original copyright owner (EBSCO or its licensors) retains the ownership of the Database(s) and all portions thereof. EBSCO does not transfer any ownership, and the Licensee and Sites may not reproduce, distribute, display, modify, transfer or transmit, in any form, or by any means, any Database or any portion thereof without the prior written consent of EBSCO, except as specifically authorized in this Agreement.

B. The Licensee is authorized to provide on-site access through the Sites to the Databases to any Authorized User. The Licensee may not post passwords to the Databases on any publicly indexed websites. The Licensee and Sites are authorized to provide remote access to the Databases only to their patrons as long as security procedures are undertaken that will prevent remote access by institutions, employees at non-subscribing institutions or individuals, that are not parties to this Agreement who are not expressly and specifically granted access by EBSCO. **Remote access to the Databases is permitted to patrons of subscribing institutions accessing from remote locations for personal, non-commercial use. However, remote access to the Databases from non-subscribing institutions is not allowed if the purpose of the use is for commercial gain through cost reduction or avoidance for a non-subscribing institution.**

C. Licensee and Authorized Users agree to abide by the Copyright Act of 1976 as well as any contractual restrictions, copyright restrictions, or other restrictions provided by publishers and specified in the Databases. Pursuant to these terms and conditions, the Licensee and Authorized Users may download or print limited copies of citations, abstracts, full text or portions thereof provided the information is used solely for personal, non-commercial use. Licensee and Authorized Users may not publish the information. Licensee and Authorized Users shall not use the Database as a component of or the basis of any other publication prepared for sale and will neither duplicate nor alter the Databases or any of the content therein in any manner nor use same for sale or distribution. Licensee and Authorized Users may create printouts of materials retrieved through the Databases via on-line printing, off-line printing, facsimile or electronic mail. All reproduction and distribution of such printouts, and all downloading and electronic

storage of materials retrieved through the Products shall be for internal or personal use. Downloading all or parts of the Databases in a systematic or regular manner so as to create a collection of materials comprising all or part of the Databases is strictly prohibited whether or not such collection is in electronic or print form. Notwithstanding the above restrictions, this paragraph shall not restrict the use of the materials under the doctrine of "fair use" as defined under the laws of the United States. Publishers may impose their own conditions of use applicable only to their content. Such conditions of use shall be displayed on the computer screen displays associated with such content. The Licensee shall take all reasonable precautions to limit the usage of the Databases(s) to those specifically authorized by this Agreement.

D. Authorized Sites may be added or deleted from this Agreement as mutually agreed upon by EBSCO and Licensee

E. Licensee agrees to comply with the Copyright Act of 1976, and agrees to indemnify EBSCO against any actions by Licensee that are not consistent with the Copyright Act of 1976.

F. The computer software utilized via EBSCO's service(s) is protected by copyright law and international treaties. Unauthorized reproduction or distribution of this software, or any portion of it, is not allowed. User shall not reverse engineer, decompile, disassemble, modify, translate, make any attempt to discover the source code of the software, or create derivative works from the software.

## II. LIMITED WARRANTY AND LIMITATION OF LIABILITY

A. EBSCO disclaims all warranties, express or implied, including, but not limited to, warranties of merchantability, noninfringement, or fitness for a particular purpose. EBSCO neither assumes nor authorizes any other person to assume for EBSCO any other liability in connection with the licensing of the Database(s) under this Agreement and/or its use thereof by the Licensee and Sites or Authorized Users.

