**INTERVENOR DEFENDANT BIA FINANCIAL NETWORK, INC.'S**

**MOTION FOR SUMMARY JUDGMENT**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| INSTITUTE FOR PUBLIC REPRESENTATION, | ) ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | Civil Action No. 07-2092 (JR) |
| FEDERAL COMMUNICATIONS COMMISSION, | ) ) ) ) |  |
| Defendant, | ) ) |  |
| - and - | ) ) |  |
| BIA Financial Network, Inc. 15120 Enterprise Court Chantilly, VA  20151 | ) ) ) ) |  |
| Applicant for Intervention as Defendant. | ) ) ) |  |

**INTERVENOR DEFENDANT BIA FINANCIAL NETWORK, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

Defendant BIA Financial Network, Inc. ("BIA*fn"*), through its undersigned counsel, hereby respectfully moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on the grounds that no genuine issue of material fact exists and that BIA*fn* is entitled to judgment, as a matter of law, that Defendant Federal Communications Commission ("FCC") properly denied Plaintiff's FOIA request insofar as it called for BIA*fn*'s copyrighted data which the FCC had accessed and used pursuant to a software and data license agreement with BIA.  In support of this Motion for Summary Judgment, BIA*fn* is submitting herewith the accompanying Intervenor Defendant BIA Financial Network, Inc.'s

Memorandum of Points and Authorities in Support of  Its Motion for Summary Judgment, a Statement of Material Fact As To Which There Is No Genuine Issue, and the Declaration of Mark R. Fratrik.

June 12, 2008                          Respectfully submitted,

_____

John H. Korns                          (DC Bar #142745)
Buchanan Ingersoll & Rooney PC
Suite 300
1700 K Street, NW
Washington, DC  20006-3807
Direct:     (202) 452-7939
General:   (202) 452-7900
Fax:        (202) 452-7989
E-Mail:    john.korns@bipc.com

*Counsel for BIA Financial Network Inc.*

*331540-v1*

- 2 -

**INTERVENOR DEFENDANT BIA FINANCIAL NETWORK, INC.'S**

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INSTITUTE FOR PUBLIC REPRESENTATION,<br><br>　　　　　　　　　Plaintiff,<br><br>　v.<br><br>FEDERAL COMMUNICATIONS COMMISSION,<br><br>　　　　　　　　　Defendant,<br><br>　- and -<br><br>BIA Financial Network, Inc.<br>15120 Enterprise Court<br>Chantilly, VA  20151<br><br>　　　Applicant for<br>　　　Intervention as Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)　　Civil Action No. 07-2092 (JR)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**INTERVENOR DEFENDANT BIA FINANCIAL NETWORK INC.'S
MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Applicant for Intervention as Defendant BIA Financial Network, Inc. ("BIA*fn*") is the owner of copyrighted data the use of which, subject to explicit limitations, was licensed to the Federal Communications Commission ("FCC").  According to the FCC, such BIA*fn* data were among the materials that the FCC declined to release pursuant to Plaintiff's FOIA request and that Plaintiff in this lawsuit seeks to require the FCC to release.  BIA*fn* has moved to intervene in this lawsuit as a Defendant, supporting the FCC's position, for the following reasons: (a) Only BIA*fn* is in a position to present to the Court the full picture regarding its business, the

substantial prices it charges for licensing access to and use of its copyrighted data, and the substantial damage that would be caused to its business by a ruling that members of the public could obtain through FOIA requests -- at zero or minimal cost -- copies of its valuable data; (b) It is important to demonstrate to the Court that BIA*fn* cares about maintaining the confidentiality of its data and that BIA*fn* supports the FCC's position; and (c) It is important to demonstrate that the legal principles asserted by the FCC apply to BIA's copyrighted data made available to the FCC pursuant to a licensing agreement.

BIA*fn* adopts and incorporates herein by reference the facts discussed and legal arguments made by the FCC in its Memorandum of Points and Authorities in Support of its Motion for Summary Judgment insofar as they relate to BIA*fn*'s data.

## Background

BIA*fn* Materials That the FCC Has Declined To Release and Its Reasons

The FCC has stated that, among the information covered by Plaintiff's FOIA request which the FCC declined to release were "approximately 700 pages of material consisting of factual data and data analyses consisting of spreadsheets and memoranda which apply and analyze factual data from several proprietary sources . . . used by Commission staff to examine issues . . . ", including "printouts containing the results of staff searches of three electronic databases: [including] MasterAccess (BIA) . . . ."  Declaration of Michael S. Perko ("Perko Decl.") ¶¶ 17, 26.  The FCC has further stated:

> 25.     The FCC cannot use and disclose the copyrighted and/or proprietary records described above as it sees fit, because Commission access to and use of this information is governed by licensing agreements and/or copyright notices that preclude release under these circumstances . . . .
>
> . . . .
>
> 27.     Master Access . . . contain information on broadcast stations . . ., including their ownership, market position, audience, and ratings. . . .

28.     Commission access to the electronic databases is governed by licensing agreements, as described below.

29.     The BIA license limits the distribution of research using the database. *See, e.g.,* Attachment H hereto (BIA Publications, Inc. Software License Agreement), at 1-2 (**"YOU MAY** distribute the results of your research (reports and/or verbal information) to clients and generally use this software for any legitimate purpose that it was designed for . . . **"YOU MAY NOT** . . . grant any rights in this . . . data . . . in any form to any person, except as provided above, without express written permission from BIA Publications" (emphasis in original). The license provides that "all terms and conditions will remain in effect throughout all renewal periods that extend beyond the first year." *Id.* at 2.[1]

Perko Decl. ¶¶ 25, 27 - 29.

Background Regarding BIA*fn,* the Licensing of Its Data and Its Rights

BIA*fn* is a financial and strategic consulting and research firm specializing in the acquisition and licensing of a variety of data regarding the broadcasting and communications industries.   Since 1985 BIA*fn* and its predecessors-in-interest have been in the business of acquiring, and licensing access to, and the use of, data re public media.   Declaration of Mark R. Fratrik ("Fratrik Decl.") ¶ 4.