B. THE MAXIMUM LIABILITY OF EBSCO AND ITS LICENSORS, IF ANY, UNDER THIS AGREEMENT, OR ARISING OUT OF ANY CLAIM RELATED TO THE PRODUCTS, FOR DIRECT DAMAGES, WHETHER IN CONTRACT, TORT OR OTHERWISE SHALL BE LIMITED TO THE TOTAL AMOUNT OF FEES RECEIVED BY EBSCO FROM LICENSEE HEREUNDER UP TO THE TIME THE CAUSE OF ACTION GIVING RISE TO SUCH LIABILITY OCCURRED. IN NO EVENT SHALL EBSCO OR ITS LICENSORS BE LIABLE TO LICENSEE OR ANY AUTHORIZED USER FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES RELATED TO THE USE OF THE DATABASES OR SERVICES OR TO THESE TERMS AND CONDITIONS, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## III. PRICE AND PAYMENT

A. License fees have been agreed upon by EBSCO and the Licensee, and includes all retrospective issues of the Product(s) as well as updates furnished during the term of this Agreement. The Licensee's obligations of payment shall be to EBSCO or its assignee. Payments are due upon receipt of invoice(s) and will be deemed delinquent if not received within thirty days of the invoice date(s). Delinquent invoices are subject to interest charges of eighteen percent per annum on the unpaid balance (or the maximum rate allowed by law if such rate is less than eighteen percent). The Licensee will be liable for all costs of collection. Failure or delay in rendering payments due EBSCO

under this Agreement will, at EBSCO's option, constitute material breach of this Agreement. If changes are made resulting in amendments to the Listing of Authorized Sites, Product(s) and Pricing identified in this Agreement pro rata adjustments of the contracted price will be calculated by EBSCO and invoiced to the Licensee and/or Sites accordingly as of the date of any such changes. Payment will be due upon receipt of any additional pro rata invoices and will be deemed delinquent if not received within thirty days of the invoice dates.

B. Taxes, if any, are not included in the agreed upon price and may be invoiced separately. Any taxes applicable to the Database(s) under this Agreement, whether or not such taxes are invoiced by EBSCO, will be the exclusive responsibility of the Licensee and/or Sites.

## IV. TERMINATION

A. In the event of a breach of any of its obligations under this Agreement, Licensee shall have the right to remedy the breach within thirty (30) days upon receipt of written notice from EBSCO. Within the period of such notice Licensee shall make every reasonable effort and document said effort to remedy such a breach and shall institute any reasonable procedures to prevent future occurrences of such breaches. If the Licensee fails to remedy such a breach within the period of thirty (30) days, EBSCO may (at its option) terminate this Agreement upon written notice to the Licensee.

B. If EBSCO becomes aware of a material breach of Licensee's obligations under this Agreement or a breach by Licensee or Authorized Users of the rights of EBSCO or its licensors or an infringement on the rights of EBSCO or its licensors, then EBSCO will notify the Licensee immediately in writing and shall have the right to temporarily suspend the Licensee's access to the Product(s). Licensee shall be given the opportunity to remedy the breach or infringement within thirty (30) days following receipt of written notice from EBSCO. Once the breach or infringement has been remedied or the offending activity halted, EBSCO shall reinstate access to the Databases. If the Licensee does not satisfactorily remedy the offending activity within thirty (30) days, EBSCO may terminate this Agreement upon written notice to the Licensee.

C. The provisions set forth in Sections I, II and V of this Agreement shall survive the term of this Agreement and shall continue in force into perpetuity.

## V. NOTICES OF CLAIMED COPYRIGHT INFRINGEMENT

EBSCO has appointed an agent to receive notifications of claims of copyright infringement regarding materials available or accessible on, through, or in connection with our services. Any person authorized to act for a copyright owner may notify us of such claims by contacting the following agent: Kim Stam, EBSCO Publishing, 10 Estes Street, Ipswich, MA 01938, phone: 978-356-6500, fax: 978-356-5191, email: kstam@epnet.com. In contacting this agent, the contacting person must provide all relevant information, including the elements of notification set forth in 17 U.S.C. 512.

## VI. GENERAL

A. Neither EBSCO nor its licensors will be liable or deemed to be in default for any delays or failure in performance resulting directly or indirectly from any cause or

circumstance beyond its reasonable control, including but not limited to acts of God, war, riot, embargoes, acts of civil or military authority, rain, fire, flood, accidents, earthquake(s), strikes or labor shortages, transportation facilities shortages or failures of equipment, or failures of the Internet.