The business of BIA with respect to such data is as follows.   Pursuant to a license of its software and data, BIA provides timely and reliable access to, and use of, over 1,200 fields of data on more than 30,000 broadcast and newspaper organizations in the U.S., Canada and Mexico, including 14,000 radio stations, approximately 10,000 commercial and non-commercial full and low power television stations, and more than 8,000 U.S. daily and weekly newspapers. Access to daily data updates through BIA's software and the internet provides an efficient way

---

[1]  In 1996, when the FCC first contracted for an annual license to use the data regarding the broadcasting and communications industries, it contracted with BIA Publications, Inc.   Subsequently, that corporation was merged into another which merged into BIA*fn.*   Pursuant to Virginia Code Ann. §13.1-721(A)(3) (Michie 1999), this vested all the assets and contracts of BIA Publications Inc. in BIA*fn* without impairment, including the BIA Publications Inc. Software License Agreement, which Agreement specified that it would "remain in effect throughout all renewal periods."   In this Memorandum, the term "BIA" will be used to cover both BIA Publications and BIA*fn.*   BIA's copyrighted software for accessing and analyzing its copyrighted data earlier called MasterAccess is more recently called Media Access Pro.   Declaration of Mark R. Fratrik ¶ 5 ("Fratrik Decl.")

for licensees to obtain updates. BIA's software permits licensees to research and analyze revenues, ratings, circulation, ownership, transactions, demographics, technical stats and more with respect to public media. BIA's software also provides the ability to have simultaneous cross-media displays of BIA-acquired data regarding radio, television and newspaper. Fratrik Decl. ¶ 7.

Generally, BIA's licenses for its software and data are for an annual period, although occasionally licenses are negotiated for a particular one-time provision of certain data. Fratrik Decl. ¶ 8.

To BIA's knowledge, there is no government entity and there is no other business entity that collects or makes available such a breadth of data re public media. Fratrik Decl. ¶ 9.

BIA uses significant manpower to collect these data on a daily basis. BIA has personnel that make phone calls to all television and radio stations and daily and weekly newspapers to determine if there are any changes necessary to the database and to update its information. BIA also monitors trade press and other public notices concerning these broadcast stations and newspapers to determine whether changes to the database are necessary. BIA also monitors the financial conditions of the three media – radio, television and newspapers – to determine whether BIA estimates of local market revenues need to be changed. Thus, BIA incurs substantial expenses to obtain this data. Fratrik Decl. ¶ 10.

These data are quite valuable to those having a need for them. BIA does not give such data away for free or make them available to the public. BIA has less than 400 annual licensees for these data. BIA charges its clients substantial fees for annual licenses that vary according to the number of media (among radio, TV and newspaper) for which data are provided and the number of users entitled to access the data at any one time. Fratrik Decl. ¶ 11.

- 4 -

Since 1996, BIA has licensed its software and its radio, television and newspaper data bases to the FCC for multiple FCC users to access and use, subject to the software and data license agreement attached to Mr. Perko's Declaration as Exhibit H.  For the license to the FCC for one year beginning March 1, 2006, permitting 50 FCC users at any one time to access its software and its data for radio, TV and newspaper, BIA*fn* charged the FCC more than $25,000. Fratrik Decl. ¶ 12.

Even access and use of a one-time dump of <u>non</u> current BIA data is quite valuable.  For instance, over the past two years, BIA*fn* has licensed use of one-time dumps of certain historical data to at least ten entities (mostly academic institutions) regarding either one medium (e.g. radio only, or television only) for charges between $3,000 and $5,000, or all three media (radio, TV and newspaper) for charges between $8,000 and $10,000.  Fratrik Decl. ¶ 13.

All of these transactions have been pursuant to written agreements in which BIA licensed to the client use of its software and specifically defined sets of data, specifying that the software and the data are copyrighted and limiting what the licensee may properly do with the software and data.  Fratrik Decl. ¶ 14.

The BIA software and data license agreement entered into in 1996 (attached as Attachment H to the Perko Declaration) ("the License Agreement") provides "The initial term of this agreement will be one year from the date below, however, all terms and conditions will remain in effect throughout all renewal periods that extend beyond the first year."  In return for payments of substantial sums, BIA has renewed the FCC's license each year since then, and therefore the terms of this license agreement continue to govern the extent and limits of the FCC's rights and obligations.  Fratrik Decl. ¶ 15.

The Licensing Agreement restricts the FCC as follows:

> YOU MAY NOT . . . transfer, . . . or grant any rights in this program, data or accompanying documentation in any form, to any person, except as provided above.

And it also provides the following permission and restrictions on the FCC:

> YOU MAY distribute the results of your research . . . to clients . . .

> YOU MAY NOT make copies of the . . . data for the purposes of . . . mass distribution to anyone not associated with you, the licensee.

> YOU MAY NOT distribute the . . . data files to clients or anyone not directly affiliated with you, the licensee, for the purpose of allowing them to conduct their own searches.

The license nowhere provides that the FCC as a licensee may transfer BIA's licensed data to members of the public.  Fratrik Decl. ¶¶ 16-17.

And, in the license, the FCC "agree[d] to use reasonable efforts to protect the software and data from unauthorized use, reproduction, distribution or publication."  Thus the license requires the FCC to treat the BIA data as proprietary and confidential.  Fratrik Decl. ¶ 18.

The records at issue, according to Mr. Perko's declaration, include BIA-licensed data -- containing information on broadcast stations, including their ownership, market position, audience, and ratings -- which were accessed and obtained by FCC staff members through BIA's software and the internet, and such data incorporated in FCC memoranda which apply and analyze factual data from several proprietary sources.  As acknowledged by the FCC, these data are covered by the BIA license and copyright, and by the specific prohibition on transfer of, and on granting any rights in, BIA's data absent BIA consent.  Providing such data to Plaintiff pursuant to Plaintiff's FOIA request is not covered by any exception in the license, and thus providing such data to Plaintiff would violate BIA's rights under the license and copyright.  Fratrik Decl. ¶ 19.

Further, even if there were no license agreement and the data were merely copyrighted, there would still be no basis under which the FCC could provide the data to Plaintiff pursuant to FOIA. Such disclosure would not constitute "fair use" of the data. Ordering the FCC to disclose BIA data pursuant to FOIA would constitute disclosure of BIA data to the world because, if a party can obtain such data pursuant to FOIA, then such party may do anything with the data it wishes (including further distribution) and every other person can also obtain the data pursuant to FOIA. Such disclosure to Plaintiff would deprive BIA*fn* of a valuable potential for sale of rights to use BIA data pursuant to license. Fratrik Decl. ¶ 20.

Further, such disclosure pursuant to FOIA would seem to establish a rule that anyone could obtain any of BIA's licensed data from the FCC with a FOIA request. Given the substantial value of such data, it could be expected that others desiring to obtain BIA's data without paying the fair price would simply use FOIA as a mechanism to do so. While FOIA may be a slow process, given the value of the data it can be anticipated that others would resort to FOIA to obtain BIA data without paying BIA*fn*. Fratrik Decl. ¶ 21.

BIA*fn* is not obligated to license its data to the FCC. It does so as a commercial matter. If BIA data in the hands of the FCC could be obtained by members of the public pursuant to FOIA, in order to prevent the undermining of its market BIA*fn* would be required to stop licensing its data to the FCC. That would cause significant harm to the FCC because the FCC makes substantial use of BIA data in doing its work, and the absence of such data would harm the FCC's ability to carry out its statutory missions. Fratrik Decl. ¶ 22.