B. This Agreement and the license granted herein may not be assigned by the Licensee to any third party without written consent of EBSCO.

C. If any term or condition of this Agreement is found by a court of competent jurisdiction or administrative agency to be invalid or unenforceable, the remaining terms and conditions thereof shall remain in full force and effect so long as a valid Agreement is in effect.

D. If the Licensee and/or Sites use purchase orders in conjunction with this Agreement, then the Licensee and/or Sites agree that the following statement is hereby automatically made part of such purchase orders: "The terms and conditions set forth in the EBSCO Publishing EBSCOhost LICENSE Agreement are made part of this purchase order and are in lieu of all terms and conditions, express or implied, in this purchase order, including any renewals hereof."

E. This Agreement represents the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior agreements and understandings, written and/or oral. There are no representations, warranties, promises, covenants or undertakings, except as described here.

# **Attachment J**

# NIELSEN BROADCAST DATA SYSTEMS LICENSED DATA AGREEMENT

This Agreement ("Agreement") is made between Nielsen Broadcast Data Systems, ("BDS"), having a place of business at Gateway Building, 14th Floor, One North Lexington Avenue, White Plains, NY 10601, and the **Federal Communications Commission** ("Licensee"), having a place of business at **445 12th Street SW, Washington D.C. 20554**. In consideration of the mutual covenants contained herein, BDS and Licensee agree as follows:

1.    GRANT OF LICENSE.

    (a)  BDS hereby grants Licensee, during the term of this Agreement and subject to the terms and conditions of this Agreement, a non-exclusive, non-assignable (except as expressly permitted under Paragraph 10 of this Agreement), non-transferable license to use the Licensed Data as defined in Exhibit 1.

    (b)  Licensee shall use the Licensed Data only as expressly set forth in Exhibit 1. Except as expressly provided in this Agreement, BDS does not grant Licensee any rights or licenses in or to the Licensed Data, the related names and trademarks or associated components, including without limitation the content and proprietary systems used by BDS in connection with the Licensed Data. Without limiting the generality of the foregoing two sentences, Licensee shall not sublicense or resell the Licensed Data without BDS' prior written consent. Licensee shall not edit, alter or modify the Licensed Data without BDS' prior written consent.

    (c)  BDS shall deliver the Licensed Data to Licensee in the manner set forth in Exhibit 1. Notwithstanding anything to the contrary contained in this Agreement or its Exhibits, Licensee agrees and acknowledges that the Licensed Data will include only that information which BDS, in its sole discretion, collects and distributes in the ordinary course of its business.

    (d)  Licensee acknowledges and agrees that: (i) the Licensed Data and any other services to be performed by BDS under this Agreement may be provided and/or performed by an affiliate of BDS; and (ii) if the Licensed Data becomes unavailable for any reason, BDS at its sole discretion may either provide substitute data or reduce the fees payable by Licensee under this Agreement.

2.    PAYMENT.

    (a)  Licensee shall pay to BDS the fees for the Licensed Data, as set forth in Exhibit 1. BDS will bill Licensee and Licensee shall pay all invoices upon receipt. Late payments will be assessed an interest charge of one percent (1%) per month. BDS, in its sole discretion, may terminate this Agreement or cease providing Licensed Data to Licensee if Licensee fails to pay any invoice within sixty (60) days after Licensee receives such invoice. Should it become necessary to institute collection proceedings, Licensee shall pay all costs incurred by BDS, including without limitation reasonable attorneys' fees, whether or not suit is filed.