If Plaintiff wishes access to the data, BIA*fn* will be pleased to license access and use of such data to Plaintiff pursuant to the same license terms, and at a price comparable to what BIA*fn* charges others for licenses for comparable data. Fratrik Decl. ¶ 23.

<u>The FCC Recognizes BIA's Rights and the Importance of the Data to the FCC</u>

Also, the Perko Declaration recognizes BIA's rights in the data, the importance of the data to the FCC, and the potential impact of the Court requiring the FCC to disclose the BIA data to Plaintiff pursuant to FOIA:

> 34.    . . . BIA . . . are commercial entities.  This material constitutes information that is of commercial interest to these entities and it is customarily not released to the public by the entities from whom it was obtained; it is available to others for purchase at substantial cost.
>
> 35.    There was no requirement for these entities to provide the FCC with access to their databases or materials, and these entities agreed to do so only in exchange for compensation.  The FCC has no regulatory authority to compel the entities to provide access to this information.  The FCC acquired at cost a conditional license of access and/or use, contingent upon the FCC honoring the non-disclosure requirements set forth in the licensing agreements and/or copyright notices.  These entities may have sought to terminate this arrangement and/or pursue legal action if the Commission did not abide by the terms, *e.g.*, by disclosing data to unauthorized third parties.
>
> 36.    The material is commercially valuable and the license agreements and notices make clear that the copyright owners expect users to treat the data as proprietary and confidential.  The terms of the license agreements indicate that the copyright owners have substantial commercial interests that they wish to assert, and the materials in question are being withheld to protect those interests.
>
> 37.    If the government were required to release commercially valuable copyrighted information under FOIA, this would make commercial providers of such information less likely to sell it to the government, or cause them to charge exorbitant fees for the government to obtain such information, thus impairing the government's ability to obtain information that it needs to carry out its regulatory responsibilities.

Perko Declaration at ¶¶ 34-37.

## ARGUMENT

### A.    The Copyrighted Materials Are Not Agency Records

As stated above, the records withheld by the FCC contain copyrighted data, consisting of printouts containing the results of staff searches of three electronic databases, including BIA data, and FCC internal memoranda which apply and analyze these data. *See* Perko Decl. at ¶¶

17, 26.  BIA data include information on broadcast stations, including their ownership, market position, audience, and ratings.  *Id*. at ¶27.

As discussed above, the terms of the license agreement between BIA and the FCC prohibit the FCC from disclosing BIA data to the public.  In addition, BIA's data are entitled to copyright protection under the Copyright Act.

With respect to copyright protection of BIA's electronic database, it possesses the requisite originality for copyright protection based on the selection and arrangement of the compiled data.  *See Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 348 (1991) (factual compilations may possess the requisite originality for copyright protection based on the selection and arrangement of the compiled data).  The database reflects the independent selection and arrangement of the data by publishers and therefore contain sufficient originality to be protected by copyright.  *See id*.  ("These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws."); *see also id*. at 358-59 ("Presumably, the vast majority of compilations will pass this test . . . .").

These copyrighted materials are not "agency records" subject to release within the meaning of FOIA, and the Court therefore lacks jurisdiction to compel the FCC to release these materials.  *See Kissinger v. Reporters Comm. For Freedom of the Press*, 445 U.S. 136, 150 (1980) ("[u]nder 5 U.S.C. §552(a)(4)(B) federal jurisdiction is dependent upon a showing that an agency has (1) 'improperly' (2) 'withheld' (3) 'agency records'").  The FOIA requires agencies to release upon request, with certain exceptions, "records."  *See* 5 U.S. C. §552(a)(3)(A).  To constitute an agency record under the FOIA, a document must be (1) either created or obtained by an agency and (2) under agency control at the time of the FOIA request.  *Tax Analysts v.*

*United States Dep't of Justice*, 913 F. Supp. 599, 602 (D.D.C. 1996) (*Tax Analysts II*), *aff'd without opinion*, 107 F.3d 923 (D.C. Cir. 1997), *cert. denied*, 522 U.S. 931 (1997), *citing U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144-45 (1989) (*Tax Analysts I*).  A four-factor test is used in this Circuit to evaluate whether an agency "controls" a record:  (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.  *See In Defense of Animals v. National Institutes of Health*, --- F. Supp.2d ---, 2008 WL 1708413 (D.D.C. 2008), *citing Burka v. U.S. Dep't of Health and Human Services*, 87 F.3d 508, 515 (D.C. Cir. 1996) (quoting *Tax Analysts v. Dep't of Justice*, 845 F.2d 1060, 1069 (D.C. Cir. 1988)).

The materials that the FCC obtained from BIA do not constitute agency records and are not subject to disclosure pursuant to a FOIA request because they are not under the FCC's control.  Commission access to BIA's electronic database is governed by the License Agreement between BIA and the FCC, which reflects the proprietary nature of the databases under the Copyright Act, 17 U.S.C. §§101 *et seq*. *See* Perko Decl. at ¶25.  The BIA License Agreement generally prohibits the transfer of the data to any person except as provided in the Agreement ("**YOU MAY NOT** … transfer . . . or grant any rights in this …data … in any form to any person, except as provided above, with express written permission from BIA Publications" (emphasis in original)).  The Agreement nowhere provides that BIA's data may be transferred to the public or pursuant to a FOIA request, and thus the quoted provision above prohibits any such transfer.  And the BIA License Agreement limits the distribution of research using the database to "clients"  ("**YOU MAY** distribute the results of your research (reports and/or verbal

information) to clients and generally use this software for any legitimate purpose that it was designed for . . . ." *Id*. at ¶29; Attachment H thereto (BIA Publications, Inc. Software License Agreement, at 1-2) But FOIA requesters cannot be understood to be "clients" of the FCC, because such exception would eviscerate the meaning of the Licensing Agreement.[2] Also, the license provides that "all terms and conditions will remain in effect throughout all renewal periods that extend beyond the first year." *Id*., Attachment H at 2.

BIA thus clearly intended to retain control over the copyrighted materials and the FCC is precluded from disclosing them to the public or otherwise using or disposing of these records as it sees fit.[3]

In addressing a FOIA request seeking copyrighted records, this Court previously concluded that such materials do not constitute "agency records" within the meaning of the FOIA and that the Court lacked jurisdiction to compel their release. In *Tax Analysts II*, the court held that the Department of Justice's (DOJ) JURIS database, which was subject to a copyright held by West, a legal publisher, was not an agency record. The court explained first that reference material is not the type of information to which the FOIA was intended to provide access. *See* 913 f. Supp.2d at 607. More importantly, the court concluded that because DOJ was required by the JURIS license agreement to treat JURIS as proprietary and restricted the DOJ's ability to use or disseminate the data contained in the database, DOJ lacked sufficient control over the JURIS database to make the database an agency record. *Id*. As the court stated, "[t]he question is whether the DOJ could 'use and dispose of the [data] as it [saw] fit.'" *Id*. at 603,

---

[2]  Because FOIA requests may be filed by "any person" (*see* 5 U.S.C. §522(a)(3)(A)), and are not limited to persons having any particular relationship with the Commission, there is no basis to deem FOIA requesters to be FCC "clients," within any reasonable definition of that term.