3.    LIMITATION OF LIABILITY.

    (a)  Licensee acknowledges and agrees that: (i) the Licensed Data is produced by BDS in good faith from information compiled and supplied by unrelated third parties; (ii) the Licensed Data is therefore subject to various inaccuracies; and (iii) BDS has no obligation to verify the accuracy of information received from third parties. BDS PROVIDES THE LICENSED DATA ON AN "AS IS" BASIS, MAKES NO EXPRESS OR IMPLIED WARRANTIES REGARDING THE LICENSED DATA, AND DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

(b) Licensee shall review the Licensed Data and notify BDS of any changes necessary to Licensee's format or any mistakes, errors or omissions in the Licensed Data. BDS shall not be liable for any loss or damage arising to Licensee by reason of non-delivery, delay or interruption in delivery of data due to circumstances beyond the control of BDS, which shall include without limitation, failure of communication equipment. IN NO EVENT SHALL BDS' LIABILITY TO LICENSEE OR ANY OTHER PARTY FOR MISTAKES, ERRORS, OR OMISSIONS IN DATA, FOR NON-DELIVERY OR LATE DELIVERY OF DATA, EXCEED THE AMOUNT PAYABLE BY LICENSEE TO BDS FOR THE DATA IN WHICH THE MISTAKE, ERROR, OR OMISSION OCCURRED, OR FOR THE DATA WHICH WAS NOT DELIVERED OR WAS NOT DELIVERED ON A TIMELY BASIS.  IN NO EVENT SHALL BDS OR LICENSEE BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES OR LOST-PROFIT DAMAGES.

5.    INDEMNIFICATION.  BDS shall indemnify, defend and hold harmless Licensee and its officers, directors, employees, representatives and agents from and against any and all claims, damages, costs and expenses (including reasonable out-of-pocket attorneys' fees) arising out of or relating to any allegation that the Licensed Data infringes or otherwise violates any third party's patent, trademark, copyright, trade secret or other intellectual property right, except to the extent such allegation relates to or arises out of any edits, modifications or alterations Licensee has made to the Licensed Data.

6.    PROPRIETARY INTEREST.  Licensee acknowledges that BDS owns all copyrights and other proprietary rights in and to the Licensed Data. Licensee shall not, by virtue of this Agreement or by virtue of its access to the Licensed Data, obtain any copyright or other proprietary right or interest in or to the Licensed Data except the rights specifically granted to Licensee herein.

7.    CONFIDENTIALITY.  Except as provided in Exhibit 1 hereto, each party agrees that, without the express consent of the other party, none of its employees or agents will disclose to any third party any information or material that the other party designates as confidential unless such information or material (i) is or becomes publicly known through no wrongful act of the receiving party, (ii) is received from a third party without restriction and without breach of any confidentiality obligation to the other party, (iii) is independently developed by the receiving party, or (iv) is required by law to be disclosed (provided that the other party is given advance notice of, and an opportunity to, contest any such requirement).

8.    POST-TERMINATION. N/A

9.    GOVERNING LAW; VENUE.  This Agreement shall be governed by and interpreted under the Federal law of contracts, where applicable, and otherwise under the laws of the State of New York, including New York's choice of law rules.  Any suit, action or proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal courts located in New York.  Both parties hereby irrevocably consent to jurisdiction and venue in the federal courts located in New York for purposes of any suit, action or proceeding arising out of or relating to this Agreement.

10.    ASSIGNMENT.  BDS may assign this Agreement without the prior consent of Licensee.  Licensee may not assign this Agreement without the prior consent of BDS.  Any permitted assignee or successor of Licensee's rights and obligations under this Agreement shall be bound by all terms and conditions of this Agreement.

11.    PUBLICITY.  BDS shall have the right to use the name of Licensee in publicity, advertising, and sales promotion only with the prior consent of Licensee.

12.    NO JOINT VENTURE CREATED.  Nothing in this Agreement and its performance shall be construed as creating a joint venture, partnership or agency between Licensee and BDS.