[3]  Agency personnel have read or relied upon the records to some extent in formulating their analysis of the data contained therein, but the documents were not formally integrated into the agency's record system or files except to the extent that the materials were used and/or retained by FCC personnel for purposes of reference.

*quoting Dow Jones & Company, Inc. v. General Services Administration*, 714 F. Supp. 35, 39 (D.D.C. 1989); *see also Gilmore v. U.S. Dept. of Energy*, 4 F. Supp. 2d 912 (N.D. Cal. 1998) (holding that the U.S. Dept. of Energy lacked sufficient control over software to make it an "agency record" under FOIA).

Because the Commission accesses and uses the BIA data subject to the License Agreement establishing similar kinds of restrictions, the materials obtained from the BIA database do not constitute agency records and are not subject to disclosure pursuant to a FOIA request.[4]  Accordingly, because the information in question was not under agency control, it does not constitute an agency record under FOIA.  *See Tax Analysts II*, 913 F. Supp.2d at 603, *citing Goland v. CIA*, 607 F.2d 339, 347 (D.C. Cir. 1978) (rejecting plaintiff's argument that agency's possession of a document *per se* dictates document's status as an "agency record," and holding instead that the crucial question was whether the document was "subject to the free disposition of the agency"), *cert. denied*, 445 U.S. 927 (1980); *Paisley v. CIA*, 712 F.2d 686, 692-93 (D.C. Cir. 1983) (same), *unrelated part of opinion vacated*, 724 F.2d 201(D.C. Cir. 1984); *Washington Post v. United States Dep't of Defense*, 766 F. Supp. 1, 16-17 (D.D.C. 1991) (citing *Goland* to hold that transcript transferred by Congress to agency for limited purpose did not become agency record because document was not subject to free disposition of agency).

### B.    The FCC Properly Withheld the BIA Copyrighted Materials Pursuant to FOIA Exemption 4

Even if the records containing the copyrighted data obtained pursuant to the BIA License Agreement are considered agency records within the purview of the FOIA, they are protected from disclosure by FOIA Exemption 4 as confidential commercial records.  This case concerns

---

[4]  In light of the restrictions on the FCC's use of these materials, it is not dispositive that the materials consist of data extracted from the database or other compilations, rather than the compilations themselves, as in *Tax Analysts II*.

the portion of Exemption 4 that protects confidential commercial or financial information.  *See* 5 U.S.C. §552(b)(4).  This exemption applies when the information is "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential."  *Id.*; *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).  The information that the FCC withheld from disclosure satisfies all of the foregoing criteria.

### 1.    <u>Commercial or Financial Information</u>

The terms "commercial" and "financial" are given their ordinary meanings for purposes of FOIA Exemption 4.  *See Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp.2d 19, 28 (D.D.C. 2000) (citing *Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983), and *Washington Post Co. v. HHS*, 690 F.2d 252, 266 (D.C. Cir. 1982)).  Records are deemed to be "commercial" so long as the submitter has a "commercial interest" in them.  *See Public Citizen*, 704 F.2d at 1290.

As discussed above, the records contain copyrighted BIA data from a proprietary source that the Commission obtained pursuant to a software and data license agreement that limits the Agency's ability to distribute or disclose the information to outside sources.  BIA makes this information available to the FCC and to others pursuant to licenses at substantial cost.  This information therefore constitutes information that is of commercial interest to the proprietary source, BIA.

### 2.    <u>Obtained From a Person</u>

Records are considered to be "obtained from a person" for purposes of FOIA Exemption 4 so long as they were submitted by a "partnership, corporation, association, or public or private organization other than an agency."  *See* 5 U.S.C. §551(2); *Allnet Communication Services, Inc. v. FCC*, 800 F. Supp. 984, 988 (D.D.C. 1992).  The BIA data records here were obtained from a

- 13 -

commercial company.  *See* Perko Decl. at ¶34, Fratrik Decl. ¶¶ 1, 19.  The records were thus obtained from a "person" as that term applies to Exemption 4.

### 3.    Confidential Information

To determine whether information is confidential, it must first be determined whether the requested information was submitted voluntarily to the government or whether its submission was required.  *See McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 304 (D.C. Cir. 1999).  If financial or commercial information was submitted voluntarily, then the information is "'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained."  *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc).  If the government requires the submission of information, then the information is "confidential" if its disclosure is "likely either '(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.'"  *Pub. Citizen Health Research Group v. FDA*, 185 F.3d 898, 903 (D.C. Cir. 1999) (quoting *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974)).

The information at issue – data that the FCC obtained the right to access and use pursuant to a license from BIA, a commercial company, by paying a substantial fee– was voluntarily submitted.  As with any arms-length commercial transaction, there was no requirement that BIA provide the FCC with access to its databases or its materials, and BIA agreed to do so only in exchange for compensation and subject to certain conditions.  *See* Perko Decl. at ¶35; Fratrik Decl. ¶¶ 1, 19, 22.  The FCC has no regulatory authority to compel the entities to provide access to this information.  *Id;* Fratrik Decl. ¶ 22.  Rather, the FCC acquired for a substantial price a

conditional license of access contingent upon the FCC honoring the non-disclosure requirements set forth in the licensing agreement. *Id;* Fratrik Decl. ¶¶ 15-16. BIA could have sought to terminate this arrangement and/or pursue legal action if the FCC did not abide by the terms, *e.g.*, by disclosing data to unauthorized third parties. *Id.* Therefore, the information should be considered voluntarily submitted for purposed of assessing confidentiality.

**The records would customarily not be released to the public**

The data at issue is "confidential" because BIA does not customarily release such information to the public, except at substantial cost. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d at 880. FOIA Exemption 4 has been held to be applicable to certain copyrighted material that is the subject of a FOIA request. *See Gilmore v. U.S. Dep't of Energy*, 4 F. Supp.2d 912, 922 (N.D. Cal. 1998) (finding that CLERVER software would be confidential and protected by FOIA Exemption 4 if it were considered an agency record); *see also* Department of Justice, Office of Information and Privacy, *Copyrighted Material and the FOIA*, FOIA Update Vol. IV, No. 4 (Fall 1983) (*Copyrighted Material and FOIA*) (*available at* <http://www.usdoj.gov/oip/foia_updates/Vol_IV_4/page3.htm> ("The only appropriate approach for protecting copyrighted documents under the FOIA is through the application of Exemption 4 . . . ."). Documents prepared by the federal government that contain "summaries or reformulations of information supplied by a source outside of the government" may also be withheld under Exemption 4. *See Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp.2d 19, 28 (D.D.C. 2000) (citing *Gulf and W. Indus.*, 615 F.2d at 529-30).