13.    ENTIRE AGREEMENT.  This Agreement and its Exhibits contain the entire understandings of BDS and Licensee concerning the subject matter hereof, and supersede and cancel all prior understandings, agreements, representations (whether oral or written) between BDS and Licensee regarding the subject matter hereof. This Agreement may only be amended by a subsequent writing signed by authorized representatives of BDS and Licensee.

In Witness Whereof, the undersigned have executed this Agreement on the dates indicated.

Accepted by:                                         Accepted by:

**Federal Communications Commission**                **Nielsen Broadcast Data Systems**

Signature: _Frank W. Oakey_                          Signature: _____

Printed Name: **MARK W. OAKEY**                       Printed Name: _Vincent Martino_

Title: **Contracting Officer**                        Title: _Account Executive_

Date: _9·30-04_                                       Date: _9·29·04_

Phone: _202 - 418 - 0933_                             Phone: _914 684 5531_

Fax: _202 418 · 0237_                                 Fax: _914 684 5680_

## Exhibit 1

Between **Nielsen Broadcast Data Systems** and **Federal Communications Commission:**

**I.    Licensed Data:**

BDS shall provide the Licensee 1000 weekly radio station playlists. The data shall be delivered to the Licensee on Compact Disc. On or before September 30, 2004, BDS shall provide the Licensee with a list of radio stations that Licensee may select to be included in the dataset.

**II.    Permitted Uses:**

1.  BDS herein grants to Licensee a non-exclusive license to use BDS Licensed Data for its internal research purposes only, provided that the FCC shall be permitted to (i) publicly release any analysis of the data produced by staff or contractors acting on its behalf, (ii) retain copies of the Data only until such time as any proceeding or recommendation arising from the FCC's "Localism in Broadcasting" initiative has become final and unappealable, except that the data may be retained beyond such time for the sole purpose of dealing with recommendations concerning localism made to Congress, and (iii) share the data with third parties subject to the terms set forth in paragraphs 2, 3, and 4 below. The permissions granted by this Section II shall apply specifically to the FCC's analysis of the data in connection with studies designed to inform the FCC's localism in broadcasting initiative, which was launched by the FCC Chairman on August 20, 2003, to conduct research on localism, hold public hearings on localism, and produce a Notice of Inquiry and report making recommendations to the Commission on how the agency could best promote localism in radio and television (including recommendations for Congressional action). Except as authorized in such Sections 2, 3, and 4, Licensee, its agents and employees shall not make available to any third party the Licensed Data, in any medium, by electronic or other means, or authorize any third party to reproduce any part of the Licensed Data. No other redistribution or derivative uses are permitted without the express written consent of BDS.

2.  The Licensee (FCC) intends to use the Licensed Data in studies that may support policy recommendations or proposed regulatory changes. Subject to the provisions of paragraph 4 below, the Licensee shall be permitted to reproduce the data for purposes of making it available to the public, provided that the call signs are masked.

3.  Subject to paragraph 4 below, Licensee shall be permitted to make the Licensed Data available to selected third parties without masking the call sign, provided that such third parties shall not be permitted to further reproduce the data except for purposes of manipulating it, may not sell or otherwise distribute it in any fashion, and may not use it for commercial purposes. If the Licensor so requests, use of the data by third parties shall be made subject to a protective order and/or non-disclosure agreement that would include the foregoing restrictions. Further, Licensee's permission to make the data available to third parties shall extend only to parties that have an interest in any Commission orders, reports, or studies that may rely on the staff's analysis of the data. This could include federal courts, as well as private parties affected by the Commission's decisions, contractors engaged by the Commission to analyze the data, and academics engaged in research that may relate to broadcast localism. Notwithstanding the foregoing, BDS shall retain authority to deny

requests for access by employees of firms that may have a commercial interest in the Licensed Data, provided that the outside counsel and consultants employed by such firms shall be permitted access upon execution of a non-disclosure agreement. The non-disclosure agreement shall prohibit disclosure of the Licensed Data to any person who has not also executed a valid non-disclosure agreement, and shall further prohibit disclosure to any firm that may have a commercial interest in such data.