Exemption 4 is correctly applied to the BIA records at issue because the material is commercially valuable and the License Agreement makes clear on its face that the copyright owner BIA expects users to treat the data as proprietary and confidential. The terms of the

License Agreement indicate that the copyright owners have substantial commercial interests that they wish to assert, and the materials in question are being withheld to protect those interests. *See* Perko Decl. at ¶¶34, 36; Fratrik Decl. ¶¶ 15-18.  Commercially valuable data that plaintiff would only be able to obtain otherwise by purchase from BIA at significant cost is properly considered information that is of commercial interest to BIA and which is not customarily made available to the public.  *Id;* Fratrik Decl. ¶ 11.

Moreover, if the government were required to release commercially valuable copyrighted or commercial information under FOIA, this would make BIA*fn* and other providers of such information less likely to license the government to access or use this information, or cause them to charge exorbitant fees for the government to obtain such information.  *Id.* at ¶37; Fratrik Decl. ¶ 22.    Indeed, "[i]t is a matter of common sense that the disclosure of information the Government has secured from voluntary sources on a confidential basis will both jeopardize its continuing ability to secure such data on a cooperative basis and injure the provider's interest in preventing its unauthorized release."  *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d at 879.  If the government were required to release commercially valuable copyrighted or commercial information under FOIA, this would make commercial providers of such information less likely to sell or license it to the government, thus impairing the government's ability to obtain information that it needs to carry out its regulatory responsibilities.[5]  *See* Perko Decl. at ¶37; Fratrik Decl. ¶ 22.

---

[5]  The copyrighted material has "intrinsic commercial value" – it can be sold like any other commodity in the marketplace, bringing to its private owner the economic benefit of his proprietary interest.  Yet, this proprietary interest can be lost when a record is submitted to the government and then requested under the FOIA, unless it is withheld as exempt.  To conclude otherwise would be to allow the ready viation of substantial private proprietary interests in valuable documents submitted to the government:  a result surely not intended by Congress in enacting the FOIA.  *Cf. Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981).

As with any arms-length business transaction, BIA was not required to enter into any agreement with the Commission to provide access to its data.  If BIA*fn* determined that doing business with the FCC, regardless of pledges of confidentiality, could result in its proprietary information being disclosed to the public, BIA*fn* would be less likely to do business with the FCC.  *See* Fratrik Decl. ¶ 22; *Comstock Int'l, Inc. v. Export-Import Bank*, 464 F. Supp. 804, 808 (D.D.C. 1979); *Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp.2d  at 30 (holding that because submitters of information were "reluctant to negotiate agreements with the agency absent assurances of confidentiality," disclosure would interfere with agency's ability to fulfill its statutory mandate).  Or BIA*fn* might charge an exorbitant fee to do business with the government.

The FCC must rely on the proper FOIA exemptions to protect outside entities from disclosure of their confidential commercial information that is voluntarily submitted to the Commission.  Disclosure of potentially sensitive commercial information would hinder the FCC's ability to do business with outside entities.  BIA*fn* would be reluctant to do business with the FCC if the FCC could reveal to competitors and/or potential customers detailed and proprietary data that would otherwise be available only for purchase.  If the information is freely available to the public, there is no reason for anyone to purchase it from BIA*fn*, and the value of BIA*fn*'s copyrights effectively will have been reduced to zero.  This information is properly protected from disclosure under FOIA Exemption 4.

## CONCLUSION

For the above stated reasons, the BIA copyrighted materials in question do not comprise agency records under FOIA and, even if they were determined to constitute agency records, they would be exempt from disclosure under FOIA Exemption 4.  For these reasons, Intervenor BIA*fn* submits that the Court should grant BIAfn's motion for summary judgment on the grounds that no genuine issue of material fact exists and that BIA*fn* is entitled to judgment, as a matter of law, that Defendant Federal Communications Commission ("FCC") properly denied Plaintiff's FOIA request insofar as it called for BIA*fn*'s copyrighted data which the FCC had accessed and used pursuant to a software and data license agreement with BIA.

June 12, 2008                          Respectfully submitted,


_____
John H. Korns                    (DC Bar #142745)
BUCHANAN INGERSOLL & ROONEY PC
Suite 300
1700 K Street, NW
Washington, DC  20006-3807
Direct:    (202) 452-7939
General:  (202) 452-7900
Fax:        (202) 452-7989
E-Mail:    john.korns@bipc.com

*Counsel for BIA Financial Network, Inc.*

*#331146-v3*

**INTERVENOR DEFENDANT BIA FINANCIAL NETWORK, INC.'S**

**STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| INSTITUTE FOR PUBLIC REPRESENTATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 07-2092 (JR) |
| FEDERAL COMMUNICATIONS COMMISSION, | ) ) ) | |
| Defendant, | ) ) | |
| - and - | ) ) | |
| BIA Financial Network, Inc. 15120 Enterprise Court Chantilly, VA  20151 | ) ) ) ) | |
| Applicant for Intervention as Defendant. | ) ) ) | |

**INTERVENOR DEFENDANT BIA FINANCIAL NETWORK, INC.'S
STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7(h), Intervenor Defendant BIA Financial Network, Inc. ("BIA*fn*") submits the following statement of material facts as to which there is no genuine issue. BIA Financial Network, Inc. adopts and incorporates herein by reference (a) Defendant FCC's Statement of Material Facts For Which There Is No Genuine Issue insofar as the facts are relevant to BIA*fn*'s Motion for Summary Judgment and (b) Exhibit H to the Declaration of Michael S. Perko ("Perko Declaration"), attached to the Motion of the Defendant Federal Communications Commission ("FCC") for Summary Judgment

1.    BIA*fn* is a financial and strategic consulting and research firm specializing in the acquisition and licensing of a variety of data regarding the broadcasting and communications industries.  Since 1985 BIA*fn* and its predecessors-in-interest have been in the business of acquiring, and licensing access to, and the use of, data re public media. Declaration of Mark R. Fratrik ("Fratrik Decl.") ¶ 4.

2.    In 1996, when the FCC first contracted for an annual license to access and use the data regarding the broadcasting and communications industries, it contracted with BIA Publications, Inc.  Subsequently, that entity's name was changed to BIA Research, Inc. and thereafter BIA Research, Inc. was merged into its parent corporation, BIA Consulting, Inc., which in turn was merged into its parent corporation, BIA Financial Network, Inc. ("BIA*fn*") in approximately May 2001 (and BIA Research, Inc. and BIA Consulting, Inc, ceased to exist).  Pursuant to Virginia law, Virginia Code Ann. §13.1-721 (A)(3) (Michie 1999), this series of transactions vested all the assets and contracts of BIA Publications Inc. in BIA*fn* without impairment, including the BIA Publications Inc. Software License Agreement.  Hereinafter, the term "BIA" alone refers to both BIA Publications, Inc. and BIA Financial Network, Inc.  BIA's copyrighted software for accessing its copyrighted data that was earlier called MasterAccess is more recently called Media Access Pro.  Fratrik Decl. ¶ 5.