4.   The availability of Licensed Data under paragraphs 2 and 3 shall be subject to the following timeframes. Licensed Data may not be made available to any third party (other than any FCC contractor engaged to analyze the data) (a) prior to the publication of any FCC study that relies on or analyzes the data (including any such study performed by an FCC contractor) or (b) after the expiration of one year from the date the data are first made available to the public in connection with the publication of any FCC study. Notwithstanding the foregoing, the Licensee shall be permitted to make the Licensed Data available at any time, upon request, to third parties that are participants in, or intend to participate in, any FCC proceeding in which the FCC relies on or proposes to rely on its analysis of the Licensed Data (including any analysis provided to the FCC by a contractor) or in any court proceeding on review of an FCC order that relies on or proposes to rely on an FCC analysis of the Licensed Data (including any analysis provided to the FCC by a contractor). The Licensed Data may be made available at any time to a court in connection with the review of any FCC order that relies on or proposes to rely on an FCC analysis of the Licensed Data (including any analysis provided to the FCC by a contractor).

5.   FCC staff and contractors shall be permitted to use the data without masking the call sign, provided that the unmasked data are not made available to the public except pursuant to the provisions of paragraphs 2, 3, and 4.

Accepted on this _30_ day of _Sept_, 2004 by:

_____ initials

_____ initials

# **Attachment K**

# 2000 CABLE AND TV STATION COVERAGE ATLAS

Albert Warren, President, Editor & Publisher
Paul L. Warren, Executive Vice President & Executive Publisher
Daniel Y. Warren, Senior Vice President & Associate Publisher
Dawson B Nail, Vice President & Executive Editor

**EDITORIAL & BUSINESS HEADQUARTERS**
2115 Ward Court, N.W., Washington, D.C. 20037
Phones: 202-872-9200; 800-771-9202   Fax: 202-293-3435
E-mail: info@warren-news.com
Web site: http://www.warren-news.com

**Editorial-Factbook/Directories**
Michael C. Taliaferro, Managing Editor & Assistant Publisher—Directories
Richard D. Koch, Assistant Managing Editor & Editorial Director
Susan Seiler, Senior Editor & Editorial Supervisor
Gaye Nail Adler, Senior Editor & Editorial Supervisor
Robert T. Dwyer, Senior Research Editor
Ted Starkey, Research Coordinator
Marla S. Bonner, Senior Editor
Jeanne T. Welsh, Senior Editor
Eric D. Wright, Associate Editor
Lacey M. Caldwell, Associate Editor
Robin Friedman, Assistant Editor
Cristina Calle, Assistant Editor
Jennifer Stahl, Assistant Editor
Meg Denbow, Editorial Assistant

**Production-Factbook/Directories**
Mark P. Flanagan, Production Manager
Koby W. Messick, Production Editor
Jodi E. Bucknam, Production Editor
Matthew Fundakowski, Production Assistant


Federal Communications Commission Library
JUN 7 2000

**Computer Systems-Factbook/Directories**
Deborah Jacobs, Information Systems Manager
Gregory E. Jones, Database/Network Manager

**Telecom Research Group**
Robert Babbitz, Executive Editor
Catherine Hackett, Managing Editor
Ron Kaplan, Research Analyst
William Stofega, Research Analyst
Jay Ulfelder, Research Analyst
Marla Shephard, Research Associate
Athena Platis, Research Associate

**Editorial-News**
R. Michael Feazel, Managing Editor
Edie Herman, Senior Editor
Herb Kirchhoff, Senior Editor
Patrick Ross, Senior Editor
Mary Greczyn, Associate Editor
Sasha Samberg-Champion, Associate Editor
Dinesh Kumar, Associate Editor
Bruce Branch, Associate Editor
Shawn Nelson, Assistant Editor
W. Pernell Smith IV, Associate Production Manager
Matt Kistenmacher, Associate Production Manager