3.    The business of BIA with respect to such data is as follows.  BIA provides timely and reliable access to, and use of, over 1,200 fields of data on more than 30,000 broadcast and newspaper organizations in the U.S., Canada and Mexico, including 14,000 radio stations, approximately 10,000 commercial and non-commercial full and low power television stations, and more than 8,000 U.S. daily and weekly newspapers.  Access to daily data updates through BIA's MasterAccess/Media Access Pro software and the internet provides an efficient way for

licensees to obtain updates.  BIA's software permits licensees to research and analyze revenues, ratings, circulation, ownership, transactions, demographics, technical stats and more with respect to public media.  BIA's software also provides the ability to have simultaneous cross-media displays of BIA-acquired data regarding radio, television and newspaper.  Among other data sets, BIA provides access to FCC geographic market reports and population counts for both primary and secondary coverage areas.  Fratrik Decl. ¶ 7.

4.     The BIA data is made available to BIA licensees through BIA's software and data disks, and data updates through the internet as described above.  Generally BIA licenses are for an annual period, although occasionally licenses are negotiated for a particular one-time provision of certain data.  Fratrik Decl. ¶ 8.

5.     To my knowledge, there is no government entity and there is no other business entity that collects or makes available such a breadth of data re public media.  Fratrik Decl. ¶ 9.

6.     BIA uses significant manpower to collect these data on a daily basis. BIA has personnel that make phone calls to all television and radio stations and to daily and weekly newspapers to determine if there are any changes necessary to the database and to update its information.  BIA also monitors trade press and other public notices concerning these broadcast stations and newspapers to determine whether changes to the database are necessary. BIA also monitors the financial conditions of the three media -- radio, television and newspapers -- to determine whether BIA estimates of local market revenues need to be changed.  Thus, BIA incurs substantial expenses to obtain this data.  Fratrik Decl. ¶ 10.

7.     These data are quite valuable to those having a need for them.  BIA does not give such data away for free or make them available to the public.  BIA has less than 400 annual licensees for these data.  BIA charges its clients substantial fees for annual licenses that vary

according to the number of media (among radio, TV and newspaper) for which data are provided and the number of users entitled to access the data at any one time. Fratrik Decl. ¶ 11.

8.    Since 1996, BIA has licensed its software and its radio, television and newspaper data bases to the FCC for multiple FCC users to access and use, subject to the software and data license agreement attached to Mr. Perko's Declaration as Exhibit H. For the license to the FCC for one year beginning March 1, 2006, permitting 50 FCC users at any one time to access its software and its data for radio, TV and newspaper, BIA charged the FCC more than $25,000. Fratrik Decl. ¶ 12.

9.    Even access and use of a one-time dump of <u>non</u> current BIA data is quite valuable. For instance, over the past two years, BIA has licensed use of one-time dumps of certain historical data to at least ten entities (mostly academic institutions) regarding either one medium (e.g., radio only, or television only) for charges between $3,000 and $5,000, or all three media (radio, TV and newspaper) for charges between $8,000 and $10,000. Fratrik Decl. ¶ 13.

10.    All of these transactions have been pursuant to written agreements in which BIA licensed to the client use of its software and specifically defined sets of data, specifying that the software and the data are copyrighted and limiting what the licensee may properly do with the software and data. Fratrik Decl. ¶ 14.

11.    The BIA software and data license agreement entered into in 1996 (attached as Attachment H to the Perko Declaration) ("the License Agreement") provides "The initial term of this agreement will be one year from the date below, however, all terms and conditions will remain in effect throughout all renewal periods that extend beyond the first year." In return for payments of substantial sums, BIA has renewed the FCC's license each year since then, and

therefore the terms of this license agreement continue to govern the extent and limits of the FCC's rights and obligations. Fratrik Decl. ¶ 15.

12.    The Licensing Agreement restricts the FCC as follows:

YOU MAY NOT . . . transfer, . . . or grant any rights in this program, data or accompanying documentation in any form, to any person, except as provided above.

And it also provides the following permission and restrictions on the FCC:

YOU MAY distribute the results of your research . . . to clients . . .

YOU MAY NOT make copies of the . . . data for the purposes of . . . mass distribution to anyone not associated with you, the licensee.

YOU MAY NOT distribute the . . . data files to clients or anyone not directly affiliated with you, the licensee, for the purpose of allowing them to conduct their own searches.

Fratrik Decl. ¶ 16.

13.    The license nowhere  provides that the FCC as a licensee may transfer BIA's licensed data to members of the public. Fratrik Decl. ¶ 17.

14.    And, in the license, the FCC "agree[d] to use reasonable efforts to protect the software and data from unauthorized use, reproduction, distribution or publication."  Thus the license requires the FCC to treat the BIA data as proprietary and confidential. Fratrik Decl. ¶ 18.

15.    The records at issue, according to Mr. Perko's declaration, include BIA-licensed data -- containing information on broadcast stations, including their ownership, market position, audience, and ratings -- which were accessed and obtained by FCC staff members through BIA's software and data disks and the internet, and such data incorporated in FCC memoranda which apply and analyze factual data from several proprietary sources.  As acknowledged by the FCC, these data are covered by the BIA license and copyright, and by the specific prohibition on transfer of, and on granting any rights in, BIA's data absent BIA consent.  Providing such data to

Plaintiff pursuant to Plaintiff's FOIA request is not covered by any exception in the license, and thus providing such data to Plaintiff would violate BIA's rights under the license and copyright. Fratrik Decl. ¶ 19

16.    Further, even if there were no license agreement and the data were merely copyrighted, there would still be no basis under which the FCC could provide the data to Plaintiff pursuant to FOIA.  Such disclosure would not constitute "fair use" of the data.  Ordering the FCC to disclose BIA data pursuant to FOIA would constitute disclosure of BIA data to the world because, if a party can obtain such data pursuant to FOIA, then such party may do anything with the data it wishes (including further distribution) and every other person can also obtain the data pursuant to FOIA.  Such disclosure to Plaintiff would deprive BIA of a valuable potential for sale of rights to use BIA's data pursuant to license.  Fratrik Decl. ¶ 20.