**Daily Document Service**
Joseph Lautieri, Manager

**Business**
Brig Easley, Vice President & Controller
Lynn Levine, Executive Sales Director
Betty Alvine, Circulation Director
Karen Thrane, Director, Business Development
William R. Benton, Account Manager
Christopher H. McKinley, Account Manager
Bruce Ryan, Account Manager
Gina Storr, Marketing Manager
Jackie Harris, Sales Coordinator

**NEW YORK BUREAU**
276 Fifth Avenue, New York, N.Y. 10001
Phone: 212-686-5410   Fax: 212-889-5097

**Editorial**
Paul Gluckman, Bureau Chief
Stephen A. Booth, Senior Editor
Mark Seavy, Senior Editor
Cindy Spielvogel, Associate Editor
Jeff Berman, Associate Editor
Razia Mahadeo, Editorial Assistant

**CONTRIBUTING EDITOR, EUROPE**
Barry Fox
22 Holmefield Court
Belsize Grove, London NW3 4TT
Phone: (44-171) 722-8295   Fax: (44-171) 483-3074

**JAPANESE REPRESENTATIVE**
Editorial and Circulation – CES International Corp.
1-22-7 Nishi Shinbashi, Minato-ku, Tokyo 105, Japan
Phone: (03) 3592-1531   Fax: (03) 3592-1532

## Publications & Services of Warren Communications News

TELEVISION & CABLE FACTBOOK
TELEVISION & CABLE FACTBOOK ON CD-ROM
CABLE & STATION COVERAGE ATLAS
*Published Annually*

TELEVISION & CABLE ACTION UPDATE
*Published Weekly*

TELEVISION DIGEST with CONSUMER ELECTRONICS
*Published Weekly*

AUDIO WEEK

COMMUNICATIONS DAILY

CONSUMER MULTIMEDIA REPORT
*Published Biweekly*

DAILY DOCUMENT SERVICE

FCC REPORT
*Published Biweekly*

LOCAL COMPETITION REPORT
*Published Biweekly*

LONG DISTANCE COMPETITION REPORT
*Published Biweekly*

MOBILE COMMUNICATIONS REPORT
*Published Biweekly*

PUBLIC BROADCASTING REPORT
*Published Biweekly*

SATELLITE WEEK

STATE TELEPHONE REGULATION REPORT
*Published Biweekly*

TELCO BUSINESS REPORT
*Published Biweekly*

TELECOM A.M.
*Published Continually*

VIDEO WEEK

WARREN'S CABLE REGULATION MONITOR
*Published Weekly*

WASHINGTON TELECOM NEWSWIRE
*Published Continually*

DATA BY DESIGN

Electronic Distribution via Dow Jones, Desktop Data,
Information Access Co., Knight-Ridder Information,
M.A.I.D. and Nexis

It is against the law to make a copy of this publication or any portion of its content without our explicit permission. Federal copyright law (17 USC 504) makes it illegal, punishable with fines up to $100,000 per violation plus attorney's fees. It is also illegal to input any of this publication into any computer or data retrieval system without our permission. Warren Publishing, Inc. frequently has taken action against individuals and firms that violated our copyright, or other rights, and we will continue to do so. We request that subscribers advise their staffs of the law and the financial penalties that will result from the copying or improper use of this publication. We welcome inquiries about additional subscriptions and we are prepared to grant authorization for certain occasional reproduction of portions of this publication, but only upon formal request to the publisher. Permission is granted to those registered with the Copyright Clearance Center to reproduce this publication for $3.75 per page. Send payments to Copyright Clearance Center, 222 Rosewood Dr., Danvers, MA 01923. Phone: 503-750-8400. For additional subscriptions, please contact our Circulation Dept. at 202-872-9200.

Copyright © 2000 by Warren Communications News
All Rights Reserved
ISBN: 1-57696-034-X ISSN: 0193-3639