17.    Further, such disclosure pursuant to FOIA would seem to establish a rule that anyone could obtain any of BIA's licensed data from the FCC with a FOIA request.  Given the substantial value of such data, it could be expected that others desiring to obtain BIA's data without paying the fair price would simply use FOIA as a mechanism to do so.  While FOIA may be a slow process, given the value of the data it can be anticipated that others would resort to FOIA to obtain BIA data without paying BIA.  Fratrik Decl. ¶ 21.

18.    BIA is not obligated to license its data to the FCC.  It does so as a commercial matter.  If BIA's data in the hands of the FCC could be obtained by members of the public pursuant to FOIA, in order to prevent the undermining of its market BIA would be required to stop licensing its data to the FCC.  That would cause significant harm to the FCC because the FCC makes substantial use of BIA data in doing its work, and the absence of such data would harm the FCC's ability to carry out its statutory missions.  Fratrik Decl. ¶ 22.

19.    If Plaintiff wishes access to the data, BIA will be pleased to license access and use of such data to Plaintiff pursuant to the same license terms, and at a price comparable to what BIA charges others for licenses for comparable data.   Fratrik Decl. ¶ 23.

June 12, 2008                              Respectfully submitted,

_____

John H. Korns                    (DC Bar #142745)
BUCHANAN INGERSOLL & ROONEY PC
Suite 300
1700 K Street, NW
Washington, DC  20006-3807
Direct:    (202) 452-7939
General:  (202) 452-7900
Fax:        (202) 452-7989
E-Mail:    john.korns@bipc.com

*Counsel for BIA Financial Network, Inc.*

*311544-v1*

# INTERVENOR DEFENDANT BIA FINANCIAL NETWORK, INC.'S

# DECLARATION OF MARK R. FRATRIK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **INSTITUTE FOR PUBLIC REPRESENTATION,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil Action No. 07-2092 (JR)** |
| ) | |
| **FEDERAL COMMUNICATIONS COMMISSION,** ) | |
| ) | |
| Defendant, ) | |
| ) | |
| - and - ) | |
| ) | |
| **BIA Financial Network, Inc.** ) | |
| **15120 Enterprise Court** ) | |
| **Chantilly, VA  20151** ) | |
| ) | |
| **Applicant for** ) | |
| **Intervention as Defendant.** ) | |

## DECLARATION OF MARK R. FRATRIK

1.      My name is Mark R. Fratrik, Ph.D.  I am Vice President of BIA Financial Network, Inc. ("BIA*fn*"), 15120 Enterprise Court, Suite 100, Chantilly, VA 20151, and have been employed by BIA*fn* for approximately seven and a half years.  BIA*fn* is a Virginia corporation.

2.      I make this Declaration in support of BIA*fn*'s Application for Intervention as a Defendant and Motion for Summary Judgment in the above-styled law suit.

3.      BIA*fn* has moved to intervene in this lawsuit as a Defendant, supporting the FCC's position, for two primary reasons:  (a) Only BIA*fn* is in a position to present to the Court the full picture regarding its business, the substantial prices it charges for licenses to access and

use its copyrighted data, and the substantial damage that would be caused to its business by a ruling that members of the public could obtain through FOIA requests -- at zero or minimal cost -- copies of its valuable data; and (b) It is important to demonstrate to the Court that BIA*fn* cares about maintaining the confidentiality of its data and that BIA*fn* supports the FCC's position.

4.    BIA*fn* is a financial and strategic consulting and research firm specializing in the acquisition and licensing of a variety of data regarding the broadcasting and communications industries.    Since 1985 BIA*fn* and its predecessors-in-interest have been in the business of acquiring, and licensing access to, and the use of, data re public media.

5.    In 1996, when the FCC first contracted for an annual license to use the data regarding the broadcasting and communications industries, it contracted with BIA Publications, Inc.    Subsequently, that entity's name was changed to BIA Research, Inc. and thereafter BIA Research, Inc. was merged into its parent corporation, BIA Consulting, Inc., which in turn was merged into its parent corporation, BIA Financial Network, Inc. ("BIA*fn*") in approximately May 2001 (and BIA Research, Inc. and BIA Consulting, Inc, ceased to exist).    Pursuant to Virginia law, Virginia Code Ann. §13.1-721 (A)(3) (Michie 1999), this series of transactions vested all the assets and contracts of BIA Publications Inc. in BIA*fn* without impairment, including the BIA Publications Inc. Software License Agreement.    Hereinafter, the term "BIA" alone refers to both BIA Publications, Inc. and BIA Financial Network, Inc.    BIA's copyrighted software for accessing its copyrighted data that was earlier called MasterAccess is more recently called Media Access Pro.

6.    I have reviewed portions of the Declaration of Michael S. Perko, attached to the Motion of the Defendant Federal Communications Commission ("FCC") for Summary Judgment filed in this case on May 9, 2008, ("Perko Declaration"), to understand generally what the FCC

licensed from BIA that is at issue in this case (downloads of data by FCC Staff from BIA's electronic database, Perko Declaration ¶26) and the FCC's position in this lawsuit.

7.      The business of BIA with respect to such data is as follows. BIA provides timely and reliable access to, and use of, over 1,200 fields of data on more than 30,000 broadcast and newspaper organizations in the U.S., Canada and Mexico, including 14,000 radio stations, approximately 10,000 commercial and non-commercial full and low power television stations, and more than 8,000 U.S. daily and weekly newspapers. Access to daily data updates through BIA's MasterAccess/Media Access Pro software and the internet provides an efficient way for licensees to obtain updates. BIA's software permits licensees to research and analyze revenues, ratings, circulation, ownership, transactions, demographics, technical stats and more with respect to public media. BIA's software also provides the ability to have simultaneous cross-media displays of BIA-acquired data regarding radio, television and newspaper. Among other data sets, BIA provides access to FCC geographic market reports and population counts for both primary and secondary coverage areas.

8.      The BIA data is made available to BIA licensees through BIA's software and data disks, and data updates through the internet as described above. Generally such licenses are for an annual period, although occasionally licenses are negotiated for a particular one-time provision of certain data.

9.      To my knowledge, there is no government entity and there is no other business entity that collects or makes available such a breadth of data re public media.

10.     BIA uses significant manpower to collect these data on a daily basis. BIA has personnel that make phone calls to all television and radio stations and daily and weekly newspapers to determine if there are any changes necessary to the database and to update its

information.  BIA also monitors trade press and other public notices concerning these broadcast stations and newspapers to determine whether changes to the database are necessary.  BIA also monitors the financial conditions of the three media -- radio, television and newspapers -- to determine whether BIA estimates of local market revenues need to be changed.  Thus, BIA incurs substantial expenses to obtain this data.

11.     These data are quite valuable to those having a need for them.  BIA does not give such data away for free or make them available to the public.  BIA has less than 400 annual licensees for these data.  BIA charges its clients substantial fees for annual licenses that vary according to the number of media (among radio, TV and newspaper) for which data are provided and the number of users entitled to access the data at any one time.

12.     Since 1996, BIA has licensed its software and its radio, television and newspaper data bases to the FCC for multiple FCC users to access and use, subject to the software and data license agreement attached to Mr. Perko's Declaration as Exhibit H.  For the license to the FCC for one year beginning March 1, 2006, permitting 50 FCC users at any one time to access its software and its data for radio, TV and newspaper, BIA charged the FCC more than $25,000.

13.     Even access and use of a one-time dump of <u>non</u> current BIA data is quite valuable.  For instance, over the past two years, BIA has licensed use of one-time dumps of certain historical data to at least ten entities (mostly academic institutions) regarding either one medium (e.g., radio only, or television only) for charges between $3,000 and $5,000, or all three media (radio, TV and newspaper) for charges between $8,000 and $10,000.

14.     All of these transactions have been pursuant to written agreements in which BIA licensed to the client use of its software and specifically defined sets of data, specifying that the

software and the data are copyrighted and limiting what the licensee may properly do with the software and data.

15.    The BIA software and data license agreement entered into in 1996 (attached as Attachment H to the Perko Declaration) ("the License Agreement") provides "The initial term of this agreement will be one year from the date below, however, all terms and conditions will remain in effect throughout all renewal periods that extend beyond the first year."  In return for payments of substantial sums, BIA has renewed the FCC's license each year since then, and therefore the terms of this license agreement continue to govern the extent and limits of the FCC's rights and obligations.

16.    The Licensing Agreement restricts the FCC as follows:

YOU MAY NOT . . . transfer, . . . or grant any rights in this program, data or accompanying documentation in any form, to any person, except as provided above.

And it also provides the following permission and restrictions on the FCC:

YOU MAY distribute the results of your research . . . to clients . . .

YOU MAY NOT make copies of the . . . data for the purposes of . . . mass distribution to anyone not associated with you, the licensee.

YOU MAY NOT distribute the . . . data files to clients or anyone not directly affiliated with you, the licensee, for the purpose of allowing them to conduct their own searches.

17.    The license nowhere  provides that the FCC as a licensee may transfer BIA's licensed data to members of the public.

18.    And, in the license, the FCC "agree[d] to use reasonable efforts to protect the software and data from unauthorized use, reproduction, distribution or publication."  Thus the license requires the FCC to treat the BIA data as proprietary and confidential.

19.    The records at issue, according to Mr. Perko's declaration, include BIA-licensed data -- containing information on broadcast stations, including their ownership, market position, audience, and ratings -- which were accessed and obtained by FCC staff members through BIA's software and data disks and the internet, and such data incorporated in FCC memoranda which apply and analyze factual data from several proprietary sources. As acknowledged by the FCC, these data are covered by the BIA license and copyright, and by the specific prohibition on transfer of, and on granting any rights in, BIA's data absent BIA consent. Providing such data to Plaintiff pursuant to Plaintiff's FOIA request is not covered by any exception in the license, and thus providing such data to Plaintiff would violate BIA's rights under the license and copyright.

20.    Further, even if there were no license agreement and the data were merely copyrighted, there would still be no basis under which the FCC could provide the data to Plaintiff pursuant to FOIA. Such disclosure would not constitute "fair use" of the data. Ordering the FCC to disclose BIA data pursuant to FOIA would constitute disclosure of BIA data to the world because, if a party can obtain such data pursuant to FOIA, then such party may do anything with the data it wishes (including further distribution) and every other person can also obtain the data pursuant to FOIA. Such disclosure to Plaintiff would deprive BIA of a valuable potential for sale of rights to use BIA's data pursuant to license.

21.    Further, such disclosure pursuant to FOIA would seem to establish a rule that anyone could obtain any of BIA's licensed data from the FCC with a FOIA request. Given the substantial value of such data, it could be expected that others desiring to obtain BIA's data without paying the fair price would simply use FOIA as a mechanism to do so. While FOIA may be a slow process, given the value of the data it can be anticipated that others would resort to FOIA to obtain BIA data without paying BIA.

22.    BIA is not obligated to license its data to the FCC.  It does so as a commercial matter.  If BIA's data in the hands of the FCC could be obtained by members of the public pursuant to FOIA, in order to prevent the undermining of its market BIA would be required to stop licensing its data to the FCC.  That would cause significant harm to the FCC because the FCC makes substantial use of BIA data in doing its work, and the absence of such data would harm the FCC's ability to carry out its statutory missions.

23.    If Plaintiff wishes access to the data, BIA will be pleased to license access and use of such data to Plaintiff pursuant to the same license terms, and at a price comparable to what BIA charges others for licenses for comparable data.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.


May 2̶8̶, 2008                                          Mark R. Fratrik, Ph.D.

#330974-v3

**ORDER GRANTING MOTION OF
BIA FINANCIAL NETWORK, INC. FOR SUMMARY JUDGMENT**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **INSTITUTE FOR PUBLIC REPRESENTATION,** ) <br> ) <br> ) <br> **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **FEDERAL COMMUNICATIONS COMMISSION,** ) <br> ) <br> ) <br> **Defendant,** ) <br> ) <br> **- and -** ) <br> ) <br> **BIA Financial Network, Inc.** ) <br> **15120 Enterprise Court** ) <br> **Chantilly, VA  20151** ) <br> ) <br> **Applicant for** ) <br> **Intervention as Defendant.** ) <br> ) | **Civil Action No. 07-2092 (JR)** |

**ORDER GRANTING MOTION OF**
**BIA FINANCIAL NETWORK, INC. FOR SUMMARY JUDGMENT**

For the reasons stated in the Memorandum Opinion filed separately and contemporaneously herewith, it is hereby

ORDERED that the Motion for Summary Judgment filed by Intervenor-Defendant BIA Financial Network, Inc., is GRANTED.

IT IS FURTHERED ORDERED that this case is dismissed from the docket of the Court. This is a final appealable order.  *See* Fed. R. App. P. 4(a).

SO ORDERED.

Dated this _____ day of _____, 2008

_____
United States District Judge

*#331848-v1*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 12th day of June, 2008, I caused to be served by electronic mail, in conjunction with electronic filing with this Court, the foregoing Motion for Summary Judgment, Memorandum of Points and Authorities in Support Thereof, Statement of Material Facts as to Which There is No Genuine Issue, Declaration of Mark R. Fratrik, and proposed Order, on behalf of Intervenor Defendant BIA Financial Network, Inc. ("BIA*fn*") on the following:

David C. Vladeck
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue, NW
Room 312
Washington, DC  20001
     E-mail:  vladeckd@law.georgetown.edu

Judith A. Kidwell
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Room 4818
Washington, DC  20530
     E-mail:  judith.a.kidwell@usdoj.gov


_____
John H. Korns                (DC Bar #142745)


*#331619-v2*